1

2

3

4

5

6

7 IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

8

9

10

11 JOHN RAPP, in his Personal Capacity and as
Personal Representative of the Estate of

12 NICHOLAS WINTON RAPP, deceased; N.R.,
by and through parent and guardian MEGAN F.

13 WABNITZ; and JUDITH RAPP, in her
Personal Capacity,

14

Plaintiffs,

15

v.

16

NAPHCARE, INC., an Alabama Corporation;

17 KITSAP COUNTY, a political subdivision of
the State of Washington; GARY SIMPSON, in

18 his personal capacity; JOHN GESE, in his
Personal Capacity; MARK RUFENER, in his

19 Personal Capacity; JIM MCLANE, in his
Personal Capacity; SUSANNE MOORE, in her

20 Personal Capacity; MARSHA BURGES, in her
Personal Capacity; AMBER H. SIMPLER, in

21 her Personal Capacity; JEFFREY ALVAREZ,
in his Personal Capacity; BRADFORD T.

22 MCLANE, in his Personal Capacity;
CORNELIUS HENDERSON, in his Personal

23 Capacity; GINA SAVAGE, in her Personal
Capacity; ODESSA MCCLEARY, in her

24 Personal Capacity; ERICA MOLINA, in her
Personal Capacity; BRANDON ROHDE, in his

NO. _____

COMPLAINT

JURY DEMANDED

25

COMPLAINT - 1

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Personal Capacity; ANDREW HREN, in his Personal Capacity; ELVIA DECKER, in her Personal Capacity; BRUCE KARL, in his Personal Capacity; SCOTT MORAN, in his Personal Capacity; ALANNA SANDACK, in her Personal Capacity; HAVEN LADUSTA, in her Personal Capacity; RIPSY A. NAGRA, in her Personal Capacity; AMANDA LACOMBE, in her Personal Capacity; JERRY RANDALL, in his Personal Capacity; MERILE MONTGOMERY, in his Personal Capacity; JOHN and JANE DOES 1-10, in their Personal Capacities,

Defendants.

COMES NOW the above-named Plaintiffs, by and through attorneys Gabriel S. Galanda and Ryan D. Dreveskracht, of Galanda Broadman, PLLC, and by way of claim alleges upon personal knowledge as to themselves and their own actions, and upon information and belief upon all other matters, as follows:

## I.    INTRODUCTION

1.    Suicide has been the leading cause of death in prisons every year since 2000.[1]  This risk is disproportionately high among inmates who are mentally ill.  And mentally ill inmates are a demographic that has risen dramatically in recent years,[2] representing what many researchers have deemed "a national public health crisis."[3]  These are facts that are well known to reasonable corrections management, staff, and healthcare providers.[4]

2.    It is also well known that this crisis is not insurmountable.  Utilizing knowledge of the factors that put inmates at an increased risk of suicide, reasonable corrections administrators

---

[1] MARGARET NOONAN, HARLEY ROHLOFF, AND SCOTT GINDER, U.S. DEP'T OF JUSTICE – BUREAU OF JUSTICE STATISTICS, MORTALITY IN LOCAL JAILS AND STATE PRISONS 1 (2015).
[2] E. FULLER TORREY, ET AL., THE TREATMENT OF PERSONS WITH MENTAL ILLNESS IN PRISONS AND JAILS 17 (2014).
[3] Jacques Baillargeon, *Psychiatric Disorders and Repeat Incarcerations*, 166 AM. J. PSYCHIATRY 103, 103 (2009).
[4] WORLD HEALTH ORGANIZATION, PREVENTING SUICIDE IN JAILS AND PRISONS (2007); Anasseril E. Daniel, *Care of the Mentally Ill in Prisons*, 35 J. AM. ACAD. PSYCHIATRY LAW 406 (2007).

COMPLAINT - 2

formulate mental health and suicide prevention policies that target these dynamics.  And if adequate supervision and training is implemented, it is more likely than not that corrections staff can prevent a majority of these suicides.

3.     Here, though, none of that happened.   Defendant Kitsap County and its administrators and subcontractors maintained and established inadequate practices and failed to train and supervise its employees.  As a result, numerous inmates have died.  During Nicholas Rapp ("Nick")'s detainment at the Kitsap County Jail, there were multiple exchanges where his serious mental illness and suicidality was known, or should have been known, and where appropriate treatment and interventions should have occurred, but did not.  Defendants' acts and omissions set into motion a particularly unfortunate series of events that resulted in Nick's death—what might glibly be referred to as a "comedy of errors" had it not involved such a tragedy.

## II.     PARTIES

**A.   PLAINTIFFS**

4.     JOHN RAPP is the Personal Representative for the Estate of NICHOLAS WINTON RAPP and Nick's biological father.  This is an action arising from Nick's wrongful and unnecessary death and the Defendants' negligence, gross negligence, and deliberate indifference to Nick's serious medical condition and conditions of confinement.  The claims herein include all claims for damages available under Washington and federal law to Nick, his Estate, and all statutory and actual beneficiaries, including his parents and minor child.

5.     N.R., by and through parent and guardian MEGAN F. WABNITZ, is Nick's minor child.  She brings suit in her Personal Capacity and is entitled to damages for the loss of her father.

6.     JUDITH RAPP is Nick's biological mother.  She brings suit in her Personal Capacity and is entitled to damages for the loss of her adult son.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**B.      KITSAP COUNTY DEFENDANTS**

7.      Defendant KITSAP COUNTY is a municipal corporation responsible for administering the Kitsap County Jail ("Jail").  The Jail is an adult corrections facility that is required to provide proper custody, control, and supervision for county, state, and federal inmates in Kitsap County.  Kitsap County is, and was at all times mentioned herein, responsible for the actions or inactions, and the policies, procedures, and practices/customs of all health services relating to the Jail, including the provision of psychiatric and medical treatment at outside facilities when necessary.  Although Kitsap County has attempted to privatize the provision of healthcare services to Defendant NAPHCARE, INC., it cannot contract-away its constitutional obligations and is legally liable for the negligence and constitutional violations committed by such providers.

8.      Defendant GARY SIMPSON is the Kitsap County Sheriff.  He supervised, administrated, and managed all Kitsap County employees and corrections facilities at the time of Nick's death, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training.  Defendant Simpson was also responsible for the training, supervision, and discipline of Kitsap County employees and/or agents, including the below individually named Kitsap Jailer Defendants and John and Jane Does 1 through 5.  He is sued in his personal capacity only.

9.      Defendant JOHN GESE is Kitsap County's Undersheriff.  He supervised, administrated, and managed all Kitsap County employees and corrections facilities at the time of Nick's injuries, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training.  Defendant Gese was also responsible for the training, supervision, and discipline of Kitsap County employees and/or agents, including the below individually named Kitsap Jailer Defendants and John and Jane Does 1 through 5.  He is sued in his personal capacity only.

COMPLAINT - 4

10.     Defendant MARK RUFENER is Kitsap County's Chief of Corrections.   He supervised, administrated, and managed all Kitsap County employees and corrections facilities at the time of Nick's death, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training.  Defendant Rufener was also responsible for the training, supervision, and discipline of Kitsap County employees and/or agents, including the below individually named Kitsap Jailer Defendants and John and Jane Does 1 through 5.  He is sued in his personal capacity only.

11.     Defendants Simpson, Gese, and Rufener shall be referred to collectively as "Kitsap Policymaking Defendants."  At all material times, each Kitsap Policymaking Defendant acted under color of law and was a state actor.

12.     Defendants BRANDON ROHDE, ANDREW HREN, ELVIA DECKER, AMANDA LACOMBE, and JERRY RANDALL ("Kitsap Defendants") at all times material to this lawsuit were employees of Kitsap County and were responsible for providing for Nick's safety and security.   Kitsap Jailer Defendants knew that Nick suffered from serious mental health conditions and was in need of medical and mental health assistance but were deliberately indifferent to his serious medical condition and/or were otherwise negligent.  At all times, Kitsap Defendants were agents and/or employees of Kitsap County and were responsible for keeping Nick safe and alive leading up to and during his incarceration.  At all material times, Kitsap Defendants were acting under color of state law.  The actions and omissions alleged in this Complaint to have been carried out by the Kitsap Defendants were carried out by themselves, personally, and/or with their knowledge, information, consent, or approval, and in violation of their obligations under*, inter alia*, the U.S. Constitution and Washington State common law.

13.     Defendants JOHN and JANE DOES 1 - 5 are subcontractors, employees, and/or agents of Kitsap County.  These Kitsap Defendants Doe are persons who knew that Nick was (1)

COMPLAINT - 5

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

in the need of medical care; (2) suicidal; (3) in the midst of a mental health crisis; and/or (4) was housed in unconstitutional conditions of confinement.  In spite of this knowledge, these Kitsap Defendants Doe took no steps to prevent serious injury and death to Nick.  Each Kitsap Defendant Doe was negligent; deliberately indifferent; acted in furtherance of an official and/or *de facto* policy or procedure of deliberate indifference; and/or was responsible for the promulgation of the policies and procedures and permitted the customs/practices pursuant to which the acts alleged herein were committed.  The identities of Kitsap Defendants Doe are unknown at this time and will be named as discovery progresses.  These Kitsap Defendants Doe are sued in their personal capacities only.

**C.   NAPHCARE, INC. DEFENDANTS**

14.     Defendant NAPHCARE, INC. ("NaphCare") is a limited partnership organized under the laws of the State of Alabama, licensed and doing business in the State of Washington as a foreign for-profit corporation.

a.     NaphCare is in the business of providing healthcare services to jail and prison facilities throughout the United States, including the Kitsap County Jail.  That is, instead of maintaining their own staff of doctors, nurses, and other health professionals, corrections facilities across the Nation hire NaphCare as an independent contractor to undertake the day-to-day responsibilities of providing their inmates with medical and mental healthcare.

b.     The services provided by NaphCare range from physician and nursing services, dental care, mental health/psychiatric care, pharmaceuticals, utilization management, and administrative support.

c.     The Jail has such an arrangement with NaphCare, as do various institutions in the 23 states that NaphCare has entered into fixed-cost contracts with.  These contracts are structured to provide an incentive to minimize the cost of care for the corrections

COMPLAINT - 6

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

institutions—and to maximize profits NaphCare's profits.   Last year, for instance, NaphCare took in roughly $300 million in annual revenue.

       d.     The County's contract with NaphCare required that the County pay over $3.1 million for NaphCare's services for calendar year 2019.   In return, NaphCare guaranteed that its services would comport with "applicable Standards," defined as follows:

"Standards" means the requirement that all Health Care Services provided under the Contract meet or exceed all recognized standards of care for the provision of health care by qualified health care professionals in Washington state, and provided in accordance with all standards and requirements of the U.S. and State Constitutions, federal, state and local laws, Chapter 70.45 RCW, Chapter 2.21 Kitsap County Code, the American Medical Association, American Psychiatric Association, American Psychological Association, and the accreditation standards of the [American Correctional Association], [National Commission on Correctional Health Care Accreditation], and [Washington Association of Sheriffs and Police Chiefs], now in effect and as amended during the Contract term regardless as to whether such standards are specifically referred to by the County.

       e.     According to Defendant Jim MCLANE, NaphCare's Founder, Owner, and Chairman of the Board, NaphCare is so profitable because it puts up "barriers so that [inmates] do not avail themselves to unnecessary treatment."[5]

       f.     NaphCare has been on notice for over a decade that its procedures, practices, and customs are deliberately indifferent to the rights and safety of inmates—having been a named defendant in over 250 lawsuits for this precise conduct.

       g.     NaphCare has a long, documented history of civil rights and medical negligence suits against them, and a body count arising from substandard medical care and neglect in Alabama, Nevada, Virginia, Texas, and Washington jails and prisons.

       h.     According to a 2019 report: "NaphCare regularly swoops in to take over troubled providers' contracts in the wake of scandal."[6]   This is exactly what occurred here,

---

[5] Jenifer Park, *NaphCare Inc.: Prisons, Jails are its Marketplace*, BIRMINGHAM BUSINESS JOURNAL, May 7, 2000, *available at* https://www.bizjournals.com/birmingham/stories/2000/05/08/focus4.html.
[6] Tara Herivel, *Profits and Preventable Deaths in Oregon Jails*, STREET ROOTS, Jan. 18, 2019, *available at* https://www.streetroots.org/news/2019/01/18/profits-and-preventable-deaths-oregon-jails.

COMPLAINT - 7

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

when in the fall of 2018, Kitsap County ended its contract with Correct Care Solutions following a string of inmate deaths.[7]  This is typically followed by "a spike in jail deaths."[8]  Which is exactly what occurred here, when three inmates died in the first year of if its contract due to NaphCare's failure to implement basic suicide prevention measures—Nick being the third.

i.      In providing medical and mental health care for inmates, NaphCare was acting under the color of state law.

j.      NaphCare is duly registered and conducts business as a health care provider in Washington state as defined by RCW 7.70 *et seq.*, and provided mental health services and medical care to Nick, as contracted for by Defendant Kitsap County.

15.    Defendant JIM MCLANE is the Founder, Owner, and Chairman of the Board for NaphCare.  In that position, Defendant McLane is responsible for establishing and has final approval on policies, procedures, and practices for NaphCare; oversees the delivery of medical, mental health and dental care in all NaphCare-served facilities, including standards of medical care and utilization review; and works with the key stakeholders across the Nation in ensuring that NaphCare turns a profit, at patient expense.  As a policymaker, Defendant McLane set in place an established practice of putting profit over care and putting vulnerable patients at risk of serious harm or death. This established practice was due to his deliberate indifference to these detainees. He acted in a tortious and constitutionally violative fashion in formulating, administering, and ratifying policies, procedures, practices, and customs within NaphCare that are deliberately indifferent to the rights and safety of pretrial detainees.  He is sued in his personal capacity only.

---

[7] *Following Lawsuits, County and Jail's Medical Provider Part Ways*, KITSAP DAILY NEWS, Sept. 11, 2018, *available at* https://www.kitsapdailynews.com/news/following-lawsuits-county-and-jails-medical-provider-part-ways/.
[8] HOLLY WELBORN, ET AL., YOUTH CONFINEMENT IN NEVADA: FACILITY ASSESSMENT AND RECOMMENDATIONS FOR HOUSING YOUTH SENTENCED AS ADULTS 11 (2018).

COMPLAINT - 8

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

16.     Defendant SUSANNE MOORE is the Executive Vice President & Chief Operating Officer at NaphCare.  In that position, Defendant Moore is responsible for establishing and has final approval on policies, procedures, and practices for NaphCare; oversees the delivery of medical, mental health and dental care in all NaphCare-served facilities, including standards of medical care and utilization review; and works with the key stakeholders across the Nation in ensuring that NaphCare turns a profit, at patient expense.  As a policymaker, Defendant Moore set in place and furthered an established company-wide practice of putting profit over care and putting vulnerable patients at risk of serious harm or death. This established practice was due to her deliberate indifference to these detainees.  She acted in a tortious and constitutionally violative fashion in formulating, administering, and ratifying policies, procedures, practices, and customs within NaphCare that are deliberately indifferent to the rights and safety of pretrial detainees.  She is sued in her personal capacity only.

17.     Defendant MARSHA BURGES is the Chief Nursing Officer at NaphCare.  In that position, Defendant Burges is responsible for establishing and has final approval on policies, procedures, and practices for NaphCare; oversees the delivery of nursing care in all NaphCare-served facilities, including standards of medical care and utilization review; and works with the key stakeholders across the Nation in ensuring that NaphCare turns a profit, at patient expense.  As a policymaker, Defendant Burges set in place and furthered an established company-wide practice of putting profit over care and putting vulnerable patients at risk of serious harm or death. This established practice was due to her deliberate indifference to these detainees.  She acted in a tortious and constitutionally violative fashion in formulating, administering, and ratifying policies, procedures, practices, and customs within NaphCare that are deliberately indifferent to the rights and safety of pretrial detainees.  She is sued in her personal capacity only.

COMPLAINT - 9

18.     Defendant AMBER H. SIMPLER is the Chief Psychologist at NaphCare.  In that position, Defendant Simpler is responsible for establishing and has final approval on policies, procedures, and practices for NaphCare; oversees the delivery of mental healthcare in all NaphCare-served facilities, including standards of care and utilization review; and works with the key stakeholders across the Nation in ensuring that NaphCare turns a profit, at patient expense.  As a policymaker, Defendant Burges set in place and furthered an established company-wide practice of putting profit over care and putting vulnerable patients at risk of serious harm or death. This established practice was due to her deliberate indifference to these detainees.  She acted in a tortious and constitutionally violative fashion in formulating, administering, and ratifying policies, procedures, practices, and customs within NaphCare that are deliberately indifferent to the rights and safety of pretrial detainees.  She is sued in her personal capacity only.

19.     Defendant JEFFREY ALVAREZ is the Chief Medical Officer at NaphCare.  In that position, Defendant Alvarez is responsible for establishing and has final approval on policies, procedures, and practices for NaphCare; oversees the delivery of medical care in all NaphCare-served facilities, including standards of medical care and utilization review; and works with the key stakeholders across the Nation in ensuring that NaphCare turns a profit, at patient expense.  As a policymaker, Defendant Alvarez set in place and furthered an established company-wide practice of putting profit over care and putting vulnerable patients at risk of serious harm or death. This established practice was due to his deliberate indifference to these detainees.  He acted in a tortious and constitutionally violative fashion in formulating, administering, and ratifying policies, procedures, practices, and customs within NaphCare that are deliberately indifferent to the rights and safety of pretrial detainees.  He is sued in his personal capacity only.

20.     Defendant BRADFORD T. MCLANE is the Chief Executive Officer at NaphCare. In that position, Defendant McLane is responsible for establishing and has final approval on

COMPLAINT - 10

1    policies, procedures, and practices for NaphCare; oversees the delivery of medical and mental

2    healthcare in all NaphCare-served facilities, including standards of medical care and utilization

3    review; and works with the key stakeholders across the Nation in ensuring that NaphCare turns a

4    profit, at patient expense.  As a policymaker, Defendant McLane set in place and furthered an

5    established company-wide practice of putting profit over care and putting vulnerable patients at risk

6    of serious harm or death. This established practice was due to his deliberate indifference to these

7    detainees.   He acted in a tortious and constitutionally violative fashion in formulating,

8    administering, and ratifying policies, procedures, practices, and customs within NaphCare that are

9    deliberately indifferent to the rights and safety of pretrial detainees.  He is sued in his personal

10   capacity only.

11          21.     Defendant CORNELIUS HENDERSON is NaphCare's Senior Vice President of

12   Jail Operations.  In that position, Defendant Henderson is responsible for establishing and has final

13   approval on policies, procedures, and practices for NaphCare; oversees the delivery of medical,

14   mental health, and dental care in all NaphCare-served facilities, including standards of medical care

15   and utilization review; and works with the key stakeholders across the Nation in ensuring that

16   NaphCare turns a profit, at patient expense.  As a policymaker, Defendant Henderson set in place

17   and furthered an established company-wide practice of putting profit over care and putting

18   vulnerable patients at risk of serious harm or death. This established practice was due to his

19   deliberate indifference to these detainees.  He acted in a tortious and constitutionally violative

20   fashion in formulating, administering, and ratifying policies, procedures, practices, and customs

21   within NaphCare that are deliberately indifferent to the rights and safety of pretrial detainees.  He

22   is sued in his personal capacity only.

23          22.     Defendant GINA SAVAGE is NaphCare's Vice President of Administration.  In that

24   position, Defendant Savage is responsible for establishing and has final approval on policies,

25

COMPLAINT - 11

procedures, and practices for NaphCare; oversees the delivery of medical, mental health, and dental care in all NaphCare-served facilities, including standards of medical care and utilization review; and works with the key stakeholders across the Nation in ensuring that NaphCare turns a profit, at patient expense.  As a policymaker, Defendant Savage set in place and furthered an established company-wide practice of putting profit over care and putting vulnerable patients at risk of serious harm or death. This established practice was due to his deliberate indifference to these detainees. She acted in a tortious and constitutionally violative fashion in formulating, administering, and ratifying policies, procedures, practices, and customs within NaphCare that are deliberately indifferent to the rights and safety of pretrial detainees.  She is sued in her personal capacity only.

23.    Defendants McLain, Moore, Burges, Simpler, Alvarez, McLane, Henderson, and Savage shall be referred to collectively as "NaphCare Policymaking Defendants."  At all material times, each NaphCare Policymaking Defendant acted under color of law and was a state actor.

24.    Individually named Defendants ODESSA MCCLEARY, ERICA MOLINA, BRUCE KARL, SCOTT MORAN, ALANNA SANDACK, HAVEN LADUSTA, and RIPSY A. NAGRA ("NaphCare Defendants") are employees or subcontractors of NaphCare.  They were at all times state actors.  These NaphCare Defendants knew that Nick was (1) in the need of medical care; (2) suicidal; (3) in the midst of a mental health crisis; and/or (4) was housed in unconstitutional conditions of confinement.  In spite of this knowledge, these NaphCare Defendants took no steps to prevent serious injury and/or death to Nick.  These NaphCare Defendants were negligent; deliberately indifferent; and/or acted in furtherance of an official and/or *de facto* policy or procedure of deliberate indifference.  These Defendants are sued in their personal capacities only.

25.    Defendants JOHN and JANE DOES 5 - 10 are subcontractors, employees, and/or agents of NaphCare.  These NaphCare Defendants Doe are persons who knew that Nick was (1) in the need of medical care; (2) suicidal; (3) in the midst of a mental health crisis; and/or (4) was

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

housed in unconstitutional conditions of confinement.  In spite of this knowledge, these NaphCare

Defendants Doe took no steps to prevent serious injury and death to Nick.  Each NaphCare

Defendant Doe was negligent; deliberately indifferent; acted in furtherance of an official and/or *de*

*facto* policy or procedure of deliberate indifference; and/or were responsible for the promulgation

of the policies and procedures and permitted the customs/practices pursuant to which the acts

alleged herein were committed.  The identities of NaphCare Defendants Doe unknown at this time

and will be named as discovery progresses.  These NaphCare Defendants Doe are sued in their

personal capacities only.

## III.   JURISDICTION AND VENUE

26.     This action arises under Washington State's wrongful death law and the Constitution

and laws of the United States, including 42 U.S.C. § 1983, the Americans with Disabilities Act, 42

U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794.  This Court has subject matter

jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims

pursuant to 28 U.S.C. § 1367.

27.     Venue is proper in the Western District of Washington pursuant to 28 U.S.C.§

1391(b)(1) and (b)(2).  Kitsap County is located in this District, and the events and omissions giving

rise to the claims in this action occurred in this District.

28.     An RCW 4.92.100 Tort Claim was properly and timely filed with the Kitsap County

on April 9, 2021.  Over sixty calendar days have elapsed since the claim was presented.

## IV.   FACTS

A.   **BACKGROUND**

29.     Nick began receiving Medication-Assisted Treatment ("MAT") for opioid addiction

at Peninsula Community Health in mid-March of 2019.  He had been using at least approximately

1 gram of heroin a day for over a decade, and—after numerous overdoses—he was ready to quit.

COMPLAINT - 13

30.   Nick was stabilized with Suboxone (buprenorphine and naloxone) and prescribed 4ml of Vivitrol (naltrexone), to be injected at the Port Orchard Behavioral Health every four weeks.

31.   Nick relapsed in May, and in June reported that he was "not doing well," did not have "any fight left," was "really struggling," and was continuing to use heroin when he felt that the Vivitrol had somewhat worn off.

32.   By July of 2019, Nick was off of Vivitrol and using heroin and alcohol daily, and benzodiazepines intermittently.

33.   In August, though, Nick had picked himself back up and began another MAT program at Peninsula Community Health with Suboxone.

34.   On September 4, 2019, Kitsap Mental Health Services [9] conducted an Intake/Assessment of Nick.  He reported that he had "infrequent suicidal thoughts" and that "he attempted suicide in 2008 and 2013 by means of suffocation."

35.   Nick also reported "a history of depression" and "loneliness, hopelessness, and thoughts related to self-harm."  At the time, he was taking Mirtazapine (anti-depressant) and Seroquel (antipsychotic).

**B.   DECEMBER 31, 2019**

36.   On December 31, 2019, Nick called his partner, Megan Wabnitz—who is also a nurse at the Jail and employee of NaphCare—and told her that he was suicidal.  Although Nick was obviously intoxicated, Megan picked him up and drove him to her house, fearing for his safety. Nick had recently attempted suicide by hanging, so Megan knew he was serious.

37.   At some point, Nick and Megan got into an argument, which escalated into a potential domestic violence situation.  At 10:00 p.m., Nick was arrested by Kitsap County Sheriff's Deputies Brandon Rohde and Andrew Hren.  It was his first time ever being arrested.

---

[9] Kitsap Mental Health Services is the Jail's contracted mental health provider.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

38.     Nick was, according to Deputy Hren, "extremely intoxicated," having "nodded off numerous times" during the arrest and telling the deputies that "he was really drunk."

39.     <u>Megan informed both Deputies Rohde and Hren that she was worried because of Nick's expressed suicidal ideations just hours earlier, and that he had recently attempted suicide by hanging.</u>  Giving her training and experience, <u>she deemed Nick acutely suicidal, and informed the arresting officers of this.</u>

40.     When he arrived at the Jail at 10:45 p.m.—his first time ever being incarcerated—Deputy Rohde filled out the Arrest and Booking Information sheet, which explicitly states: "It is very important the jail have this information in order to assure we make appropriate custody and care decisions for your arrested subject."

41.     Deputy Rohde answered the Arrest and Booking Information sheet as follows:

**During your contact with the arrestee has he/she…**
*'Please answer to the best of your ability.  If "yes" – explain by the question or on the bottom of this form.)*

| | | | |
|---|---|---|---|
| 1 | Y | N | engaged in any assaultive or violent behavior? |
| 2 | Y | N | attempted to elude or escape from custody? |
| 3 | Y | N | sustain a dog bite? |
| 4 | Y | N | demonstrated any behaviors that might suggest they may be developmentally disabled? |
| 5 | Y | N | demonstrated any behaviors that might suggest suicidal tendencies? |
| 6 | Y | N | demonstrated any behaviors that might suggest mental illness? |
| 7 | Y | N | demonstrated any behaviors that might suggest acquired brain injury (trauma to the head)? |
| 8 | Y | N | demonstrated any communication difficulties (such as language barriers)? |

**Are you aware…**
*(Please answer to the best of your ability.  If "yes" – explain by the question or on the bottom of this form.)*

| | | | |
|---|---|---|---|
| 9 | Y | N | of this arrestee's consumption or use of a potentially dangerous level of alcohol and/or drugs? |
| 10 | Y | N | of any acute medical condition or injury sustained by this arrestee that may require immediate medical attention? |
| 11 | Y | N | of the need to keep this arrestee separated from others housed in this facility? |

| | | | |
|---|---|---|---|
| 12 | Y | N | Do you have any other information that may assist this agency in the care and/or custody of this arrestee? |
| 13 | Y | N | Has your search of this arrestee uncovered any dangerous contraband such as drugs or weapons? |

42.     Nick was booked into the jail at 11:00 p.m. by Officer Elvia Decker.

43.     Deputy Rhode answered the Accept / Do Not Accept Questions as follows, and the Jail accepted him into custody without a Fit for Jail examination:

COMPLAINT - 15

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

| 1 | Y | N | Does The arrestee have any observable medical problems or injuries? |
| 2 | Y | N | Did the arrestee ever lose consciousness? |
| 3 | Y | N | Does the arrestee have any observable mental health problems? |
| 4 | Y | N | Does the arrestee show any signs of suicidal behavior or attempts? |
| 5 | Y | N | Is the arrestee intoxicated? Level_____ |
| 6 | Y | N | Does the transporting officer have any other information, which we need to know concerning this arrestee? |

Accept _____✗_____   Not Accept _____   Date and Time 12-31-19   2301

Note – A "yes" in #1, 2, 3, 4, or 5 requires the **Medical Notification** section to **be** filled out

**C.     JANUARY 1, 2019**

44.     At 2:11 a.m., NaphCare employee Odessa McCleary, RN, conducted Nick's Receiving Screening.

**GENERAL MENTAL HEALTH ASSESSMENTS–Select and Document all that apply**

45.     According to the form filled by Nurse McCleary, the arresting officer did not provide the requested information, including whether the officer had information pertaining to any "current/recent suicidal ideation when it occurred, and what treatments/drugs or alcohol."

**Mental Health History**

**List diagnosis, location, when it occurred, and what treatments below**

46.     Other than the fact that Nick "denie[d] any alcohol, illegal drug or prescribed medications use," the five-page form was largely blank.

**Please provide location, when and reason below**

47.     Notably blank was the only check-box pertaining to suicide on the Receiving Screening form:

☐ Past suicide attempts, strong plans, or treatment for attempts

**NAPHCARE068**

48.     Based on this assessment, Nurse McCleary assigned Nick to General Population housing.

49.     At 2:28 a.m., Nick informed Nurse McCleary that he was "detoxing" from alcohol, heroin, methamphetamine, and MDMA.[10]

50.     In response, Nurse McCleary put in a plan for Nick to undergo Clinical Institute Withdrawal Assessment for Alcohol ("CIWA-Ar") and Clinical Opiate Withdrawal Score ("COWS") assessments.

---

[10] This was later confirmed by his drug screen test.

COMPLAINT - 16

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    51.    The first COWS, allegedly conducted by Nurse McCleary, rated Nick at a "1." The

2    CIWA-Ar that Nurse McCleary allegedly conducted rated Nick at a "0."  The box under the

3    question "Do you currently have thoughts of self-harm or suicide" was marked "No" on both forms.

4    The Comprehensive Detox Screen, also conducted by Nurse McCleary, indicated that Nick drank

5    alcohol more than 5 days a week (and had more than five drinks each time), and that he was a daily

6    heroin user.

7    52.    Nurse McCleary also allegedly conducted Nick's Mental Health Screening.  The

8    sole entry on the five-page form, predominantly dedicated to identifying suicide risk, was as

9    follows:

10

**9) How does the inmate feel about the current situation?**

11   "I feel awesome." Stated fasiciously

12   53.    Nurse McCleary then re-assigned Nick to general population housing, but noted that

13   he needed "special care" and to be on a "detox watch" until January 6, 2020.

14   54.    Before being sent to a solitary cell, Nick was informed that if he wanted any further

15   medical or mental health assistance, he would have to pay for it—an integral component of the

16   NaphCare for-profit scheme:

17       For non-chronic care requests, the medical access fee process begins with the sick
         call/charge nurse assessment of the problem. . . . [I]f medication is prescribed or
18       renewed by the sick call/charge nurse or physician, there will be an additional
         medication fee assessed.  If an inmate requests emergency care that is determined
19       not to be an emergency condition, that inmate may be charged a Medical Access Fee
         for calling a false emergency.

20   55.    At 2:37 a.m., NaphCare employee Bruce Karl, LPN, allegedly conducted another

21   COWS.  Because Nick was sweaty, had enlarged pupils, was feeling aches in his bones, NAPHCARE 048

22   and was yawning, Nurse Karl rated him at a 6.  His CIWA-Ar was an 8, for largely the same reasons.

23   The box to indicate whether Nick currently had thoughts of self-harm or suicide was marked "No"

24   on both assessments.

25

COMPLAINT - 17

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

56. Subsequently, nurse practitioner and NaphCare employee Scott Moran, ordered that Nick receive three 25 milligram capsules of the benzodiazepine Chlordiazepoxide (Librium) daily.

57. Dr. Alanna Sandack, also a NaphCare employee, put in orders for Ondansetron (Zofran), Levetiracetam, Loperamide, and Dicyclomine. Dr. Sandack also ordered that Nick undergo a neurological assessment two times daily.

58. At 10:49 a.m., Nick refused his dose of Librium, instead requesting a buprenorphine (Subutex). At 1:59 p.m., however, Nick took two Librium tabs.

**D.    JANUARY 2, 2019**

59. At 2:22 a.m., NaphCare employee Haven LaDusta, LPN, allegedly attempted to conduct COWS and CIWA-Ar assessments on Nick, but could not because he was sleeping.

60. LaDusta indicated on the COWS and CIWA-Ar paperwork that Nick did not currently have thoughts of self-harm or suicide, but it is unknown how she came to this conclusion, since Nick was sleeping.

61. Megan arrived at work at roughly 7:00 a.m. and was shocked to see that Nick was not on a suicide precaution protocol, given what she had told the arresting officers.

62. Megan immediately sent her NaphCare supervisor, Health Services Administrator ("HSA") Erica Molina, an email explaining that she could not work on the side of the Jail where Nick was housed because Nick was N.R.'s father and because there had been a domestic violence incident the previous night.

63. Megan also informed HSA Molina and her coworker, Ripsy Amninder Nagra, LPN, that Nick had recently attempted suicide by hanging and that Nick was likely acutely suicidal.

64. This information was relayed to other NaphCare and Kitsap County employees, who chose to treat Nick with indifference, due to his rumored assault on their coworker.

COMPLAINT - 18

65.     At around 10:40 a.m., Nick told his parents on a phone call, "I'm done" and "I just won't make it in here." He also described his solitary cell as "a 22 hour lockdown" and his detox treatment as "nothing, you just lie in bed. That's it."

66.     At 10:39 a.m., Nurse Nagra entered into Nick's chart that she conducted a CIWA-Ar, writing that Nick was experiencing tremors, paroxysmal sweats, and again requested Subutex. He was rated a 3 and the box asking whether the patient currently has "thoughts of self-harm or suicide" is checked "No."

67.     At 10:46 a.m., Ms. Nagra entered into Nick's chart that she conducted a COWS, and Nick was rated a 3. Ms. Nagra also noted that Nick was again requesting Subutex. The box asking whether the patient currently has "thoughts of self-harm or suicide" is checked "No."

68.     At 12:49 p.m., Ms. Nagra entered into Nick's chart that she conducted another COWS, this time rating Nick at a 4, and again checking the "thoughts of self-harm or suicide" box as a "No." Nick's CIWA-Ar this time was a 1, and the "thoughts of self-harm or suicide" box was likewise marked "No."

69.     In reality, Nurse Nagra did not conduct at least a majority of the CIWA-Ar or COWS for Nick. She filled these forms out at the nurse's station, without actually interacting with him. Nurse Nagra was retaliating against Nick for allegedly attacking her friend, Megan, and did not want to go back into the unit to provide Nick with the medication indicated by his actual symptoms and that he was requesting.

70.     According to a log created by Kitsap County Officers, cell checks were allegedly conducted in Central A, the tank that Nick was housed in, at 12:54 p.m. and 1:27 p.m.:

COMPLAINT - 19

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

71.     These time entries are suspicious, though, especially given that many of the Kitsap Defendants have admitted in private that they either did not do the checks or, even worse, that they intentionally treated Nick with contempt because of what he had allegedly done to Megan.

72.     It appears that Officers Amanda LaCombe and Jerry Randall were assigned to the tank. [illegible] is likely LaCombe and [illegible] is likely Randall.

73.     In a sworn statement, however, Randall says that he was assigned to Central B, not Central A.

74.     LaCombe was in Central D when the incident occurred.

75.     Neither Randall, Lacombe, nor Officer Merile Montgomery said anything about doing cell checks at 1:27 or 1:55.

76.     It is unknown who [illegible] is, or why they were doing a cell check while emergency medical technicians ("EMT") were trying to save Nick's life.

77.     At 1:42 p.m. Officer Montgomery observed that Nick "was ashen in color" with "his mattress cover . . . tied around his neck in a big knot" that "wasn't attached to anything."

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

78.     At 1:45 p.m.—three minutes later—Montgomery called for backup and opened the door to Nick's cell.  He was soon assisted by Officers Bezotte, Smith, Lacombe, and Peterson, who helped to drag Nick out of the cell to determine if he was breathing or had a heartbeat.

79.     Nick's hands and arms were already "very cold" at this point "and he was a grayish-blueish color."  He also had "a visible mark across his neck" such that it "appeared to be broken."

80.     Officer Smith did not detect any breathing or feel a pulse, so he began chest compressions, while Officer Bezotte conducted rescue breathing.

81.     After about thirty sets of compressions, Nick's pulse began to beat, and color began coming back to his skin.

82.     Emergency aid was called at 1:47 p.m.  EMTs took over at 1:54 p.m., and left the scene headed to Tacoma General Hospital at 2:10 p.m.

83.     Nick was taken off of life support on January 6, 2020.  The Kitsap County Coroner found that Nick "died of asphyxia due to ligature hanging."  The immediate cause of death was "hypoxic ischemic brain injury."

84.     In a subsequent interview conducted by Kitsap County Corrections Lieutenant Penelope Sapp, HSA Molina admitted that she knew Nick was suicidal, but did nothing.  HAS Molina also confirmed that Nick's acute suicidality was relayed to the arresting officers, but they also did nothing.  As explained in Lieutenant Sapp's report:

> When I found HSA Molina she was upset so I checked to see if she was okay.  She had them told me that [Megan] had told her that when [Nick] was arrested, she had told the arresting agency that he had attempted suicide recently by a hanging.  HSA Molina stated that [Megan] was concerned for [Nick]'s safety, and that is why she went to pick him up from wherever he was located.  It was after that when the [domestic violence] incident occurred and the police were called.  I went to check the booking form to see of [sic] there was any information indicating that [Nick] might have been suicidal, there was not.  Chief Rufener had the arrest report printed and we read that to see if the deputies were told that [Nick] was suicidal, there was not.

COMPLAINT - 21

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

85.    HSA Molina was subsequently transferred to the South Correctional Entity, a regionally owned jail in Des Moines, Washington, that also contracts with NaphCare.[11]

86.    Nick left behind his grieving parents and a doting daughter, plaintiff N.R., the light of his life:



E.    **VIOLATIONS OF KITSAP COUNTY AND NAPHCARE POLICIES AND THE STANDARD OF CARE**

**87.**    Kitsap County Sheriff's Office Custody Policy ("Kitsap Policy") No. 504.3 requires that "[a]ll arrestees shall be screened prior to booking to ensure the arrestee is medically acceptable for admission." This requires that "law enforcement agencies which commonly bring arrestees to the jail for booking" provide arrest reports and "[a]ll information relevant and necessary to safely process and house the arrestee."

---

[11] Where NaphCare apparently provides similar care. *See, e.g., Dawson v. S. Corr. Entity*, No. 19-1987 (W.D. Wash.).

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

88.     Deputies Rhode and Decker omitted relevant information about Nick's intoxication and suicidality.

89.     The National Commission on Correctional Health Care ("NCCHC")'s Standards for Health Services in Jails ("NCCHC Health Standards") J-E-02 requires that all inmates that are "severely intoxicated" be either (1) "[r]eferred immediately for care and medical clearance into the facility," or (2) "referred to a community hospital and then returned" with "written medical clearance from the hospital."

90.     Kitsap Policy No. 504.7 explicitly states that "[a]restees who are intoxicated or under the influence of any chemical substance . . . will not be placed into general population."

91.     Although Nick was "extremely intoxicated," having "nodded off numerous times" during the arrest and telling the deputies that "he was really drunk," it appears that Kitsap County neither referred him immediately for care and medical clearance nor referred him to a community hospital.  NaphCare employee Odessa McCleary, RN, also failed to comply with this standard when conducting Nick's receiving screening.   Instead, Nurse McCleary assigned Nick to general population housing, in violation of Kitsap Policy.

92.     Generally, the standard of care for Washington jails requires that corrections staff shall not accept custody of inmates with a breath alcohol level of 0.25 or greater.

93.     We do not know what Nick's breath or blood alcohol level was because—even though Nick was "extremely intoxicated"—neither Deputy Rhode, Officer Decker, nor any other Kitsap County employee cared to check.

94.     The American Correctional Association ("ACA")'s Core Jail Standard 4C-09 requires that health screening "commences upon the inmate's arrival at the facility" and include a "suicidal risk assessment."   Typical suicidal risk assessments include the Columbia-Suicide Severity Rating Scale ("C-SSRS") and the Brief Jail Mental Health Screen ("BJMHS"), both of

COMPLAINT - 23

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  which are public—but to correct three institutions' decision to halt a method—is not a suicidal risk

2  assessment, by any reasonable stretch of the definition:

**************
*
Screeners: All questions in this form must be addressed. For questions with a single checkbox, by leaving the checkbox unselected you are indicating your answer to the question or the answers to all questions in this question are false. By selecting the checkbox, you are acknowledging a positive response to the item and further documentation must be provided in the corresponding text box.
*

SUICIDE RISK ASSESSMENT - Select and document all that apply
_____
_
**Does/Has the inmate: (Select all that apply)**

☐ 1) Currently feel depressed?

☐ 2) Currently have thoughts of self harm or suicide?

**Receiving screen response:**

☐ 3) Strongly considered or attempted suicide in the past?

**Receiving screen response:**

NAPHCARE047

☐ 4) Feel that he/she has nothing positive to look forward to?

☐ 5) Have any family history of attempted or committed suicide?

☐ 6) Had any recent emotional losses?

☐ 7) Had any treatment for mental health issues or suicide risk during any previous incarceration?

☐ 8) Exhibit any disorientation to person, place, time, and/or situation?
_____
_
**9) How does the inmate feel about the current situation?**

"I feel awesome." Stated fasiciously

☐ 10) Does the interviewer feel the inmate is a suicide risk and/or should be on suicide watch?

GENERAL MENTAL HEALTH ASSESSMENTS - Select and document all that apply
_____

Does the inmate:

Receiving screen response:

Receiving dose if appropriate

NAPHCARE048

3  95.    In 2018, the ACA and the American Society of Addiction Medicine ("ASAM")

4  issued a Joint Public Policy on the Treatment of Opioid Use Disorders for Justice Involved

5  Individuals, requiring that "[a]ll individuals with suspected [opioid use disorder] should be screened

6  for mental health disorders, especially trauma-related disorders, and offered evidence-based

7  treatment for both disorders if appropriate."

8  96.    NCCHC's Standards for Mental Health Services in Correctional Facilities (NCCHC

9  Mental Health Standards) MH-E-02 requires that mental health screening be "performed on all

10 inmates on arrival at the intake facility."  The mental health screening must be conducted by "mental

11 health staff" or, "[w]hen mental health staff are not on-site, [a] mental-health trained correctional

12 staff . . . , which is reviewed by mental health staff on the next shift they are present."  The Standard

13 goes on:

COMPLAINT - 24

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Individuals should not be released from the intake area until the receiving screening in completed. . . . Mental health staff providing the screening are trained consistent with an outline approved by the responsible mental health clinician . . . . Screeners are to make adequate efforts to explore the potential for suicide. . . . In addition, the potential for exhibiting symptoms of withdrawal from alcohol and other drugs is investigated. *These approaches, coupled with training in aspects of mental health and chemical dependency, enable staff to intervene early to treat withdrawal and to prevent most suicides. . . . When inmates indicate they are currently under treatment for a medical, mental health, or substance problem . . . <u>health staff should initiate a request for a medical summary from community providers following a signed release from the inmate.</u>* (emphasis added).

97.     At no time was Nick screened by mental health staff or a mental health trained correctional staff supervised by mental health staff.  Although Nick indicated that he was detoxing and had previously received MAT, no efforts were made to request medical records from community providers.  Notably, these records—which were easily accessible in the custody of Jail's contracted mental health provider—would have revealed that Nick had had very recently experienced "suicidal thoughts"; had "attempted suicide in 2008 and 2013 by means of suffocation"; had "a history of depression, . . . loneliness, hopelessness, and thoughts related to self-harm"; and was taking Mirtazapine and Seroquel for his serious mental illnesses.

98.     Again, <u>Kitsap Policy No. 504.7</u> explicitly states that "[a]restees who are intoxicated or under the influence of any chemical substance . . . will not be placed into general population."

99.     <u>The national standard of care</u> requires that inmates with serious health conditions be housed in a specific area within the institution, separate from other housing areas, where inmates are admitted for health observation and care under the supervision and direction of health care personnel.

100.     <u>The Kitsap Policy No. 508.2 and national standard of care</u> requires that personal observation of inmates in medical units, crisis cells and, pre-classification/special management units occur *at least* every thirty (30) minutes, on an irregular schedule.  *See, e.g., Smith v. Snyder Cty. Prison*, No. 14-1329, 2017 WL 9485537, at *3 (M.D. Pa. July 17, 2017) (noting "a 30-minute

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

detox watch"); *but see Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 483 (M.D. Pa. 2017) (describing "detox watch" as "a 15-minute watch [where] the inmate is placed in a day room, and they're observed by the corrections officer on the unit every 15 minutes").

101.   Nurse McCleary was informed that Nick was "detoxing" from alcohol, heroin, methamphetamine, and MDMA at 12:28 a.m. on January 1, 2019.[12]  This is a serious medical condition.  Instead of housing Nick in the infirmary, she kept him in general population but noted that he needed "special care" and to be on a "detox watch."  Whether housed in the infirmary or "detox watch," Nick should have been observed more frequently than other inmates, at least every thirty minutes, on an irregular schedule.

102.   Dr. Sandack ordered that Nick undergo a neurological assessment ("neuro check") two times daily.  Neurological assessments are a necessary aspect of any withdrawal protocol and require a medical professional together vitals, information for the Glasgow Coma Scale, test for pupil reaction, observe muscle strength, and gauge verbal and motor responses.[13]  It is typically documented on a flowsheet and reviewed by a physician when making clinical decisions.[14]  This was not done.

103.   The NCCHC Standards for Opioid Treatment Programs in Correctional Facilities (NCCHC Opioid Standards) A-01 and D-01 require that inmates have "access to opioid treatment"[15]

---

[12] This was later confirmed by his drug screen test.
[13] *See* KATE CURTIS & CLAIR RAMSDEN, EMERGENCY AND TRAUMA CARE FOR NURSES AND PARAMEDICS 644 (2011) ("Alcoholic acidosis usually occurs in patients with chronic alcoholism . . . .  Vital signs and neurological assessment are imperative to the nursing care of these patients, together with accurate monitoring of fluid, hydration, and electrolyte status.").
[14] *See, e.g.*, https://www.briggshealthcare.com/Neurological-Assess-Flowsheet;
[15] *See also* AMERICAN SOCIETY OF ADDICTION MEDICINE, NATIONAL PRACTICE GUIDELINE FOR THE USE OF MEDICATIONS IN THE TREATMENT OF ADDICTION INVOLVING OPIOID USE 47 (2015) ("Pharmacotherapy for the treatment of opioid use disorder among prisoners has been shown to be effective. Most evidence for the effectiveness of pharmacotherapy for the treatment of opioid use disorder among prisoners has been derived from treatment with methadone.  However, there is some evidence supporting the use of buprenorphine and naltrexone in this population.").

COMPLAINT - 26

1   to include "methadone, buprenorphine, naltrexone, and combination products approved for

2   treatment of opioid dependence."[16]

3       104.    The NCCHC's Opioid Detoxification Guideline, issued in 2013, makes clear that

4   "[d]etoxification does not treat the underlying disease of addiction. All inmates with opioid

5   dependence should be referred for substance abuse treatment."[17]

6       105.    Here, Kitsap County had no type of MAT.  While benzodiazepines such as Librium

7   are useful for alcohol withdrawal, they do not treat opioid withdrawal.  Nick was constantly

8   requesting buprenorphine (Subutex) to treat his opioid withdrawal, which fell on deaf ears.[18]

9       106.    NaphCare, Kitsap County's contracted medical provider, knew in 2019 that "the

10  traditional opiate detox protocol, which consists of COWS monitoring and administration of

11  comfort medications, is insufficient to protect the lives and health of [its] patient population."[19]  In

12  response, NaphCare implemented a "buprenorphine taper" MAT in some of its operations,

13  including Kitsap County.[20]  The "buprenorphine taper" MAT, however, was ineffective because:

14  (1) nurses were provided no training on how to implement it; (2) there was no supervision to ensure

15  that nurses were implementing it correctly; and (3) per NaphCare policy, a score of 9 was required

16

17

---

18  [16] The latter would be products such as Clonidine (for reducing anxiety and blood pressure), Loperamide (for diarrhea), Dicyclomine (for abdominal discomfort), Promethazine / Zofran (for nausea/vomiting), Ibuprofen / Tylenol (for muscle pain), and Doxepin or Trazodone (for insomnia).

19  [17] NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE, OPIOID DETOXIFICATION GUIDELINE, Apr. 18, 2013, *available at* https://www.ncchc.org/opioid-detoxification-guideline.

20  [18] The clinical indication for the introduction of buprenorphine therapy is a diagnosis of "opioid use disorder, with or without comorbid chronic pain and [a d]esire for buprenorphine treatment to assist with cessation or reduction in use," and is not related to a COWS score.  DIANA COFFA, *ET AL.*, INPATIENT MANAGEMENT OF OPIOID USE DISORDER:

21  BUPRENORPHINE 3 (2019), *available at* https://cha.com/wp-content/uploads/2019/01/SHOUT-GUIDELINE-inpatient-buprenorphine-4-18-18.pdf.  Some guidelines, though, require that the "COWS needs to be at least 6 in order to

22  proceed" with MAT.  AMERICAN SOCIETY OF ADDICTION MEDICINE, CLINIC INDUCTION PROTOCOL – SAMPLE, *available at* https://www.asam.org/docs/default-source/education-docs/clinic-induction-protocol-example_it-matttrs_8-28-2017.pdf?sfvrsn=a30640c2_2.  Because Nick's COWS was a 6 on January 1, buprenorphine therapy

23  would have been clinically indicated under either standard.

24  [19] NAPHCARE, NAPHCARE'S EXPERIENCE WITH OPIOID-ADDICTED PATIENTS IN JAILS, *available at* https://www.sheriffs.org/sites/default/files/NaphCare.pdf.

25  [20] Andy Klein, *Detoxification vs. Withdrawal Management: The Jail Challenge*, at 43, Jun. 19, 2019, *available at* https://www.rsat-tta.com/Files/RSAT_Webinar-06-2019

COMPLAINT - 27

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

to trigger it.  Shortly after Nick's death NaphCare policy was changed to reflect the standard of care, and the score needed to start a buprenorphine taper was lowered to a 6.

107.    The standard of care requires that the healthcare provider administer the CIWA-Ar every hour to assess the patient's need for medication, and when the patient's score is 8-10 points to administer Chlordiazepoxide (Librium), 50 to 100 mg; Diazepam (Valium), 10 to 20 mg; or Lorazepam (Ativan), 2 to 4 mg every hour.[21]

108.    The standard of care also requires that the COWS be scored every four (4) hours and that a vitals check be done at this same time.

109.    Here, although Nick was receiving Librium as indicated by the CIWA, he was not reassessed every hour, if he was assessed at all.  In fact, after the COWS and CIWA were *allegedly* scored at 2:37 a.m. on January 1, 2019, Nick was not scored again until 2:22 a.m. the next day— and it is highly unlikely that these scales were completed, since Nick was sleeping.  This is important because, again, each COWS and CIWA required the provider to determine whether Nick was having "thoughts of self-harm or suicide."

110.    Kitsap Policy No. 508.3 requires that safety checks "be done by personal observation of the corrections officer and shall be sufficient to determine whether the inmate is experiencing any stress or trauma."

111.    The last documented safety check of Nick's entire tank took just one minute.  It is highly unlikely that this was a sufficient check, or that Nick was sufficiently observed.  Again Kitsap Defendants have admitted to intentionally treating Nick with contempt because of what he allegedly did to Megan.

---

[21] Max Bayard, et al., *Alcohol Withdrawal Syndrome*, 69 AM. FAM. PHYSICIAN 1443 (2004) (citing Michael F. Mayo-Smith, *Pharmacological Management of Alcohol Withdrawal: A Meta-analysis and Evidence-Based Practice Guideline*, 278 JAMA 144 (1997)).

COMPLAINT - 28

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

112.   <u>Kitsap Policy No. 510</u> has particular requirements for "Special Management Inmates."

a.   Kitsap Policy No. 510.1.1 defines "administrative segregation" as "[t]he physical separation of an inmate who is . . . in need of medical isolation or infirmary status" and a "special management inmate" as an inmate who falls into the "administrative segregation" definition.

b.   Kitsap Policy No. 510.3 states: "Individuals who may be classified as special management inmates include, but are not limited to, inmates who are . . . [e]xhibiting medical issues."

c.   Kitsap Policy No. 510.8 states: "After an inmate has been placed in segregation, the Shift Supervisor shall ensure that . . . [n]otification is made to the jails medical and mental health professionals" and that "medical department shall review the inmates health record to determine whether existing medical, dental, or mental health needs contraindicate the placement of require special accomodations [sic]."

d.   Kitsap Policy No. 510.8.1 states: "Due to the possibility of self-inflicted injury and depression during periods of segregation, health evaluations should include notations of any bruises and other trauma markings and the qualified health care professional's comments regarding the inmate's attitude and outlook."

e.   Kitsap Policy No. 510.9 states: "A staff member shall conduct a face-to-face safety check of all special management inmates, including those housed in administrative segregation or protective custody housing units, at least every 30 minutes on an irregular schedule" and that "[s]pecial management inmates shall receive increased monitoring to include, at a minimum: [a] daily visit by a Shift Supervisor [and r]egular review by mental health contractors."

COMPLAINT - 29

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

f.      Kitsap Policy No. 510.11 states that: "To qualify for an assignment in which one is responsible for the supervision of special management inmates, the employee must demonstrate that he/she has:

(a) Attained a minimum of six months experience supervising inmates.
(b) A history of maturity and tolerance.
(c) Expressed an interest in working with special management inmates.
(d) The ability to manage difficult inmates through conflict management skills.
(e) Received satisfactory ratings in the three most recent performance evaluations."

113.    ACA Standard 1-CORE-2A-24 requires that "[a]ll special management inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule."

114.    Nurse McCleary assigned Nick to general population housing, but noted that he needed "special care" and to be on a "detox watch" until January 6, 2020.

115.    Although Nurse McCleary did not refer to Nick's housing as "administrative segregation," he fit the definition of a "special management inmate" and was in a cell, by himself, on "22 hour lockdown."

116.    If this policy was not applicable to Nick, it should have been,[22] due to—as Kitsap Policy No. 510.8.1 recognizes—the increased risk "of self-inflicted injury and depression during periods of segregation."

117.    A number of the precautions included in this Policy were not followed.  Most notably: there was no special health evaluation; neither Nick nor his records were evaluated by a mental health provider to evaluate Nick's mental suitability of the setting; and safety checks were not conducted at least every 30 minutes on an irregular schedule.  In addition, although we do not

---

[22] *See* Reena Kapoor & Robert Trestman, *Mental Health Effects of Restrictive Housing, in* NATIONAL INSTITUTE OF JUSTICE, RESTRICTIVE HOUSING IN THE U.S. 199-200 (2016) ("In practice, correctional systems throughout the U.S. use many terms to describe the same phenomenon . . . circumstances in which prisoners are removed from the general population of the institution and confined to their cells for more than 22 hours per day.").

COMPLAINT - 30

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

know for sure, it is unlikely that Officers LaCombe or Randall met the criteria for special management supervision.

118.   <u>NCCHC Opioid Standard O-G-01</u> states: "[I]nmates in the early stages of recovery from severe depression may be at risk [for suicide], as are inmates newly admitted to segregation or in single-cell housing."

119.   <u>NCCHC Health Standard J-E-09</u> requires that "upon notification that an inmate is placed in segregation, a qualified health care professional reviews the inmate's health record to determine whether existing medical, dental, or mental health needs contraindicate the placement or require accommodation.  Such review is documented in the health record."

120.   <u>NCCHC Mental Health Standard MH-E-07</u> states: "On notification that an inmate is placed in segregation, mental health staff reviews the inmate's mental health record to determine whether existing menta health needs contraindicate the placement or require accommodation. . . . Persons in segregated environments are vulnerable to mental illness and often experience irritability, anxiety, or depression. . . . Mental health staff should receive regular feedback on the inmate's mental health behaviors observed by medical and custody staff during routine segregation checks."

121.   As discussed above, there is no indication that mental health staff interacted with Nick, reviewed his records, or had anything at all to do with his care.

122.   <u>ACA Core Jail Standard 4C-01</u> requires that medical care not be denied "based on an inmate's ability to pay."

123.   Kitsap County has a policy that impose a "medical access fee" for inmates that make sick calls and fines inmates that that request emergency care "that is determined not to be an emergency."[23]

---

[23] NAPH BATES.pdf, at 60.
COMPLAINT - 31

124.    By 2016, Kitsap County knew that it was lacking a much-needed MAT program, and that there was an established practice amongst its employees and contractors to ignore its written withdrawal policies. *See Boshears v. Kitsap County*, No. 16-6012 (W.D. Wash.).

125.    In 2016, the estate of a deceased inmate brought suit against Kitsap County, alleging that its lack of a MAT and an established practice amongst its employees and contractors to ignore its written withdrawal policies cause the death of a 35-year-old woman.  The case settled in 2018. Despite this knowledge, Kitsap County took no efforts to introduce a MAT program or to enforce its written withdrawal policies.

126.    By 2017, Kitsap County knew that mattress covers could easily be placed in a cell door as an improvised hanging point and then used as a ligature to commit suicide.  *See Nall v. Correct Care Solutions, LLC*, No. 19-5289 (W.D. Wash.).

127.    In October of 2017, a young woman named Tessa Nall sustained a serious and permanent brain injury by using the same exact means as Nick in a suicide attempt.  Video of the attempt was described in the Complaint: "[A]t 10:17 a.m., Tessa returned to her cell and can be seen on security video attempting to anchor her knotted mattress cover between the door and the door jamb. After first attempting to lodge it on the side of the door, the door opens fully and Tessa can be seen picking up the mattress cover, which had fallen to the floor. Tessa then moved the mattress cover to the top of the door and slammed the door shut."

128.    ACA Core Jail Standard 4C-14 requires that "[s]pecific criteria are established for referring symptomatic inmates suffering from withdrawal or intoxication for more specialized care at a hospital or detoxification center."

129.    The Jail's withdrawal policy, Kitsap Policy No. 504.7.1, does not include any discussion on referring inmates to a specialized care facility.

COMPLAINT - 32

130.     <u>ACA Core Jail Standard 7B-03</u> requires that "[a]ll professional, support, clerical, and health care employees, including contractors, receive continuing annual training."  Based upon the information included in the *Nall* and *Boshears* Complaints, this appears to not have been complied with.

131.     <u>ACA Core Jail Standard 7D-01</u> requires that the Jail's policies be "reviewed annually and updated, as needed."  Based upon the information included in the *Nall* and *Boshears* Complaints, this appears to not have been complied with.

**F.    KITSAP COUNTY AND NAPHCARE POLICY AND ESTABLISHED PRACTICE – *MONELL*, SUPERVISORY, AND POLICYMAKING LIABILITY**

132.     The death by suicide of Nick was tragic and could have been prevented by standard approaches to medical and mental health care management.

133.     The policies, established procedures, and protocols in place at the Jail—maintained *vis-à-vis* its Supervisory and Policymaking Defendants and NaphCare—put Nick and all other similarly situated patients at an increased risk of serious harm and death.

134.     That these policies, established procedures, and protocols would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

135.     Kitsap County—*vis-à-vis* its Supervisory and Policymaking Defendants and NaphCare—also failed to adequately train its employees, resulting in a condition that put Nick and all other similarly situated patients at an increased risk of serious harm and death.

136.     That this failure to train would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

137.     Nick would have not died at the time and in the manner that he did, had jailers and medical and mental health staff not been indifferent to his needs.

COMPLAINT - 33

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

138.    Jailers and medical and mental health staff's indifference to Nick's serious medical and mental health needs was ratified by Supervisory and Policymaking Defendants and NaphCare.

139.    Despite knowledge of Nick's serious medical needs, jailers and medical and mental health staff failed to administer and attend to Nick.  As a result, Nick was allowed to successfully take his own life.

140.    Jail staff did not have a rescue tool on their person when they found Nick with cloth around his neck not breathing.

141.    Hanging is the most common form of successful suicide in jails.  This is well-known and was in fact known by Kitsap County and its Policymaking and Supervising Defendants.

142.    Reasonable and prudent jailers and jail administrators possess or make immediately available for their subordinates relatively inexpensive rescue tools:



143.    Kitsap County's failure to require that its jailers and staff possess this type of tool and Kitsap County's failure to make this type of tool available to them, constitutes negligence and deliberate indifference.  Possession of this tool would have prevented Nick's extended period of suffocation and saved his life.

144.    All of the acts and omissions taken in regard to the care and custody of Nick were in accordance with Kitsap County's established practices and/or were ratified by the Policymaking and Supervisory Defendants and/or NaphCare.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

145.    It is a common and widespread practice at the Jail and NaphCare to ignore information related to suicidality and healthcare in a measured attempt to avoid liability in a deliberate indifference action, by claiming a lack of knowledge.

146.    Kitsap County has a policy of placing inmates' cells without a cellmate ("solitary confinement"), without a mental health assessment, regardless of whether the inmate's healthcare or mental healthcare needs contraindicated such confinement.

147.    Reasonable and prudent jailers and jail administrators also do not utilize cloth-type mattress covers in solitary confinement units, which inmates can easily hang themselves with. Kitsap County and its Policymaking and Supervisory Defendants usage of cloth-type mattress covers, in the face of other suicides wherein cloth-type mattress covers were utilized, constitutes negligence and deliberate indifference.

148.    Solitary confinement and similar types of confinement are well known by prudent jail administrators to have exceedingly injurious effects on an inmate's mental health-which is why a policy of housing mentally ill inmates in segregation without first adequately assessing risks to an inmate's mental health is never allowed; it poses an unnecessary risk of harm to inmates.

149.    King County, NaphCare, and their Policymaking and Supervisory Defendants were also negligent and deliberately indifferent when they failed to adequately train individual Defendants.   These individual Defendants failed to perform their duties as described in this Complaint due to inadequate training.   Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants knew that their training inadequately instructed its employees, but did nothing to change this policy.

150.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants failed to adequately train officers and employees in suicide prevention.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

151.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants failed to train officers and employees in suicide prevention policies and procedures.

152.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants failed to train officers and employees to properly monitor and to protect inmates.

153.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants failed to train officers and employees to properly identify and monitor at-risk inmates.

154.    Kitsap County, Naphcare, and their Policymaking and Supervisory Defendants failed to train officers and employees in in-take procedure.

155.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants failed to enforce policies and procedures for suicide prevention, including, but not limited to, policies and procedures for prisoner in-take and monitoring of prisoners.

156.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants failed to enforce the aforesaid policies and procedures by disciplining officers and employees or by other means.

157.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures.

158.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants maintained inadequate suicide prevention policies and procedures which, failed to identify and/or monitor at-risk detainees.

159.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants maintained inadequate in-take policies and procedures, which failed to identify at-risk detainees and failed to identify and monitor prescription medication and treatment.

COMPLAINT - 36

160.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants maintained inadequate monitoring and safety check systems.

161.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants maintained a policy of placing inmates into solitary confinement with ready means to commit acts of self-harm, without adequate review by a mental health provider prior to such a placement.

162.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants failed to create systems of information sharing, communication, and clearly delineated roles and lines of authority for County Jail staff, medical providers, and officers bringing in detainees from the street, or other facilities, and/or courts.

163.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants failed to provide sufficient resources to provide for the necessary medical care for mentally ill inmates.

164.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants maintained a policy of using cursory mental health and suicide screening that essentially amounted to no screening at all for incoming inmates.

165.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants maintained a policy of not regularly monitoring inmates.

166.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants maintained a policy of ignoring and refusing to implement relatively inexpensive suicide prevention measures.

167.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants maintained a policy of refusing to allow inmates to obtain medically necessary prescribed medication.

COMPLAINT - 37

1    168.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants

2    maintained no established protocol—written or unwritten—regarding the monitoring or medical

3    treatment of withdrawal syndrome, and otherwise refuses to acknowledge the well-known dangers

4    attendant withdrawal syndrome, including increased suicide risk.

5    169.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants

6    maintained a policy of permitting employees to provide clearly inadequate suicide prevention care.

7    170.    A death in a correctional facility is a very serious incident.  A death by suicide or

8    diabetes complications typically causes an incident review to occur which includes a complete

9    accounting of what happened, what lessons can be learned from the event and what changes need

10    to be made in order decrease the likelihood that it occurs again.  Had Kitsap County and NaphCare

11    officials had an adequate policy in place to review previous incidents of deaths by suicide,

12    accommodations could have been made that would have kept Nick safe and alive.

13    171.    Nothing is more fundamental in corrections work than regular safety checks to make

14    sure the inmates are safe.  Kitsap County, NaphCare, and their Policymaking and Supervisory

15    Defendants failed to have the appropriate policy in place in this regard.  Had Kitsap County,

16    NaphCare, and their Policymaking and Supervisory Defendants kept their policies updated to

17    reflect common correctional practices and standards, Nick's death would more than likely have

18    been prevented.

19    172.    Each of the above policies and established practices amounts to negligence and

20    deliberate indifference to the known and/or obvious risk of suicide and serious medical and safety

21    needs of at-risk detainees, including Nick.

22    173.    Kitsap County employees and subcontractors deliberately did not comply with

23    formal policies and national standards, which evidences their deliberate indifference and

24    negligence. *See Salter v. Booker*, No. 12-0174, 2016 WL 3645196, at *12 (S.D. Ala. June 29, 2016)

25

COMPLAINT - 38

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  ("Defendants acted with deliberate indifference when they failed to enforce or follow the written

2  jail policies and procedures put in place to protect suicidal prisoners.").

3       174.    Defendants are not even trying; they have been negligent, grossly negligent, and

4  have showed deliberate indifference to the medical and safety needs of the inmates at the Jail.  This

5  includes, again, failing to have and follow proper training, policies, and procedures for the care and

6  treatment of people in the Jail.  It also includes a cold-hearted attitude on the part of staff and

7  subcontractors, who ignore medical and safety harms as they present and who turn a blind eye and

8  a deaf ear to people who have serious medical and safety needs.

9       175.    Each and every individually named Defendant had knowledge that a substantial risk

10  of serious harm existed as to Nick's health and safety.

11       176.    Kitsap County, NaphCare, and their Policymaking and Supervisory Defendants had

12  knowledge that their policies, customs, and/or protocols created a substantial risk of serious harm

13  as to Nick's health and safety.  But even if these Defendants did not have knowledge of the risk of

14  harm, the risk created by their policies, customs, and/or protocols-and lack thereof/lack of training

15  thereon/lack of funding to implement-was obvious in light of reason and the basic general

16  knowledge that Defendants are presumed to have obtained regarding the type of deprivation.

17       177.    The acts and omissions caused by Defendants through their policies, practices,

18  customs-including inadequate staffing, training, preparation, procedures, supervision, and

19  discipline-were a proximate cause of Nick's pain, suffering, death, and Plaintiffs' damages.

20  **F.**   **DAMAGES**

21       178.    Nick was 34 years old at the time of his death.  He left behind loving parents and a

22  dependent daughter.

23       179.    The aforesaid acts and omissions of Defendants deprived Nick of his right to be free

24  from cruel and punishment and to due process of law as guaranteed by the Fourteenth Amendment

25

COMPLAINT - 39

of the United States Constitution; directly caused and/or directly contributed to his pain, suffering, and a general decline of his quality of life; directly caused and/or directly contributed to cause his death; directly caused and/or directly contributed to cause his family to suffer loss of services, companionship, comfort, instruction, guidance, counsel, training, and support; and directly caused and/or directly contributed to cause his family to suffer pecuniary losses, including but not limited to medical and funeral expenses.

180.    Prior to death, Nick suffered extreme physical and mental pain, terror, humiliation, anxiety, suffering, and emotional distress.

181.    Nick's death was completely unnecessary and could have been easily prevented via provision of even the most basic medical care and treatment.

## V. CLAIMS

**A.    FIRST CAUSE OF ACTION – NEGLIGENCE, GROSS NEGLIGENCE, AND MEDICAL NEGLIGENCE —ALL DEFENDANTS**

182.    Defendants had a duty to care for inmates and provide reasonable safety and medical and mental healthcare.

183.    This duty extends to foreseeable self-inflicted harms and includes protecting inmates against suicide and identifying at-risk inmates.

184.    This duty is an affirmative one under both Washington State and federal law because prisoners, by virtue of incarceration, are unable to obtain medical and psychiatric care for themselves.

185.    Defendants breached this duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the assessment of persons with apparent medical and psychiatric needs.

186.    Defendants breached this duty, and were negligent, when they failed pass on vital lifesaving information from one institution or person to another.

COMPLAINT - 40

187.   Defendants breached that duty, and were negligent, when they failed to adequately treat Nick's medical and psychiatric needs.  Indeed, because Nick's medical and psychiatric needs were entirely ignored, Defendants were grossly negligent.

188.   Defendants breached that duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the provision of reasonable and necessary medical and psychiatric care, treatment of inmates, and the passing on of information.

189.   Defendants breached that duty, and were negligent, when they failed to ensure adequate and proper staffing at the Jail.

190.   Defendants breached that duty, and were negligent, when they failed to ensure that Nick was properly supervised and/or that cell checks were conducted in a safe, timely, and consistent manner.

191.   Defendants breached that duty, and were negligent, when they failed to ensure that Nick received necessary medication.

192.   Defendants breached that duty, and were negligent, when they ignored notification of Nick's serious mental health condition and suicidality.

193.   Defendants breached that duty, and were negligent, when they failed to properly assess and treat Nick prior to his death.

194.   As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, Nick was allowed to successfully take his own life.

195.   Nick suffered unimaginable pre-death pain, suffering, embarrassment, and terror.

196.   As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, Plaintiffs have incurred and will continue to incur economic and noneconomic damages in an amount to be determined at trial.

COMPLAINT - 41

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

197.    As a direct and proximate result of the negligence of Defendants, Nick's parents and minor child have suffered the loss of familial association.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Nick's wrongful death.

**B.    SECOND CAUSE OF ACTION – CORPORATE NEGLIGENCE – NAPHCARE**

198.    Defendant NaphCare had a duty to select its employees with reasonable care and to supervise all persons practicing medicine under its corporate name and to ensure that they complied with the standard of care and did not put profits ahead of comprehensive patient care.

199.    Defendant NaphCare breached this duty by failing to hire competent and properly trained employees, oversee care, implement safety policies designed to prevent harm to patients, and in many more regards, described above.

200.    As a direct and proximate cause of the aforesaid failure to follow the standard of care to which NaphCare patients are entitled, Nick sustained pain, anguish, and death.

201.    As a direct and proximate cause of NaphCare's conduct, Plaintiffs have suffered a destruction and permanent impairment of their relationship with Nick.

**C.    THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 – KITSAP COUNTY, NAPHCARE, AND ALL INDIVIDUALLY NAMED DEFENDANTS**

202.    The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

203.    At the time Nick was detained by Kitsap County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates, including from self-harm.

204.    Being subjected to unnecessary physical and mental pain and suffering is simply not part of the penalty that criminal offenders pay for their offenses against society.  As a result,

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    municipalities, Jail officials, and subcontractors are liable if they know that an inmate or inmates

2    face a substantial risk of serious harm and callously disregard that risk by failing to take reasonable

3    measures to abate it.

4        205.   Here, Defendants knew that Nick faced a substantial risk of suicide or mental pain

5    and anguish, yet callously disregarded that risk by failing to take reasonable measures to abate it.

6        206.   Here, Defendants knew that Nick faced a substantial risk of harm or death due to his

7    serious mental health condition, yet callously disregarded that risk by failing to take reasonable

8    measures to abate it.

9        207.   Having an inmate in custody creates a duty of care that must include enough

10   attention to mental health concerns that inmates with obvious symptoms receive medical attention.

11   Defendants had numerous opportunities to meet their responsibilities to help Nick, but no one did.

12   One cannot avoid responsibility by putting one's head in the sand.

13       208.   Here, Kitsap County, NaphCare, and their Policymaking and Supervising

14   Defendants knew of and callously disregarded the excessive risk to inmate health and safety caused

15   by their inadequate formal and informal policies, including a lack of training, funding, and

16   supervision.

17       209.   Kitsap County, NaphCare, and their Policymaking and Supervising Defendants

18   knew of this excessive risk to inmate health and safety because it was obvious and because

19   numerous other inmates had been injured and/or killed as a result of these inadequacies in the past.

20       210.   Kitsap County, NaphCare, and their Policymaking and Supervising Defendants were

21   responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient

22   safety and medical and mental health care, and training thereon, which placed inmates like Nicl at

23   substantial risk.

24

25

COMPLAINT - 43

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

211.    There was little to no supervision of Nick and inmates like him because Kitsap County, NaphCare, and their Policymaking and Supervising Defendants maintained a known policy and custom of providing the cheapest care available, cutting corners to save and/or make money. That this would result in serious injury or death would have been obvious to any corrections management official exercising his or her professional judgment.

212.    While it appears that Kitsap County did have a suicide prevention policy, Kitsap County's actual policy was to ignore the written policy—written policy intended to protect inmates from the foreseeable consequences of not following the written policy, including death by suicide.

213.    Kitsap County, NaphCare, and their Policymaking and Supervising Defendants also has an impermissible policy of using cursory mental health screenings and check-box determinations to determine that mentally ill inmates are not a danger to themselves.

214.    Kitsap County, NaphCare, and their Policymaking and Supervising Defendants had an unwritten policy of understaffing and indifference to inmate supervision that was maintained with deliberate indifference.  Kitsap County, NaphCare, and their Policymaking and Supervising Defendants know that the Jail is understaffed and undertrained, and that their employees often have trouble completing all of their duties as a result.  Yet these Defendants failed to take any steps to correct these inadequacies.

215.    Kitsap County, NaphCare, and their Policymaking and Supervising Defendants lack of clear delineation of authority and inadequate means of communication with respect to assessing risks of suicide was an additional policy that caused jailers' failure to prevent Nick's pain, suffering, and death.  In essence, there is a "who's on first" problem at the Jail where an established practice of non-communication to one another or amongst themselves in regard to inmate suicidality and safety has been implemented.

COMPLAINT - 44

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

216.    Defendants were subjectively aware that Nick was suicidal, or at a minimum in the midst of a mental health crisis.  From this evidence, a reasonable jailer and/or healthcare provider would have been compelled to infer that a substantial risk of serious harm existed.  Indeed, Defendants did infer that a substantial risk of serious harm existed yet failed to take any steps to alleviate this risk.  And Nick died as a result.

217.    Defendants had a policy, custom, and practice of denying treatment, such as prescribed medication; these policies, customs, and practices posed a substantial risk of serious harm to the inmates in the jail, including Nick, and Defendants knew that its policies, customs, and practices posed this risk.

218.    Defendants knew of a number of previous suicides and incidences of self-harm, yet deliberately did nothing to provide its personnel with adequate training to prevent future suicides and incidences of self-harm.  Instead, Defendants acquiesced in a long-standing policy and custom of inaction.

219.    Indeed, even without the previous in-custody deaths, it was obvious that a total lack of training to appropriately address mentally ill inmates and efforts at cost-cutting would result in the harm caused here. Kitsap County, NaphCare, and their Policymaking and Supervising Defendants were expressly informed that their official policies were being ignored and that its unofficial or *de facto* policies would result in inmate deaths, yet deliberately did nothing to address these unofficial or *de facto* policies.  Kitsap County, NaphCare, and their Policymaking and Supervising Defendants had numerous opportunities to obtain training to appropriately address physically and mentally ill inmates, but knowingly and deliberately declined to obtain it.

220.    Kitsap County, NaphCare, and their Policymaking and Supervising Defendants have consistently failed to attend to the serious medical needs of inmates.  Kitsap County, NaphCare, and their Policymaking and Supervising Defendants knew that there were successful suicides in

COMPLAINT - 45

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

recent years, and that there were relatively inexpensive prevention measures available.  Yet these Defendants did not employ any of these measures.  In addition, these Defendants knew that its employees were not providing adequate suicide prevention care, but continued to employ them nonetheless.

221.    As a direct and proximate result of the deliberate indifference of Defendants, as described above and in other respects as well, Nick died a terrible and easily preventable death.  He suffered pre-death pain, anxiety, and terror, before becoming asphyxiated, and leaving behind a loving child.

222.    As a direct and proximate result of the deliberate indifference of these Defendants, Plaintiffs—Nick's child and parents—have each suffered the loss of familial association with Nick, in violation of their Fourteenth Amendment rights.  Plaintiffs, each of them, have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Nick's death.

223.    These Defendants have shown reckless and callous disregard and indifference to inmates' rights and safety and are therefore subject to an award of punitive damages to deter such conduct in the future.

**D.    FOURTH CAUSE OF ACTION – 42 U.S.C. § 12132 – KITSAP COUNTY AND NAPHCARE**

224.    The Americans with Disabilities Act ("ADA") provides in its relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A failure to reasonably accommodate a person's disability is an act of discrimination under the ADA. Per 28 C.F.R. §35.130(b)(7): "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability,

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  unless the public entity can demonstrate that making the modifications would fundamentally alter

2  the nature of the service, program, or activity."

3      225.    256. Although NaphCare is a private entity, it operated at the Jail under contract

4  with Kitsap County, and therefore is subject to Title II of the ADA.

5      226.    Kitsap County and NaphCare failed to institute adequate policies and procedure or

6  train its employees on how to accommodate individuals with disabilities, such as Nick.

7  **E.    FIFTH CAUSE OF ACTION – 29 U.S.C. § 701 – KITSAP COUNTY AND NAPHCARE**

8      227.    Like the ADA, Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 701, *et*

9  *seq.*, also requires the recipients of federal funds to reasonably accommodate persons with

10  disabilities.  The Jail is believed and therefore alleged to receive federal funds.

11      228.    Although NaphCare is a private entity, it operated at the Jail under contract with

12  Kitsap County, and therefore is subject to Section 504 of the RA.

13      229.    Kitsap County and NaphCare failed to institute adequate policies and procedure or

14  train its employees on how to accommodate individuals with disabilities, such as Nick.

15                              **VI.    JURY DEMAND**

16      185.    Plaintiffs hereby demand a trial by jury.

17                              **VII.    AMENDMENTS**

18      186.    Plaintiffs hereby reserves the right to amend this Compliant.

19                          **VIII.    RELIEF REQUESTED**

20      187.    Damages have been suffered by all Plaintiffs and to the extent any state law

21  limitations on such damages are purposed to exist, they are inconsistent with the compensatory,

22  remedial and/or punitive purposes of federal law, and therefore any such alleged state law

23  limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

24      188.    WHEREFORE, Plaintiff requests a judgment against all Defendants:

25

COMPLAINT - 47

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

(a)     Fashioning an appropriate remedy and awarding economic and noneconomic damages, including damages for pain, suffering, terror, loss of consortium, and loss of familial relations, and loss of society and companionship pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be determined at trial;

(b)     Punitive damages;

(c)     Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as otherwise available under the law;

(d)     Declaring the defendants jointly and severally liable;

(e)     Awarding any and all applicable interest on the judgment; and

(f)     Awarding such other and further relief as the Court deems just and proper.

Respectfully submitted this 28th day of October, 2021.

GALANDA BROADMAN, PLLC

s/Ryan D. Dreveskracht

Ryan D. Dreveskracht, WSBA #42593
s/Gabriel S. Galanda

Gabriel S. Galanda, WSBA #30331
s/Matthew J. Slovin

Matthew J. Slovin, WSBA #58452
Attorneys for Plaintiffs
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com
Email: gabe@galandabroadman.com
Email: matt@galandabroadman.com

COMPLAINT - 48