UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOHN RAPP, et al.,<br><br>                              Plaintiffs,<br><br>        v.<br><br>NAPHCARE, INC. an Alabama<br>Corporation, et al.,<br><br>                              Defendants. | CASE NO. 3:21-cv-05800-DGE<br><br>ORDER GRANTING IN PART<br>AND DENYING IN PART<br>DEFENDANTS NAPHCARE AND<br>KITSAP COUNTY'S MOTIONS TO<br>DISMISS (DKT. NOS. 66, 64) |

## I       INTRODUCTION

This matter comes before the Court on Defendant Kitsap County's Motion to Dismiss for Failure to State a Claim (Dkt. No. 64) and Defendants NaphCare and NaphCare's Out-of-State Leadership's Motion to Dismiss for Failure to State a Claim and Lack of Personal Jurisdiction. (Dkt. No. 66.)  The Court considered the pleadings filed in support of and in opposition to the motions and the remainder of the record and hereby GRANTS in part and DENIES in part the Defendants' motions.

1

## II    BACKGROUND

2        This action arises out of the suicide of Nicholas Rapp while he was a pretrial detainee at

3  Kitsap County Jail ("Jail").  (Dkt. No. 63 at 2.)  Plaintiffs are John Rapp, Nicholas Rapp's father,

4  in his personal capacity and as personal representative for the estate of Nicholas Rapp, N.R.,

5  Nicholas Rapp's minor child, and Judith Rapp, Nicholas Rapp's biological mother.  (*Id*. at 3–4.)

6        Defendants are Kitsap County, a municipal corporation responsible for administering the

7  Jail and NaphCare, Inc. ("NaphCare"), the healthcare provider at the Jail at the time of Nicholas

8  Rapp's death.  (*Id*. at 4–8.)  There are also a number of individual Defendants discussed below

9  who were either employed by Kitsap County or NaphCare at the time of Nicholas Rapp's death.

10        Nicholas Rapp struggled with opioid and alcohol addiction for a decade prior to his arrest

11 on December 31, 2019.  (*Id*. at 14–15.)  He attempted suicide multiple times between 2003 and

12 2013.  (*Id*.)  Nicholas Rapp had a daughter with his partner, Megan Wabnitz, who is also a nurse

13 at the Jail and employee of NaphCare.  (*Id*. at 15.)

14        On the night of December 31, 2019, Nicholas Rapp was intoxicated and called Megan

15 Wabnitz and told her he was suicidal.  (*Id*. at 15–16.)  Megan drove to pick up Nicholas Rapp

16 and brought him back to her house.  (*Id*.)  At some point, an argument broke out between the two

17 and the police were called to the residence.  (*Id*. at 16.)  Kitsap County Sherriff's Deputies

18 Brandon Rohde and Andrew Hren arrested Nicholas Rapp.  (*Id*.)  The deputies noticed Nicholas

19 Rapp was extremely intoxicated and that he nodded off several times during the arrest.  (*Id*.)  At

20 the time of the arrest, Megan Wabnitz informed Deputies Rohde and Hren that she was worried

21 because Nicholas Rapp had expressed suicidal ideations a few hours earlier and that he had

22 recently attempted suicide by hanging.  (*Id*.)

23

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP
COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 2

1    When Nicholas Rapp arrived at the Jail, Deputy Rhode filled out an "Arrest and Booking

2  Information" sheet where Deputy Rhode marked "No" to the questions "Does the arrestee show

3  any signs of suicidal behavior or attempts?" and "Is the arrestee intoxicated?" (*Id*. at 16–17.)

4  Officer Elvia Decker handled Nicholas Rapp's booking at the Jail. (*Id*. at 16.)

5    NaphCare employee Nurse Odessa McCleary conducted Nicholas Rapp's "Receiving

6  Screening." (*Id*. at 18.) According to the form completed by Nurse McCleary, the arresting

7  officers made no mention whether Nicholas Rapp had any current or recent suicidal ideation or

8  whether he was under the influence of drugs or alcohol. (*Id*.)

9    Nicholas Rapp informed Nurse McCleary he was detoxing from alcohol, heroin,

10  methamphetamine, and MDMA. (*Id*.) In response, Nicholas Rapp underwent a Clinical Institute

11  Withdrawal Assessment for Alcohol ("CIWA-Ar") and Clinical Opiate Withdrawal Score

12  ("COWS") assessments. (*Id*. at 19.) As part of the first COWS Nurse McCleary conducted, she

13  marked "No" to the question of "Do you currently have thoughts of self-harm or suicide." (*Id*.)

14  Nurse McCleary then "re-assigned Nick to Central A Pod, noting he needed 'special care' and to

15  be on a 'detox watch' until January 6, 2020." (*Id*.)

16    On January 1, 2019 at 2:03 a.m., NaphCare nurse Bruce Karl conducted another COWS

17  on Nicholas Rapp, indicating Nicholas Rapp had no thoughts of self-harm or suicide. (*Id*. at 20.)

18    Megan arrived at work at 7:00 am and sent her NaphCare supervisor Erica Molina an

19  email explaining that she could not work on the side of the Jail where Nicholas Rapp was housed

20  because of the domestic violence incident from the previous night and that Nicholas Rapp

21  recently attempted suicide and was acutely suicidal. (*Id*. at 21.) Megan also informed Ripsy

22  Nagra, a NaphCare nurse, of Nicholas Rapp's past suicide attempt and current suicidal ideations.

23  (*Id*.)

24

1   Nurse Nagra subsequently conducted a health check on Nicholas Rapp and indicated he

2   did not have thoughts of self-harm or suicide.  (*Id*.)  Nurse Nagra conducted three subsequent

3   health checks that day, all showing Nicholas Rapp did not have thoughts of self-harm or suicide.

4   (*Id*. at 21, 26.)

5   NaphCare employee Dr. Alanna Sandack was not at the jail during Nicholas Rapp's stay

6   but ordered various medications and that he undergo a neurological assessment twice daily.  (*Id*.

7   at 21.)  Dr. Sandack never "once examine[d] Nick.  Instead, she relied on LPNs to serve as

8   gatekeepers and []to make independent assessment and treatment decisions[.]"  (*Id*.)

9   On January 2, 2020, NaphCare employee Nurse LaDusta Haven is alleged to have

10   falsified information on the COWS and CIWA-Ar assessment forms.  (*Id*. at 23.)  "Video

11   evidence shows that LPN LaDusta did not see or talk to Nick during the fourteen seconds his

12   door was open while she made entries at the portable nursing station[.]"  (*Id*.)

13   That afternoon Officers Jerry Randall and John Peterson performed safety checks on

14   Nicholas Rapp.  (*Id*. at 26–27.)  Both are alleged to have walked by Nicholas Rapp's cell without

15   looking in or doing a direct visual safety check at certain times before he was found unconscious.

16   (*Id*.)

17   At 1:42 p.m., Officer Merile Montgomery found Nicholas Rapp hanging from a mattress

18   cover in his cell.  (*Id*. at 28.)  Officer Montgomery called for back-up and was soon assisted by

19   Officers Bezotte, Smith, Lacombe, and Peterson.  (*Id*.)  The officers untied Nicholas Rapp from

20   the hanging mattress cover and attempted life-saving measures.  (*Id*.)  At 2:10 p.m., Nicholas

21   Rapp was taken to Tacoma General Hospital where he was taken off life support on January 6,

22   2020.  (*Id*.)

23

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP
COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 4

1    Plaintiffs now sue Defendants Kitsap County, a number of named and unnamed Kitsap

2    County employees, NaphCare, NaphCare's Out-of-State Leadership[1] executives, and certain

3    NaphCare employees working at the Jail while Nicholas Rapp was detained.

4    The Court dismissed Plaintiffs' Amended Complaint with leave to amend.  (Dkt. No. 62.)

5    Plaintiffs have since filed their Second Amended Complaint ("SAC") which Kitsap County and

6    NaphCare again moved to dismiss.  (Dkt. Nos. 64, 66.)  Plaintiffs allege violations of 42 U.S.C.

7    § 1983 against all Defendants.  (Dkt. No. 63 at 48–54.)  Plaintiffs also bring claims of negligence

8    and gross negligence against Kitsap County and NaphCare and claims of corporate negligence,

9    negligent hiring, and medical negligence against NaphCare.  (*Id*.)

10    **A.  Legal Standards**

11        1.  12(b)(6) Motion

12    Federal Rule of Civil Procedure 12(b) motions to dismiss may be based on either the lack

13    of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

14    theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  Material

15    allegations are taken as admitted and the complaint is construed in the plaintiff's favor.  *Keniston*

16    *v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983) (citations omitted).  "While a complaint attacked

17    by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

18    obligation to provide the grounds of his entitlement to relief requires more than labels and

19    conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl.*

20    *Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007) (citations omitted).

21

22

23    _____

[1] NaphCare's Out-of-State Leadership Defendants are Defendants Jim McLane, Moore, Burgess, Simpler, Alvarez, Bradford McLane, Henderson, and Savage.  Plaintiffs also identify these individuals as "NaphCare Policymaking Defendants."  (Dkt. 63 at 9–12.)

24

1      2.  Rule 8(a)

2          Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short plain

3      statement of the claim showing that the pleader is entitled to relief."  To comply with Federal

4      Rule of Civil Procedure 8(a)(2), a plaintiff "must plead a short and plain statement of the

5      elements of his or her claim, identifying the transaction or occurrence giving rise to the claim

6      and the elements of the prima facie case[.]"  *Bautista v. Los Angeles Cnty.*, 216 F.3d 837, 840

7      (9th Cir. 2000).  Although Federal Rule of Civil Procedure 8 "encourages brevity, the complaint

8      must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the

9      grounds upon which it rests.'"  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 319

10     (2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).

11         3.  12(b)(2) Motion

12          When a defendant moves to dismiss a complaint for lack of personal jurisdiction, the

13     plaintiff bears the initial burden of showing that jurisdiction is appropriate.  *Schwarzenegger v.*

14     *Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  A plaintiff cannot simply rest on the

15     bare allegations of its complaint, but is obligated to come forward with facts, by affidavit or

16     otherwise, supporting personal jurisdiction.  *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d

17     784, 787 (9th Cir. 1977).  When resolving such a motion on written materials, the court

18     need "only inquire into whether the plaintiff's pleadings and affidavits make a prima facie

19     showing of personal jurisdiction."  *Schwarzenegger*, 374 F.3d at 800 (internal quotation and

20     citation omitted).

21     **B.  42 U.S.C.§ 1983 Claims**

22          A pretrial detainee has a substantive due process right under the 14th Amendment to be

23     protected from harm during custody.  *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067 (9th

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP
COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 6

Cir. 2016).  As relevant here, that right may be violated by a correctional facility's failure to adequately address the detainee's medical needs, including an imminent risk of suicide.  *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019); *accord Est. of Vela v. Cty. of Monterey*, 2018 WL 4076317, at *3 (N.D. Cal. Aug. 27, 2018).

Kitsap County moves to dismiss Plaintiffs' 42 U.S.C.§ 1983 claims against the County and individual Defendants Rufener, Simpson, Gese, Decker, Rohde, and Hren.  (Dkt. No. 64 at 1–2.)  NaphCare moves to dismiss Plaintiffs' 42 U.S.C.§ 1983 claims against individual Defendants Sandack, McCleary, Karl, and Haven.  (Dkt. No. 66 at 2.)

1. Plaintiffs have adequately alleged a *Monell* claim against Kitsap County

To impose *Monell* liability on a municipality under § 1983, plaintiffs must prove: "(1) [plaintiff] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) the policy is the moving force behind the constitutional violation."  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (internal quotations and citations omitted).

There are three established scenarios in which a municipality may be liable for constitutional violations under § 1983.  "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'"  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2012) *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (quoting *Monell*, 436 U.S. at 708).

Second, a plaintiff can prevail on a § 1983 claim against a municipality by identifying acts of omission, such as a pervasive failure to train its employees, "when such omissions amount to the local government's own official policy."  *Id.*  "A policy of inaction or omission

1   may be based on failure to implement procedural safeguards to prevent constitutional

2   violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (internal citations

3   omitted).

4       Omission as the result of a failure to train is established when "the need for more or

5   different training is so obvious, and the inadequacy so likely to result in the violation of

6   constitutional rights, that the policymakers of the city can reasonably be said to have been

7   deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

8   "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality can a

9   city be liable for such a failure under § 1983." *Id.* at 389.  "A pattern of similar constitutional

10  violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate

11  indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011)

12  (internal citations omitted).

13      Finally, a municipality "may be held liable under § 1983 when 'the individual who

14  committed the constitutional tort was an official with final policy-making authority' or such an

15  official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'"

16  *Clouthier*, 591 F.3d at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir.

17  1992)).

18      Kitsap County does not dispute that Nicholas Rapp had a constitutional right of which he

19  was deprived.  Citing specific paragraphs within the SAC, Plaintiffs' Response to Kitsap

20  County's Motion to Dismiss identifies ten policies they allege caused Nicholas Rapp's death.

21  (*See* Dkt. No. 70 at 17–19.)  Taken as true, the SAC contains factual allegations that Kitsap

22  County employees followed a series of policies and customs that resulted in Nicholas Rapp's

23  death.  The Court finds Rules 8(a) and 12(b)(6) are satisfied as the SAC provides Defendant

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP
COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 8

1   Kitsap County "fair notice of what the . . . claim is and the grounds upon which it rests."

2   *Twombly*, 550 U.S. at 555.  Thus, Kitsap County's Motion to Dismiss is DENIED as to

3   Plaintiffs' *Monell* claim.

4           2.   Individual Defendants

5           Pretrial detainee medical claims are "evaluated under an objective deliberate indifference

6   standard."  *Vasquez v. Cty. of Santa Clara*, 803 Fed. App'x 100, 102 (9th Cir. 2020) (quoting

7   *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–1125 (9th Cir. 2018)).  Specifically, "the

8   elements of a pretrial detainee's medical care claim against an individual defendant under the

9   due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional

10  decision with respect to the conditions under which the plaintiff was confined; (ii) those

11  conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not

12  take reasonable available measures to abate that risk, even though a reasonable official in the

13  circumstances would have appreciated the high degree of risk involved—making the

14  consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the

15  defendant caused the plaintiff's injuries."  *Gordon*, 888 F.3d at 1125.  As for the third element, a

16  plaintiff must "prove more than negligence but less than subjective intent—something akin to

17  reckless disregard."  *Id.*

18           i.   Officer Elvia Decker

19           Plaintiffs allege Officer Decker booked Nicholas Rapp into the Jail on the night of his

20  arrest despite signs of extreme intoxication without first having him evaluated at a local hospital

21  to determine if he was medically able to be housed in the jail.  (Dkt. No. 63 at 17.)  Plaintiffs

22  further allege Officer Decker should have transferred Nicholas Rapp to a community hospital

23  due to his extreme intoxication.  (*Id*. at 30.)  The SAC also alleges that after processing Nicholas

24

1  Rapp, Nurse McCleary told Officer Decker she almost put Nicholas Rapp in a "suicide thing"

2  because he responded "no" to her questions.  (*Id.* at 20.)

3         Taking all allegations as true and construed in the light most favorable to Plaintiffs,

4  Plaintiffs allege sufficient facts to infer that: (i) Officer Decker "made an intentional decision"

5  not to flag Nicholas Rapp as a risk; (ii) those conditions put Nicholas Rapp "at substantial risk of

6  suffering serious harm"; (iii) Officer Decker "did not take reasonable available measures to abate

7  that risk, even though a reasonable [officer] in the circumstances would have appreciated the

8  high degree of risk involved"; and (iv) by not taking such measures, Officer Decker caused

9  Nicholas Rapp's injuries.  *Gordon*, 888 F.3d at 1125.

10         Thus, Kitsap County's Motion to Dismiss is DENIED as to Officer Decker.

11           *ii.  Deputies Brandon Rohde and Andrew Hren*

12         Plaintiffs allege "Megan informed both Deputies Rohde and Hren that she was worried

13  because of Nick's expressed suicidal ideations just hours earlier, and that he had recently

14  attempted suicide by hanging.  Giv[en] her training and experience, she deemed Nick acutely

15  suicidal, and informed the arresting officers of this."  (Dkt. No. 63 at 16.)  The SAC contains

16  allegations that Deputy Rohde incorrectly answered the Arrest and Booking Information sheet

17  about Nicholas Rapp exhibiting any signs of suicidal behavior (*id.* at 16–17), implying Deputies

18  Rohde and Hren failed to inform anyone at the Jail that Nicholas Rapp "expressed suicidal

19  ideations just hours earlier, and that he had recently attempted suicide by hanging."  (*Id.* at 16.)

20  Taken as true, this enough to state a § 1983 claim against Deputies Rohde and Hren.  Thus,

21  Kitsap County's Motion to Dismiss is DENIED as to Deputies Rohde and Hren.

22

23

24

1          *iii.  Gary Simpson, Mark Rufener, and John Gese*

2          "Supervisory liability is imposed against a supervisory official in his individual capacity

3   for his own culpable action or inaction in the training, supervision, or control of his subordinates,

4   for his acquiescence in the constitutional deprivations of which the complaint is made, or for

5   conduct that showed a reckless or callous indifference to the rights of others." *Corales v.*

6   *Bennett*, 567 F.3d 554, 570 (9th Cir. 2009).  Supervisory officials may be held liable if they

7   implement a policy so deficient that the policy "itself is a repudiation of constitutional rights"

8   and is "the moving force of a constitutional violation." *See Hansen v. Black*, 885 F.2d 642, 646

9   (9th Cir. 1989).

10         The SAC alleges Simpson, Rufener, and Gese, based on claims related to a prior

11  deceased inmate, knew the County's "employees and contractors [ignored] its written

12  [substance] withdrawal policies" and that despite this prior knowledge "chose not to . . . enforce

13  its written withdrawal policies."  (Dkt. No. 63 at 38.)  The SAC further alleges that Simpson,

14  Rufener, and Gese "failed to implement training programs on the use of cloth-type mattress

15  covers in single occupant cells and identifying signs of suicide risk and suicide precautions."

16         Viewed in the light most favorable to Plaintiffs, these allegations are sufficient to allege

17  supervisory liability against Simpson, Rufener, and Gese.  Thus, Kitsap County's Motion to

18  Dismiss is DENIED as to Simpson, Rufener, and Gese.

19         *iv.  Dr. Alanna Sandack*

20         Plaintiffs assert Dr. Sandack was not at the Jail at any point during Nicholas Rapp's

21  detention and never once examined Nicholas Rapp.  (Dkt. No. 63 at 21.)  Instead, Dr. Sandack

22  relied solely on nursing staff "to serve as gatekeepers and [] to make independent assessment and

23

24

1   treatment decisions[.]"  (*Id*.)  Despite no examination, Dr. Sandack ordered medications and

2   other treatment for Nicholas Rapp.  (*Id*.)

3       Viewing these allegations in the light most favorable to Plaintiffs, these facts are

4   sufficient to state a claim against Dr. Sandack based on deliberate indifference.  Therefore,

5   NaphCare's Motion to Dismiss is DENIED as to Dr. Sandack.

6       *v.  Nurse Odessa McCleary*

7       Plaintiffs allege Nurse McCleary conducted Nicholas Rapp's receiving screening at the

8   Jail when Nicholas Rapp informed Nurse McCleary he was detoxing.  (Dkt. No. 63 at 18.)  She

9   then put in a plan to have him undergo COWS and CIWA-Ar assessments.  (*Id*.)  Plaintiffs allege

10  that after Nurse McCleary conducted Nicholas Rapp's mental health screening she told Officer

11  Decker she almost "put him in a suicide thing 'cause he was . . . answering the questions like, no,

12  no, no, kinda, you know, not listening."  (*Id*. at 20.)

13      Reading the SAC in the light most favorable to Plaintiffs, Nurse McCleary new Nicholas

14  Rapp's conduct and responses during the mental health screenings raised possible suicide

15  concerns but failed to do more to properly assess his mental health.  These allegations are

16  sufficient to survive a motion to dismiss.  Thus, NaphCare's Motion to Dismiss is DENIED as to

17  Nurse McCleary.

18      *vi.  Nurse Bruce Karl*

19      Plaintiffs allege Nurse Karl conducted COWS and CIWA-Ar assessments on Nicholas

20  Rapp at 2:03 a.m. on January 1, 2020.  (Dkt. No. 63 at 20.)  Plaintiffs allege that "[t]he box to

21  indicate whether Nick currently had thoughts of self-harm or suicide was marked 'No' on both

22  assessments."  (*Id*.)  Plaintiffs also allege Nurse Karl performed these assessments despite

23  knowing he was "was out of date on his Suicide Prevention in Jails training[.]"  (*Id*.)  Whether

24

1    Nurse Karl's assessment of Nicholas Rapp's suicidality while knowingly being out of date on his

2    suicide prevention training amounts to deliberate indifference requires further factual

3    development, but at this stage is enough to state a claim.  Thus, NaphCare's Motion to Dismiss is

4    DENIED as to Nurse Karl.

5           *vii.  Nurse Haven LaDusta*

6           Plaintiffs allege Nurse LaDusta falsified a COWS and CIWA-Ar assessments for

7    Nicholas Rapp at 2:22 a.m. on January 2, 2020.  (*Id*. at 23.)  Plaintiffs allege Nurse LaDusta

8    "indicated on the COWS and CIWA-Ar paperwork that Nicholas Rapp did not currently have

9    thoughts of self-harm or suicide" but that Nurse LaDusta "did not see or talk to Nick during the

10   fourteen seconds his door was open while she made entries at the portable nursing station[.]"

11   (*Id*.)  Whether Nurse LaDusta allegedly falsifying an assessment and otherwise failing to review

12   Nicholas Rapp's condition amounts to deliberate indifference requires further factual

13   development, but at this stage these allegations are sufficient to state a claim.  Therefore,

14   NaphCare's Motion to Dismiss is DENIED as to Nurse LaDusta.

15   **C.  Negligence**

16        1.  <u>Plaintiffs have adequately alleged negligence and gross negligence claims against
         Kitsap County</u>

17
18        To prove negligence, a plaintiff must establish the existence of a duty owed, breach of

18   that duty resulting injury, and proximate cause between breach and injury.  *Tincani v. Inland*

19
20   *Empire Zoological Soc.*, 875 P.2d 621, 624 (Wash. 1994). "Washington courts have long

20
21   recognized a jailor's special relationship with inmates, particularly the duty to ensure health,

21
22   welfare, and safety." *Gregoire v. City of Oak Harbor*, 244 P.3d 924, 928 (Wash. 2010) (citation

22
23   omitted).  A "jail's duty to protect inmates includes protection from self-inflicted harm[.]"  *Id*. at

23
24

931.  Gross negligence is "negligence substantially and appreciably greater than ordinary

negligence."  *Nist v. Tudor*, 407 P.2d 798, 803 (Wash. 1965).

Kitsap County moves to dismiss Plaintiffs' negligence claims arguing "Plaintiffs' SAC

fails to articulate the basis for any negligence claims and leaves defendants guessing as to the

legal theory and factual basis for the same."  (Dkt. No. 64 at 9.)  Kitsap County specifically

argues Plaintiffs "fail[] to sufficiently identify what conduct by what defendant is meant to form

the basis of a negligence or gross negligence claim" or "how any alleged breach may have

proximately caused Rapp's death."  (*Id*. at 10–11.)

Based on the alleged conduct of each individual Kitsap County employee already

identified related to Plaintiffs' § 1983 claims, the SAC sufficiently identifies the conduct of each

defendant forming the basis of Plaintiffs' negligence and gross negligence claims.  Therefore,

Kitsap County's Motion to Dismiss is DENIED as to Plaintiffs' negligence and gross negligence

claims.

2.  <u>Plaintiffs adequately alleged negligence and gross negligence claims against
NaphCare</u>

NaphCare moves to dismiss Plaintiffs' negligence and gross negligence claims arguing

that "Plaintiffs have failed to state a claim against NaphCare for negligence and gross negligence

that is separate and apart from medical negligence, corporate negligence, and negligent

hiring[.]"[2]  (Dkt. No. 66 at 23–24.)  Specifically, Naphcare asserts "there are no allegations that

Nick was injured by Naphcare for a non-healthcare related reason."  (*Id*. at 24.)

---

[2] NaphCare argues for the first time in its Reply that Plaintiffs had previously waived all negligence claims against it in their previous Response to NaphCare's Motion to Dismiss the First Amended Complaint.  (Dkt. No. 74 at 3) (citing Dkt. No. 36.)  But as the argument is first raised in a Reply, the Court will not address the argument for now.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 14

Plaintiffs do allege Naphcare's employee, Nurse Karl, knowingly was "out of date on his Suicide Prevention in Jails training" when he completed the COWS and CIWA-Ar assessments. (Dkt. No. 63 at 20.)  They also allege Naphcare's employees, Nurse LaDusta and Nurse Nagra falsified information when completing the forms for the COWS and CIWA-AR assessments as they are alleged not to have interacted with Nicholas Rapp when completing the forms.  (*Id*. at 22–23, 25–26.)

These allegations viewed in the light most favorable to Plaintiffs would support negligence and gross negligence claims.  These claims, arguably, are based on conduct unrelated to and independent of any medical treatment provided to Nicholas Rapp.  Thus, NaphCare's Motion to Dismiss is DENIED as to Plaintiffs' negligence and gross negligence claims.

### D.  The Court Lacks Personal Jurisdiction over the NaphCare Out-of-State Leadership

NaphCare moves to dismiss the SAC arguing the Court lacks personal jurisdiction over the NaphCare's Out-of-State Leadership Defendants.  (Dkt. No. 66 at 10–16.)  The Court's previous Order dismissing Plaintiffs' First Amended Complaint ("FAC") reserved judgment on the issue but noted that "[i]t does appear NaphCare has raised significant issues regarding the lack of purposeful direction and intentional acts by most of, if not all, NaphCare's Out-of-State Leadership Defendants."  (Dkt. No. 62 at 18.)

"Federal courts apply state law to determine the bounds of their jurisdiction over a party."  *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017) (citing Fed. R. Civ. P. 4(k)(l)(A)).  Washington's long-arm statute, Washington Revised Code § 4.28.185, "extends jurisdiction to the limit of federal due process."  *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 82 (Wash. 1989).  The due process clause grants the court jurisdiction over defendants who have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional

1    notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

2    (1945) (quotations omitted).

3           Personal jurisdiction can be based on either general jurisdiction or specific jurisdiction.

4    *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) *overruled in*

5    *part on other grounds by Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433

6    F.3d 1199, 1207 (9th Cir. 2006) (en banc).  Plaintiffs do not allege NaphCare's Out-of-State

7    Leadership are subject to general jurisdiction.  Thus, only specific jurisdiction is at issue.

8           "The inquiry whether a forum State may assert specific jurisdiction over a nonresident

9    defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'"

10   *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quoting

11   *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014)).  Two principles guide this inquiry: first, this

12   relationship must arise from contacts that the "defendant *himself*" creates with the forum

13   state.  *Walden*, 571 U.S. at 284 (emphasis in original).  In other words, plaintiffs' or third parties'

14   contacts with the forum state cannot be the basis for jurisdiction over the defendant.  *Id.*  This is

15   because due process in this context "principally protect[s] the liberty of the nonresident

16   defendant—not the convenience of plaintiffs or third parties."  *Id.*  Second, the "'minimum

17   contacts' analysis looks to the defendant's contacts with the forum State itself, not the

18   defendant's contacts with persons who reside there."  *Id.* at 285.

19          The Ninth Circuit applies a three-part test to determine whether the exercise

20   of specific jurisdiction over a nonresident defendant is appropriate: (1) the defendant has either

21   purposefully directed his activities toward the forum or purposely availed himself of the

22   privileges of conducting activities in the forum; (2) the claims arise out of the defendant's forum-

23

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP
COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 16

1    related activities; and (3) exercise of jurisdiction is reasonable.  *Axiom*, 874 F.3d at 1068

2    (citations and quotations omitted).

3         For "purposeful direction," courts apply the three-part test from *Calder v. Jones*, 465 U.S.

4    783 (1984), which asks whether the defendant (1) committed an intentional act, (2) expressly

5    aimed at the forum, (3) causing harm that it knows is likely to be suffered there.  *Axiom*, 874

6    F.3d at 1069.

7         Plaintiffs concede that the Court lacks general jurisdiction over any of the NaphCare Out-

8    of-State Leadership Defendants.  (Dkt. No. 73 at 12.)  Instead, Plaintiffs argue the Court has

9    specific jurisdiction over each of the NaphCare Out-of-State Leadership Defendants because

10   they purposefully directed their activities toward the forum.  (*Id*. at 12–16.)  Plaintiffs argue the

11   NaphCare Out-of-State Leadership Defendants committed an intentional act by "formulating,

12   administering, and ratifying policies, procedures, practices, and customs within NaphCare that

13   are deliberately indifferent to the rights and safety of pretrial detainees, including Nick[,]" and

14   being "responsible for establishing and hav[ing] final approval on policies for NaphCare;

15   oversee[ing] the delivery of nursing care in all NaphCare-served facilities, including standards of

16   medical care and utilization review; and work[ing] with the key stakeholders across the Nation in

17   ensuring that NaphCare turns a profit, at patient expense."  (Dkt. No. 73 at 13) (citing Dkt. No.

18   63).

19        But in the face of a Rule 12(b)(2) motion "mere 'bare bones' assertions of minimum

20   contacts with the forum or legal conclusions unsupported by specific factual allegations will not

21   satisfy a plaintiff's pleading burden."  *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007).

22   Plaintiffs contend that the NaphCare Out-of-State Leadership Defendants were responsible for

23   administering all policies without mentioning any NaphCare policy the Defendants specifically

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP
COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 17

1    administered or formulated.  Nor have they explained how these policies or customs were the

2    result of the intentional act by each of the NaphCare Out-of-State Leadership Defendants.

3    Essentially, Plaintiffs argue the Court has jurisdiction over the NaphCare Out-of-State

4    Leadership Defendants because of their positions as executives of NaphCare.  This does not

5    satisfy the intentional act requirement of the *Calder* effects test.

6         Plaintiffs' only specific factual allegation of purposeful direction is that NaphCare's

7    founder and owner Jim McLane personally solicited Kitsap County to contract for its medical

8    services at the Jail.  (Dkt. No. 63 at 39.)  Plaintiffs allege the solicitation included a description

9    of the NaphCare Out-of-State Leadership Defendants as "Key Personnel" involved in

10   NaphCare's leadership.  (Dkt. No. 73 at 16.)  But jurisdiction is created by the contacts the

11   "defendant *himself*" creates with the forum state.  *Walden*, 571 U.S. at 284.  Plaintiffs have

12   provided no factual support, beyond the specific jurisdictional allegations of Jim McLane, that

13   would lead the Court to find it has jurisdiction over the other NaphCare Out-of-State Leadership

14   Defendants.

15        NaphCare disputes Plaintiffs' allegation that Jim McLane participated in the negotiation

16   process that resulted in NaphCare being awarded the contract to provide health care at the Jail.

17   (Dkt. No. 66 at 9.)  The only factual support offered by Plaintiffs that Jim McLane was involved

18   with solicitation of the Kitsap County is that Jim McLane signed a letter to Kitsap County on

19   behalf of NaphCare and the contract between NaphCare and Kitsap County on NaphCare's

20   behalf.  (*See generally* Dkt. No. 37-1.)

21        As to Jim McLane, Plaintiffs have adequately alleged his personal solicitation was an

22   intentional act expressly aimed at the forum.  But Plaintiffs have failed to explain how their

23   injuries arose out of Jim McLane's forum-related activities.  The Ninth Circuit uses a 'but for'

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP
COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 18

1   test to determine whether a plaintiff's claims arise out of a defendant's forum-related conduct.

2   *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007) (citation omitted).

3       The Court finds that Nicholas Rapp's death did not arise out of Jim McLane's role in

4   soliciting the contract to provide health care services at the Jail.  Indeed, Plaintiffs' response to

5   NaphCare's motion fails to address the "arise out of" portion of the specific jurisdiction analysis.

6   Plaintiffs' only citation in support of its position is not analogous.  In *Failla v. FixtureOne Corp.*,

7   the court found it had jurisdiction over an officer "directly responsible for the hiring, firing,

8   promotion, and payment of [the plaintiff]'s wages" in a "wage dispute[] arising from those

9   contacts."  336 P.3d 1112, 1118 (Wash. 2014).  Jim McLane's signature on forms as part of the

10  contract between Kitsap County and NaphCare is far too attenuated to be a but for cause of

11  Nicholas Rapp's death.

12      Thus, the Court finds it lacks personal jurisdiction over the NaphCare Out-of-State

13  Leadership Defendants and GRANTS NaphCare's Motion on these grounds.

14  **III      CONCLUSION**

15      Accordingly, and having considered Defendants' motions, the briefing of the parties, and

16  the remainder of the record, the Court finds and ORDERS that Defendants' Motions to Dismiss

17  are GRANTED in part and DENIED in part as follows:

18      1.  NaphCare's Motion to Dismiss (Dkt. No. 66) is GRANTED as to Defendants Jim

19          McLane, Susanne Moore, Marsha Burgess, Amber Simpler, Jeffrey Alvarez,

20          Bradford McLane, Cornelius Henderson, and Gina Savage for lack of personal

21          jurisdiction and DENIED as to all other claims and parties.

22      2.  Kitsap County's Motion to Dismiss (Dkt. No. 64) is DENIED.

23      Dated this 19th day of December 2022.

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS NAPHCARE AND KITSAP
COUNTY'S MOTIONS TO DISMISS (DKT. NOS. 66, 64) - 19

1

2

David G. Estudillo
United States District Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24