UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN RAPP, et al.,

               Plaintiffs,

    v.

NAPHCARE INC, et al.,

               Defendants.

CASE NO. 3:21-cv-05800-DGE

ORDER ON MOTIONS TO
EXCLUDE EXPERT TESTIMONY
(DKT. NOS. 93, 152)

## I      INTRODUCTION

This matter comes before the Court on Plaintiffs' and Kitsap County's[1] motions to

exclude expert testimony.  (Dkt. Nos. 93, 152.)  Plaintiffs move to exclude expert testimony from

Penny Bartley ("Ms. Bartley"), Thomas Ovens ("Mr. Ovens"), and Clifford Nelson ("Dr.

Nelson").  (Dkt. No. 93.)  Kitsap County moves to exclude expert testimony from Stephen

Sinclair ("Mr. Sinclair"), David Sweeney ("Mr. Sweeney"), Kris Sperry ("Dr. Sperry"), Joseph

---

[1] Kitsap County's motion was filed on behalf of Defendants Kitsap County, Elvira Decker, John
Gese, Andrew Hren, John Petersen, Brandon Rohde, Mark Rufener, and Gary Simpson.  The Court
refers to these defendants collectively throughout the motion as "Kitsap County" or "the County."

Penn ("Dr. Penn"), and Richard Hayward ("Dr. Hayward").  (Dkt. No. 152.)  The Court presumes familiarity with the facts of this case.  (*See* Dkt. Nos. 111 at 2–4; 198 at 2–4.)

Based on the Court's review of the parties' briefing and the record, the Court GRANTS in part and DENIES in part Plaintiffs' motion, and GRANTS in part and DENIES in part Kitsap County's motion.

## II      DISCUSSION

### A.  Legal Standard

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise" if their expertise "will help the trier of fact to understand the evidence or determine a fact in issue," the proffered testimony "is based on sufficient facts or data" and "is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."  The party seeking to offer expert testimony "has the burden of showing the admissibility of the testimony by a preponderance of the evidence."  *Spearman Corp. Marysville Div. v. Boeing Co.*, 2022 WL 11823467, at *1 (W.D. Wash. Oct. 21, 2022).

The Court's role is to act as a gatekeeper, "ensur[ing] the reliability and relevancy of expert testimony."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  "The test for reliability, however, 'is not the correctness of the expert's conclusions but the soundness of his methodology.'  And, reliable testimony must nevertheless be helpful."  *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)).  The Ninth Circuit has cautioned district courts from weighing expert "conclusions or assum[ing] a factfinding role."  *Elosu v. Middlefork Ranch, Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022).  The Court "is not tasked with deciding whether the expert

1    is right or wrong, just whether [the] testimony has substance such that it would be helpful to a

2    jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013).

3        **B. Plaintiffs' Motion to Exclude**

4            *a.  Ms. Bartley's Opinions*

5        Plaintiffs challenge Ms. Bartley's opinions on two bases:  first, taking issue with Ms.

6    Bartley's discussion of a "constitutional standard of care" (Dkt. No. 93 at 3–5); and second,

7    arguing that Ms. Bartley makes improper credibility assessments (*id.* at 5–8).

8                    i.   Opinion on Standard of Care

9        Plaintiffs first argue that Ms. Bartley applies an "inapplicable 'standard of care'" such

10   that her opinion is irrelevant to Plaintiffs' negligence claims.  (*Id.* at 3.)  In particular, Plaintiffs

11   assert that Ms. Bartley's opinion applies only a standard of "constitutionally required minimum

12   care" under the United States Constitution.  (*Id.*)  Because proving a constitutional violation is

13   "more demanding" than proving negligence, Plaintiffs ask that Ms. Bartley be precluded from

14   equating the constitutional standard of care with the standard for negligence under state law, and

15   that her opinion applying the constitutional standard be excluded as it pertains to Plaintiffs'

16   negligence claims.  (*Id.* at 3–5.)

17       Kitsap County counters that Ms. Bartley's opinions are relevant to Plaintiffs' negligence

18   claim because "Ms. Bartley expressly opines on **both** the constitutionally required minimum

19   level of care and the reasonableness of the conduct of corrections officers."  (Dkt. No. 112 at 7.)

20   The County further argues that caselaw on constitutional principles cited by Ms. Bartley is

21   relevant to understanding whether Defendants' conduct was reasonable for the purpose of

22   analyzing Plaintiffs' negligence claims:  in the County's view, Ms. Bartley's discussion of "the

23

24

constitutionally required minimum level of care aids and informs, and does not diminish, her opinions regarding the reasonableness of Defendants' conduct." (*Id.* at 8.)

As an initial matter, "[n]o expert shall testify on the wrong legal standard." *In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *10 (N.D. Cal. July 17, 2023).  Courts have excluded sections of expert reports that "misleadingly implie[d]" the relevant legal standard.  *Id.*; *see also Allegro Ventures, Inc. v. Almquist*, 2014 WL 1871628, at *6 (S.D. Cal. May 8, 2014); *Gaschler v. Scott County, Kan.*, 963 F. Supp. 971, 981 (D. Kan. 1997), *aff'd*, 141 F.3d 1184 (10th Cir. 1998).

Ms. Bartley's report focuses heavily on a constitutional standard of care.  She cites throughout her report Supreme Court and Ninth Circuit precedents applying constitutional law and attempts to apply those precedents to the present case.  (Dkt. No. 94-1 at 206, 208–09, 227, 229–231.)  Although the stated focus of Ms. Bartley's report is whether the County's care for Mr. Rapp fell "within the *reasonable* standard of care," the report's conclusion is that the "the Kitsap County jail provided *constitutionally required* minimum care to Mr. Rapp." (*Id.* at 206, 231 (emphases added).)  From this, one can only conclude Ms. Bartley is asserting that a "reasonable" standard of care relevant to assessing negligence is in fact the equivalent of "constitutionally required minimum care."  Indeed, Ms. Bartley confirmed that her "intent" in preparing her report was "to evaluate whether the care received [by Mr. Rapp] was acceptable under constitutional requirements." (*Id.* at 209.)

Ms. Bartley's opinion is improper to the extent it suggests that proving negligence requires proving a constitutional violation.  Finding otherwise would allow litigants to use expert testimony as a means of altering the legal standard by which a claim is to be assessed—in this instance, allowing the County to inject constitutional law into negligence law.  Such testimony

would confuse the jury regarding the appropriate legal standard for assessing Plaintiffs'

negligence claims. *Nyerges v. Hillstone Restaurant Grp., Inc.*, 2021 WL 3290463, at *7 (D.

Ariz. Aug. 2, 2021) (finding that allowing an expert to opine on a standard of care by discussing

statutory law "would create a significant risk of confusion" to the jury).

The Court further observes that Ms. Bartley's analysis as to whether the County satisfied

its obligations under the Constitution is comprised of improper legal conclusions and is

inadmissible on that related basis. *See Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th

Cir. 1996) ("Expert testimony is not proper for issues of law"); *Stewart Title Ins. Co. v. Credit

Suisse*, 2015 WL 4250704, at *5 (D. Idaho July 13, 2015) (excluding testimony opining that a

party violated duties imposed by law). Accordingly, Ms. Bartley may not testify as to her

understanding of the care required under the Constitution, whether in the context of Plaintiffs'

negligence claim or otherwise.

The Court does not, however, find that Ms. Bartley's constitutional analysis renders the

entirety of her proposed testimony inadmissible. While most of Ms. Bartley's opinion revolves

around constitutional precedents, there remain other, albeit minimal, aspects of her opinion—for

example, discussion of national and accreditation standards (Dkt. No. 94-1 at 207–08, 224),

screening procedures (*id.* at 220), and generally accepted industry practices (*id.* at 225). Apart

from the Court's holding with respect to credibility assessments discussed below, the Court does

not rule on the admissibility of the remainder of Mr. Bartley's proposed testimony at this time.

ii.   Credibility Assessments

Plaintiffs next argue that proposed testimony in Ms. Bartley's report addendum regarding

the reasonableness of the arresting officers' conduct is based on improper credibility

assessments, and, as such, ask that Ms. Bartley's "reasonableness opinion" be excluded. (Dkt.

No. 93 at 7–8.)  The County asserts that Ms. Bartley does not opine on credibility, but instead "properly relies on the accounts of the arresting deputies in preparing her opinion," which "require[] her to discount Wabnitz's account of the incident."  (Dkt. No. 112 at 9.)  And the County asserts that it is a "proper inquiry" of a rebuttal report to "criticize[] the factual assumptions" made by the opposing party's experts by showing how those assumptions are "inconsistent with certain documents in the record."  (*Id.* at 9–10.)

The Court agrees with Plaintiffs that statements within Ms. Bartley's report addendum constitute improper credibility assessments.  Although an expert may "offer[] an opinion based on a set of facts assumed to be credible," *Ellis v. Navarro*, 2012 WL 3580284, at *6 (N.D. Cal. Aug. 17, 2012), an expert may not "testify specifically to a witness' credibility or . . . in such a manner as to improperly buttress a witness' credibility," *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989).  Credibility determinations are "tasks suited to a jury."  *Godinez v. Huerta*, 2018 WL 2018048, at *6 (S.D. Cal. May 1, 2018).  It is also not, as the County represents, an expert's job to critique the strength of another expert's factual assumptions; allowing otherwise would outsource the jury's role in weighing the evidence.  *See Hinkle v. LaRoche*, 2008 WL 5453779, at *2 (E.D. Wash. Aug. 1, 2008).

Ms. Bartley opines on Wabnitz's credibility by questioning whether Wabnitz truly believed Mr. Rapp was suicidal and whether Wabnitz had actually informed officers about Mr. Rapp's suicidality.  For instance, Ms. Bartley opines that Wabnitz's "claim[ed] . . . concern[]" that Rapp was suicidal "is not supported by the records from three separate events involving different people."  (Dkt. No. 94-1 at 199.)  She speculates that Wabnitz's "actions are not consistent with someone who believes someone is actively suicidal" and "[i]nstead . . . seem consistent with someone [who] thinks a friend has had too much to drink."  (*Id.* at 189.)  Ms.

1   Bartley further urges her audience to embrace her favored factual narrative by "consider[ing]"

2   Plaintiffs' expert's opinions "against the contemporaneously handwritten statement" by Wabnitz,

3   which did not mention Mr. Rapp being suicidal.  (*Id.*)

4          Such fact-based advocacy reflects an improper attempt to discredit Wabnitz by

5   speculating as to her internal beliefs and truthfulness.  *See Gonzalez v. Valenzuela*, 2001 WL

6   36387147, at *4 (C.D. Cal. Nov. 26, 2001); *Snead v. Wright*, 2022 WL 4329390, at *4 (D.

7   Alaska Sept. 19, 2022).  These statements do not simply rely on factual assumptions as the mere

8   foundation for Ms. Bartley's expert opinion.  Instead, they provide improper discussion, and in

9   effect, advocacy, as to why Ms. Bartley's chosen factual assumptions are better than alternate

10  views.

11         Although Plaintiffs argue, in light of Ms. Bartley's improper credibility assessments, for

12  exclusion of what they characterize as the rebuttal's entire "reasonableness opinion" (Dkt. No.

13  93 at 8), the Court does not find such broad exclusion appropriate on that basis at this time.  Ms.

14  Bartley's opinion is not exclusively comprised of credibility assessments.

15         The Court therefore DENIES Plaintiffs' motion to exclude Ms. Bartley's proposed

16  testimony in its entirety, but GRANTS Plaintiffs' motion to the extent Ms. Bartley opines on

17  constitutional or other legal standards, as well as to the extent she attempts to buttress or

18  diminish the credibility of witnesses.

19              *b.   Mr. Ovens' Opinions*

20         Plaintiffs move to exclude Mr. Ovens' opinion on the grounds that (1) Mr. Ovens'

21  proposed testimony improperly opines on credibility (Dkt. No. 93 at 8–10); (2) Mr. Ovens' "only

22  opinion" is an improper legal conclusion (*id.* at 10); and (3) Mr. Ovens disclosed no opinion on

1   whether the acts of the involved officers were reasonable, such that he should be precluded from

2   testifying as to the officers' reasonableness at trial (*id.* at 10–11).

3                         i.   Credibility Assessments

4         Plaintiffs first argue that Mr. Ovens improperly "attempts to undermine Ms. Wabnitz's

5   credibility by urging that the jury 'question Wabnitz's account of events.'" (*Id.* at 9.) Plaintiffs

6   point to two statements from paragraph 13 in Mr. Ovens' report. The first states that "it is of

7   note" that Plaintiffs' expert "does not question Wabnitz's account of events even though she

8   admitted to being upset with Rapp during her interview with Detectives because she had to pick

9   him up after she wanted a night off." (Dkt. No. 94-1 at 248.) The second states that Wabnitz

10   "claims that Rapp was going to hang himself but despite being a trained health care provider she

11   failed to act on his suicidal ideation and instead brought him to her house." (*Id.*)

12         The County asserts that Mr. Ovens' report, "as a rebuttal" to Plaintiffs' expert Mr.

13   Sweeney, may "challenge[] Mr. Sweeney's reliance on the statements of Ms. Wabnitz in light of

14   conflicting, inconsistent, and contradictory pieces of evidence." (Dkt. No. 112 at 10.) The

15   County also offers assurances that Mr. Ovens will not comment on witness credibility "unless

16   Plaintiffs' counsel improperly asks him to do so." (*Id.*)

17         The County's contention that an expert may challenge another expert's reliance on

18   certain factual assumptions is incorrect, as "jurors can [] make their own determination of how

19   events unfolded." *McGough v. Penzone*, 2021 WL 1575054, at *3 (D. Ariz. Apr. 22, 2021).

20   Proposed testimony that merely vouches for one side's version of events is unhelpful to the trier

21   of fact. *Mata v. Oregon Health Auth.*, 739 Fed. Appx. 370, 372 (9th Cir. 2018). In this instance,

22   Mr. Ovens' statements in paragraph 13 do no more than vouch for Defendants' preferred factual

23   narrative by expressly encouraging the "question[ing]" of one witness' "account of events" while

24

highlighting favored aspects of the record in a quest to undermine that witness' account.  (Dkt. No. 94-1 at 248.)  The Court therefore excludes paragraph 13 of Mr. Ovens' report.  However, Plaintiffs have not shown how the specific credibility judgments from paragraph 13 render the remainder of Mr. Ovens' report inadmissible; the Court does not adopt this far-reaching an exclusion at this time.

### ii.   Legal Conclusions

Plaintiffs also argue that Mr. Ovens' opinion in paragraph 11 that arresting deputies were not "deliberately indifferent" to Mr. Rapp's medical needs is an improper legal conclusion. (Dkt. No. 93 at 10.)  While the County maintains that Mr. Ovens does not render legal conclusions, it proposes that, in the event this Court finds testimony on "deliberate indifference" improper, the phrase be excluded "while allowing the remainder of Mr. Ovens' opinions to be admitted."  (Dkt. No. 112 at 11.)

Mr. Ovens' opinion on "deliberate indifference" does constitute an improper legal conclusion that must be excluded.  *See M.H. v. County of Alameda*, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015).  Although Plaintiffs again argue that the entirety of Mr. Ovens' report should be excluded on this ground (Dkt. No. 93 at 10), such result is not appropriate, as Mr. Ovens' opinion on deliberate indifference is limited to a single paragraph.  (Dkt. No. 94-1 at 247.)

### iii.   Reasonableness Opinions

Finally, Plaintiffs argue that Mr. Ovens should not be permitted to offer any testimony regarding the reasonableness of the involved officers' conduct, as Mr. Ovens disclosed no opinion on reasonableness in his report.  (Dkt. No. 93 at 10–11.)  Plaintiffs point to Mr. Ovens' deposition testimony as confirmation that Mr. Ovens did not opine on reasonableness, as Mr. Ovens' stated that he has "been not asked to form [an] opinion" on whether the acts or omissions

1   of the involved officers were reasonable, and therefore does not intend to testify on that issue at

2   trial.  (Dkt. No. 118 at 6.)  In response, the County asserts that Mr. Ovens *does* opine on the

3   reasonableness of the officers' conduct through his proposed testimony "explain[ing] [that] the

4   deputies properly investigated the domestic violence incident, [] had probable cause to make an

5   arrest, and [] properly transported Mr. Rapp to the jail."  (Dkt. No. 112 at 10–11.)

6       As an initial matter, the County's reference to Mr. Ovens' opinion on probable cause is

7   unhelpful, as that opinion is an impermissible legal conclusion.  *Stuart v. United States*, 23 F.3d

8   1483, 1487 (9th Cir. 1994) (district court did not abuse its discretion in prohibiting expert from

9   providing opinion on probable cause); *Morales v. Fry*, 2014 WL 12042563, at *4 (W.D. Wash.

10  March 25, 2014) (expert witness was prohibited from offering testimony on the existence of

11  probable cause).  Opinions offered by Mr. Ovens that discuss probable cause will be excluded.

12      The Court nonetheless finds that at least some remaining portions of Mr. Ovens' report

13  contain opinions that may be relevant to the reasonableness of Defendants' actions.  (*See* Dkt.

14  No. 94-1 at 246–47 (opining on the booking process at jails).)  Accordingly, the Court declines

15  Plaintiffs' request to broadly preclude Mr. Ovens from testifying on reasonableness.  Kitsap

16  County is advised, however, that experts are to refrain from proffering legal conclusions in this

17  context.  While a qualified expert may speak to "standard law enforcement practices and whether

18  [a party's] conduct is in accord with those practices," *Fontana v. City of Auburn*, 2014 WL

19  4162528, at *6 (W.D. Wash. Aug. 21, 2014), the expert should not opine as to whether the party

20  acted in a manner that was objectively reasonable, *Holley v. Gilead Sciences, Inc.*, 2023 WL

21  2469632, at *4 (N.D. Cal Feb. 27, 2023).

22      The Court therefore DENIES Plaintiffs' motion to exclude Mr. Ovens' proposed

23  testimony in its entirety, but GRANTS Plaintiffs' motion to exclude Mr. Ovens' proposed

24

1  testimony to the extent it opines on issues of law—including but not limited to deliberate

2  indifference or probable cause—and to the extent it contains improper credibility assessments.

3          c. *Dr. Nelson's Opinions*

4          Kitsap County has withdrawn Dr. Nelson as an expert and states he will not be called as a

5  witness at trial.  (Dkt. No. 112 at 12.)  Accordingly, the Court need not address Plaintiffs' request

6  that Dr. Nelson's proposed testimony be excluded.

7      **C.  Kitsap County's Motion to Exclude**

8          a. *Mr. Sinclair's Opinions*

9          The County argues for exclusion of two of Mr. Sinclair's opinions—Opinion A and

10  Opinion D.  (Dkt. No. 152 at 5–6.)  The Court addresses each in turn.

11              i.   Opinion A

12          Opinion A is Mr. Sinclair's opinion that "Kitsap County Deputy Sheriffs failed to pass on

13  vital information [on the pre-booking form], which, if shared [with jail staff], would have more

14  likely than not prevented Mr. Rapp's suicide."  (Dkt. No. 94-1 at 40.)  The County breaks this

15  opinion into two parts: first, taking issue with the factual assertion that the arresting deputies did

16  not pass information about Mr. Rapp's intoxication and suicidality to jail staff; and second,

17  taking issue with Mr. Sinclair's opinion on causation.  (Dkt. No. 152 at 11–12, 13.)

18          With respect to the former—*i.e.*, Mr. Sinclair's proposed testimony that the arresting

19  deputies did not convey to jail staff information about Mr. Rapp's suicidality and intoxication—

20  the County argues for exclusion on several bases.  First, that Mr. Sinclair is not qualified to

21  render such an opinion; second, that Mr. Sinclair does not reference any law enforcement

22  standards in rendering the opinion; third, that the opinion lacks factual basis; and fourth, that the

23  opinion is not helpful to the trier of fact.  (*Id.* at 12–13).  Plaintiffs respond by observing that the

24

County's argument is only rooted in its "disagreement" with Mr. Sinclair's interpretation of record evidence, which is "not the proper focus of a Rule 702 inquiry." (Dkt. No. 165 at 3.) Plaintiffs also point to Mr. Sinclair's experience as a trained police officer as evidence of his qualifications, and assert Mr. Sinclair properly relied on record evidence including testimony of and statements by witnesses in providing his recitation of the facts. (*Id.* at 5–7.)

The Court declines to exclude this aspect of Mr. Sinclair's proposed testimony. That certain information was not conveyed to jail staff by the arresting deputies is a factual assumption—based on evidence in the record—that the County improperly seeks to challenge in its *Daubert* motion. The existence of conflicting factual narratives on which competing experts rely is not a proper basis to exclude testimony. *See Vanguard Logistics Svcs. (USA), Inc. v. Groupage Svcs. of New England, LLC*, 2022 WL 17369626, at *5 (C.D. Cal. Oct. 4, 2022) (a party's "concern[]" about "the factual basis" for an expert's report is "not an appropriate basis to exclude [the] testimony and report."). The County's "challenges to the factual assumptions relied upon by [Mr. Sinclair] are a matter for cross-examination, not exclusion." *Scripps Health v. nThrive Revenue Sys., LLC*, 2021 WL 3372835, at *3 (S.D. Cal. May 10, 2021); *see also Hynix Semiconductor, Inc. v. Rambus, Inc.*, 2008 WL 73689, at *12 (N.D. Cal. Jan. 5, 2008) ("[I]f the jury concludes [an expert's] assumed facts are wrong," then the jury may reject that expert's conclusion.).

The County's remaining arguments concerning expert qualifications, law enforcement standards, and helpfulness to the jury are inapposite as they pertain to the propriety of Mr. Sinclair's factual assumptions. Factual assumptions comprise the groundwork on which an expert opinion is based; they are not themselves expert opinion. *See Udd v. City of Phoenix*, 2020 WL 1536326, at *34 (D. Ariz. March 31, 2020). Accordingly, Mr. Sinclair did not need a

certain type of expertise[2] nor the support of a law enforcement standard to simply recite an assumed fact.  The jury will decide whether it agrees with the assumptions on which Mr. Sinclair's expert testimony is based.

The County also challenges Mr. Sinclair's opinion with respect to causation—specifically, Mr. Sinclair's conclusion that, had the arresting deputies shared the "vital information" about Mr. Rapp's suicidality, Mr. Rapp's suicide would have "more likely than not" been prevented.  (Dkt. No. 152 at 5–6, 13–14.)  The County argues this opinion is "entirely speculative" and that Mr. Sinclair "fails to explain how his experience in the field of corrections leads him to his conclusions." (*Id.* at 14.)  Plaintiffs respond that Mr. Sinclair's opinion is based on his "extensive experience in the corrections field," his training and service as a police officer, his review of the factual record, and Washington Association of Sheriff and Police Chiefs ("WASPC") standards.  (Dkt. No. 165 at 5, 7–8.)

Mr. Sinclair's opinion is sufficiently supported.  Mr. Sinclair specifies *how* it is that, in his opinion, sharing information about Mr. Rapp's suicidality and intoxication would have "more likely than not prevented" Mr. Rapp's suicide (Dkt. No. 94-1 at 40), as he opines that the information "would have dictated different required actions by the [jail]," including "placement on a special watch for suicide," (*id.* at 43).  As Mr. Sinclair elaborates, placement on suicide

---

[2] In any event, Mr. Sinclair is qualified.  Although the County argues Mr. Sinclair should not be permitted to opine on the conduct of law enforcement officers since he was "retained to offer opinions in the field of corrections" (Dkt. No. 152 at 2, 5), the Court finds that Mr. Sinclair does have sufficient experience in law enforcement, particularly in light of his experience as a police officer and training with the Walla Walla Police Department.  (Dkt. No. 94-1 at 39.)  *See California Steel and Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1003 (9th Cir. 1981).  The jury may decide how much weight Mr. Sinclair's testimony deserves considering the extent of that experience. *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *Seattle Mideast Awareness Campaign v. King County*, 2011 WL 13356164, at *4 (W.D. Wash. Aug. 5, 2011).

1   watch would necessitate more frequent visual safety checks, "enhanced psychiatric interaction,"

2   and the use of "special cells designed to prevent suicide." (*Id.* at 45.)

3       Mr. Sinclair further shows *why* he concludes that information about intoxication and

4   suicidality are "vital" in the screening stage by explaining that a substantial proportion of

5   suicides in jails and prisons occur within the "first seven days of incarceration," and noting that

6   WASPC best practices recognize a link between suicide and "co-occurring substance abuse and

7   mental health conditions." (*Id.* at 40–41.) Mr. Sinclair's opinions on screening to ensure safety

8   for incarcerated individuals are also linked to his experience as an officer and professional focus

9   on the safety of correctional facilities. (*Id.* at 38–39.) *See United States v. Pulido-Avina*, 562 F.

10  Supp. 3d 795, 800 (C.D. Cal. 2022). Mr. Sinclair's Opinion A is therefore reliable.[3]

11                        ii.   Opinion D

12      The County next seeks to exclude Mr. Sinclair's Opinion D, in which he concludes:

13  "Kitsap County Jail Employees failed to follow jail procedures and sound correctional practice,

14  which may have prevented Mr. Rapp's completed suicide, when Corrections Officer Petersen

15  failed to conduct a thorough 'Tier Check.' Had an effective tier check been completed by

16  Corrections Officer Petersen the emergency response to Mr. Rapp's suicide attempt would have

17  been initiated 20 minutes sooner than it occurred." (Dkt. No. 94-1 at 40.)

18      The County argues Opinion D is unreliable, based on unsupported assumptions, and not

19  the proper subject of expert testimony. (Dkt. No. 152 at 14–16.) Plaintiffs respond by arguing

20

21  ---
[3] Although the County also takes issue with Mr. Sinclair's (and other experts') failure to "discuss[]

22  . . . the policies/protocols in place at the [Kitsap County jail]" (Dkt. No. 167 at 4), the Court notes
    that Mr. Sinclair *does* discuss Kitsap County's Sheriff's Office Custody Policy. (Dkt. No. 94-1 at

23  45.) And in any event, to the extent the County has issues with the specific materials reviewed by
    Plaintiffs' experts, the County "may cross-examine [those experts] regarding the materials [they]

24  failed to review at trial." *Arriaga v. Logix Fed. Credit Union*, 2022 WL 3052318, at *3 (C.D. Cal.
    April 22, 2022).

1  that Mr. Sinclair's opinion is reliable because Mr. Sinclair "*does* reference the County's own

2  safety check policies" and compares Officer Petersen's ineffective check with a later check that

3  that he found effective.  (Dkt. No. 165 at 13.)

4         Mr. Sinclair's opinion regarding Officer Petersen's cell check is reliable.  Mr. Sinclair

5  supports his opinion by reference to Kitsap County Sheriff's Office Custody Policy 507, which

6  requires that safety checks involve "personal observation . . . sufficient to determine whether the

7  inmate is experiencing any stress or trauma."  (Dkt. No. 94-1 at 49–50.)  Mr. Sinclair further

8  compares Officer Petersen's inadequate check to an adequate check conducted later, which

9  involved "pausing and looking in each cell to confirm a living, breathing person."  (*Id.* at 50.)

10  Moreover, Mr. Sinclair's experience in correctional safety provides him the knowledge to

11  reliably opine on whether the cell check conformed with expected practice.  (*Id.* at 36.)

12         The County spends considerable time disputing the factual support for Opinion D.  For

13  example, the County takes issue with the statement that at the time of Officer Petersen's safety

14  check, "Mr. Rapp was more likely than not 'slumped on the floor slowly being choked to

15  death.'"  (Dkt. No. 152 at 15; Dkt. No. 167 at 5.)  The County instead contests that "Mr. Rapp

16  could have been doing absolutely anything on the right side of his cell."  (Dkt. No. 167 at 6.)

17  The County further argues that "Mr. Sinclair's attempt to opine regarding what Officer Petersen

18  should or would have seen [during a proper cell check] is [] the improper subject of expert

19  testimony," as "[w]hat someone might have seen when looking through a window is not beyond

20  the common knowledge of the average layman."  (Dkt. No. 152 at 16.)  Plaintiffs respond by

21  noting that Mr. Rapp's physical state at the time of the check "is a factual dispute unfit for a

22  *Daubert* motion," and that Mr. Sinclair's opinion is properly based on video evidence.  (Dkt. No.

23  165 at 10–11.)

24

1    The Court agrees with Plaintiffs as, again, "the factual basis of an expert opinion goes to

2    the credibility of the testimony, not the admissibility, and it is up to the opposing party to

3    examine the factual basis for the opinion in cross-examination." *Hangarter v. Provident Life and*

4    *Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (internal citation and quotation omitted).

5    The Court reminds the parties, however, that while expert testimony necessarily involves some

6    discussion of factual evidence, "[e]xperts will not be permitted . . . to gratuitously comment on

7    factual evidence or present what are essentially lawyer arguments with regard to factual

8    testimony." *In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 11696720, at *3 (D. Ariz. Dec.

9    22, 2017).  "The Court will seek to strike the proper balance at trial between allowing experts to

10   provide some background information and reasonably explain their opinions in a manner helpful

11   to the jury, and avoiding unnecessary factual narratives." *Smilovits v. First Solar, Inc.*, 2019 WL

12   6875492, at *12 (D. Ariz. Dec. 17, 2019).

13        The Court DENIES the County's motion to exclude Mr. Sinclair's proposed testimony.

14            *b.   Mr. Sweeney's Opinions*

15        Kitsap County next challenges the reliability of Opinions 3, 5, and 6 from Mr. Sweeney's

16   report.  Opinions 3 and 5 are factual assumptions:  they state that Deputy Rohde was not accurate

17   and/or truthful in completing the domestic violence supplemental report and the Arrest and

18   Booking Information form, respectively.  (Dkt. No. 94-1 at 165–66.)  The County's arguments

19   for exclusion again center on a challenge to the strength of the support in the record for these

20   factual assumptions (Dkt. No. 152 at 16–17), which the Court rejects.  However, the Court does

21   instruct that an expert is not allowed to opine directly on a party's truthfulness.  *Candoli*, 870

22   F.2d at 506 (9th Cir. 1989).  Mr. Sweeney's opinion that Deputy Rohde was untruthful must be

23   excluded.  *Id.*

24

1   The Court further finds that, when viewed in context of Mr. Sweeney's expert report, the

2   factual assumptions that various police forms were inaccurate—as well as the remainder of Mr.

3   Sweeney's proposed testimony—must be excluded.  Rather than apply his expertise to a set of

4   assumed facts, Mr. Sweeney's report is comprised almost entirely of factual narrative:

5   descriptions of the responses recorded by the arresting deputies on police forms and reports, the

6   accuracy of those answers, Mr. Rapp's behavior leading to his arrest, Mr. Rapp's transport to

7   jail, and the nature of the charges faced by Mr. Rapp.  (Dkt. No. 94-1 at 165–67.)

8   The only apparent "opinions" by Mr. Sweeney state that accuracy and honesty are of

9   considerable import in police reports and that the arresting deputies did not adhere to the "best

10  practice" of accuracy and honesty in filling out the various police reports and forms.[4]  (*Id.* at

11  165–167.)  For example, Opinion 6—also challenged by the County—concludes that "Deputy

12  Rohde fell far below the standard of care," defining the "standard of care" merely as "striv[ing]

13  for accuracy when completing police reports."  (*Id.* at 166–67.)  Plaintiffs do not need an expert

14  to convey these opinions; the importance of accuracy and honesty in police reporting is not

15  "beyond the common knowledge of the trier of fact."  *United States v. Finley*, 301 F.3d 1000,

16  1008 (9th Cir. 2002); *see also Nyerges*, 2021 WL 3290463, at *7–8.  Indeed, Mr. Sweeney

17  himself describes "standards" of accuracy and honesty in reporting as "well-known" and

18  "incontrovertible."  (Dkt. No. 94-1 at 167.)  As Mr. Sweeney's opinions "are a matter of lay

19  knowledge," Mr. Sweeney's opinions are excluded.  *Sedlik v. Drachenberg*, 2022 WL 17886029,

20  at *4 (C.D. Cal. June 27, 2022).

21

22

23

24

---

[4] While Mr. Sweeney also dedicates one sentence to opining that, had the forms been accurate, Mr. Rapp would likely have been hospitalized or placed on suicide watch (Dkt. No. 94-1 at 167), Mr. Sweeney provides no further explanation for this opinion and in any event, the discussion is redundant with opinion offered by Mr. Sinclair.

1   The Court GRANTS the County's motion to exclude Mr. Sweeney's Opinions 3, 5, and

2   6, and further excludes the remainder of Mr. Sweeney's report.

3          *c.  Dr. Sperry's Opinions*

4   The County challenges opinions by Dr. Sperry regarding cell checks and causation.  (Dkt.

5   No. 152 at 19–21.)

6          i.   Qualifications Related to Opinions on Cell Checks

7   The County first argues that Dr. Sperry is unqualified to render opinions on "the

8   sufficiency of Officer Petersen's cell check," as Dr. Sperry's background is in forensic pathology

9   rather than custody or corrections.  (*Id.* at 19.)  According to the County, opinions regarding

10  Officer Petersen's cell check are not medical opinions so should not be conveyed to the jury as

11  such.[5]  (*Id.* at 19–20.)  Consequently, the County asks that Dr. Sperry's opinions on the propriety

12  of cell checks be excluded.  (*Id.*)

13  Plaintiffs agree that "Dr. Sperry is unqualified to opine on the propriety of Officer

14  Petersen's safety check."  (Dkt. No. 165 at 17.)  But Plaintiffs contend that Dr. Sperry has

15  rendered no such opinion on the *propriety* of the check; rather, "[h]e simply states facts drawn

16  from the evidence reviewed, including video evidence."  (*Id.*)

17  At the outset, the Court observes that Dr. Sperry may recount, based on record evidence,

18  Officer Petersen's conduct during the 1:25 p.m. cell check.  *Moonbug Entm't Ltd. v. BabyBus*

19  *(Fujian) Network Tech. Co.*, 2023 WL 4108838, at *15 (N.D. Cal. June 21, 2023) (permitting

20

21  [5] Raised within the County's argument on qualifications is an assertion that there is no factual
    support for Dr. Sperry's assumption that Officer Petersen would have seen Mr. Rapp engaged in

22  suicidal activity at 1:25 p.m., had the officer looked into Mr. Rapp's cell.  (Dkt. No. 152 at 20.)
    This argument has nothing to do with Dr. Sperry's qualifications, and everything to do with Dr.

23  Sperry's recitation of the facts based on his review of the record.  For reasons already explained,
    this argument fails.  Issues with the extent to which the record supports Dr. Sperry's opinion may

24  be elicited during cross-examination.

1    factual narrative by an expert insofar as it served as a basis for the expert opinion).  However, to

2    the extent that Dr. Sperry's proposed testimony expresses an opinion as to the propriety or

3    sufficiency of Officer Petersen's cell check, such testimony must be excluded, as Plaintiffs

4    concede that Dr. Sperry does not have the requisite law enforcement or corrections experience.

5    (*Id.*)

6           The Court finds that Dr. Sperry's report walks a fine line between opining on the

7    propriety of Officer Petersen's cell check and simply recounting observations as to Officer

8    Petersen's physical actions.  For instance, Dr. Sperry states that at 1:25 p.m., "Officer [] Petersen

9    walked by all of the cells in the unit" and "never looked in Mr. Rapp's cell."  (Dkt. No. 158-18 at

10   3, 8).  Such recitation is acceptable factual predicate for Dr. Sperry's opinion and need not be

11   excluded.

12          However, Dr. Sperry's report also states that Officer Petersen did not "mak[e] a direct

13   visual safety check into Nick's cell."  (*Id.* at 4.)  And Dr. Sperry concludes that Officer Petersen

14   either "did not sufficiently look into the cell" or "sufficiently look[ed] into the cell" and "chose

15   to leave Mr. Rapp for dead."  (*Id.* at 9.)  These opinions go beyond factual recitation based on

16   record evidence and purport to convey to the jury Mr. Sinclair's opinion on what a "visual safety

17   check" should entail and what type of "look into" a cell would be "sufficient."  Given Dr.

18   Sperry's lack of expertise in law enforcement or corrections, Dr. Sperry may not proffer such

19   opinions at trial.  *See In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 6523833, at *9 (D.

20   Ariz. Dec. 21, 2017) (an expert "may not venture outside his area of expertise.").

21          Dr. Sperry also must not testify that factual assumptions—*e.g.*, that Officer Petersen did

22   not look into Mr. Rapp's cell—are supported "to a reasonable degree of medical certainty."

23   (Dkt. No. 158-18 at 9.)  As written, Dr. Sperry's report appears to do exactly that.  (*See id.*)

24

While Dr. Sperry may state facts perceived from record evidence as the predicate for his opinion, he is precluded from conveying that factual predicate as though it is itself expert medical opinion.

### ii.   Causation Opinions

Finally, the County argues that Dr. Sperry's "opinion regarding operational causation is unreliable" and speculative.  (Dkt. No. 152 at 20–21.)  The County characterizes Dr. Sperry's "operational causation" opinion as opining that "the frequency or sufficiency of cell monitoring [wa]s a cause in Mr. Rapp's suicide."  (*Id*. at 20.)  In the County's view, Dr. Sperry should have only opined regarding the "medical cause" of Mr. Rapp's death, in light of his background as a forensic pathologist, rather than "operational causes" of death, such as the frequency or sufficiency of cell checks.  (*Id.* at 20–21.)  Any conclusion by Dr. Sperry that "an inmate who is monitored more closely has less of an opportunity to commit suicide" is "based solely on logic and reasoning" rather than medical knowledge, the County argues, and is therefore "not the proper subject for expert opinion."  (*Id.* at 21.)

Plaintiffs' response does not fully address the County's arguments.  Plaintiffs respond cursorily that they are "unsure as to what [the County] means by 'operational cause' versus 'medical cause.'" (Dkt. No. 165 at 18.)  Plaintiffs do not attempt to address the County's characterization of Dr. Sperry's testimony on the cause of Mr. Rapp's death, nor the County's arguments regarding the propriety of such opinion, and instead just point out that Dr. Sperry properly relies on video evidence to support observations in his report.  (*Id.*)

The Court has already addressed above Dr. Sperry's opinion on the sufficiency of cell checks; opinions on the sufficiency of cell checks—including the proper frequency for cell checks—have already been excluded as beyond Dr. Sperry's expertise.  However, the Court

instructs that Dr. Sperry's opinions regarding the relationship between the timing of medical intervention and Mr. Rapp's death, including his opinions regarding at what point in time intervention would have averted death, may stand.  These opinions are based on Dr. Sperry's medical expertise as to how long death takes to occur under the circumstances, and at what points in time medical intervention would have been successful.  (Dkt. No. 158-18 at 7–9.)  Such matters are "beyond the common knowledge of the average layman."  *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001).

Accordingly, the Court GRANTS the County's motion to exclude Dr. Sperry's opinions regarding the propriety or sufficiency of cell checks—including the proper frequency of such checks—and DENIES the County's motion to the extent that the County seeks to prohibit Dr. Sperry from testifying as to the timing of underlying events and medical intervention.

### d.  Dr. Penn's Opinions

The County challenges Dr. Penn's opinions on two grounds:  first, that Dr. Penn is not qualified to render certain opinions; and second, that certain of Dr. Penn's opinions are unreliable.  (Dkt. No. 152 at 21–24.)

#### i.  Qualifications Related to Custodial or Corrections Practices

The County first asks that the Court exclude "all of Dr. Penn's opinion regarding custody staff and custodial/corrections practices because Dr. Penn," as "an expert in the field of correctional mental health," is "not a custody/corrections expert."  (*Id.* at 21.)  As the County contends, Dr. Penn's opinions "fail to account for the fact that custody/corrections and psychiatry are two separate fields."  (*Id.* at 21–22.)

Plaintiffs respond by pointing out that Dr. Penn's experience includes "administering mental health care delivery systems in a variety of correctional settings," serving as a chair of the

1  National Commission on Correctional Health Care's ("NCCHC") accreditation committee, and

2  helping revise NCCHC standards.  (Dkt. No. 165 at 19.)  Therefore, Plaintiffs argue that Dr.

3  Penn "is qualified to opine on 'operational issues' relating to mental health delivery in custodial

4  situations, including 'suicide prevention and intervention' efforts executed by corrections,

5  medical, and mental health staff."  (*Id.* at 19–20.)

6         The Court finds that Dr. Penn is qualified to opine on custodial or corrections practices as

7  they relate to mental health care and suicide prevention measures.  The County's argument that

8  Dr. Penn is unqualified would appear to suggest that Dr. Penn is experienced only in general

9  psychiatry, without any specialization in correctional settings.  Were that the case, the County's

10 argument would be stronger.  But as Plaintiffs properly assert, much of Dr. Penn's expertise in

11 psychiatry lies in correctional settings.  (Dkt. No. 158-15 at 29–33.)  Defendants have cited no

12 authority warranting disqualification in these circumstances.  The Court declines to exclude Dr.

13 Penn's testimony on this basis.  *See Ferreira v. Arpaio*, 2017 WL 5504453, at *6 (D. Ariz. Nov.

14 16, 2017); *Douglas v. County of Greene*, 2022 WL 467622, at *9 (N.D.N.Y. Jan 25, 2022).

15                                   ii.   Reliability of Opinions 5, 6, and 7

16        The County next challenges three opinions by Dr. Penn on the basis that each is

17 unreliable.  The County starts with Dr. Penn's Opinion 5, which opines that "[t]he systematic

18 disregard for Mr. Rapp's known increased risk of suicide . . . fell far below the standard of care

19 and was grossly incompetent."  (Dkt. No. 158-15 at 25–26.)  The County argues that Dr. Penn

20 fails to explain the standard of care applied in rendering this opinion.  (Dkt. No. 152 at 22.)

21 Plaintiffs respond that Dr. Penn does identify the standard of care when he opines that "[t]he

22 standard of care for the evaluation and treatment of a patient such as Nicholas Rapp in a jail

23

24

1    setting is for timely access to quality mental health treatment services and suicide prevention

2    practices carried out by both custody and health care staff." (Dkt. No. 165 at 20.)

3          Opinion 5 is sufficiently reliable. As Plaintiffs point out, Dr. Penn does specify a

4    standard. (*Id.*) Moreover, Dr. Penn's opinion is based on his specialized knowledge of and

5    experience with suicide prevention practices and policies in correctional settings, familiarity with

6    NCCHC Standards, and review of the factual record. *See Elosu*, 26 F.4th at 1024 ("An expert's

7    specialized knowledge and experience can serve as the requisite 'facts or data' on which they

8    render an opinion"). The County may challenge the strength of Dr. Penn's opinion as to standard

9    of care on cross-examination. *See id.*

10        The County also challenges Dr. Penn's Opinion 6, in which Dr. Penn opines that Officer

11    Petersen's cell check "fell below the standard of care" and resulted in Mr. Rapp's death. (Dkt.

12    No. 158-15 at 26.) The County argues that this opinion again fails to identify a standard of care

13    and does not "explain[] what was deficient about the cell check."[6] (Dkt. No. 152 at 23.)

14    Plaintiffs respond that Dr. Penn's opinion on the cell check is "precisely the type of opinion one

15    would expect from a corrections professional tasked by the NCCHC to promulgate national

16    standards" for a "safe . . . scheme of corrections healthcare." (Dkt. No. 165 at 21.)

17        Dr. Penn's Opinion 6 is sufficiently reliable. In asserting that Dr. Penn did not explain

18    the cell check's deficiencies, the County overlooked that within Opinion 6, Dr. Penn explained

19    that the purpose of a proper cell check "is to ensure that inmates—particularly those with mental

20    health impairments and risk factors, who are known to be at a higher risk of suicide—are kept

21    safe and alive." (Dkt. No. 158-15 at 26.) One may readily conclude, then, that Dr. Penn is

22

23    [6] The County also contends that a portion of Dr. Penn's deposition testimony conceded that Dr.
Penn could not define the standard of care for cell checks. (Dkt. No. 152 at 22–23.) However, the

24    County did not provide the Court with any such excerpt of Dr. Penn's testimony showing as much.

1  opining that a proper cell check is one in which custody staff are able to ensure high-risk inmates

2  are "safe and alive." (*Id.*)  And importantly, Dr. Penn's opinion is reinforced by his expertise

3  with mental health care and suicide prevention in correctional settings. (*Id.* at 10–12.)

4       Finally, the County challenges the reliability of Dr. Penn's Opinion 7—*i.e.*, that the

5  County's "established practice of having corrections officers without knowledge of [each

6  inmate's location] conduct cell checks obviously falls below the standard of care." (*Id.* at 26.)

7  Dr. Penn also opines in Opinion 7 that "[k]nowing the appropriate location of an inmate—

8  particularly an at-risk inmate like Mr. Rapp—is one of the most fundamental aspects of a

9  corrections system," and "[r]equiring corrections officers to conduct cell checks when they do

10 not know if a cell is supposed to have an inmate" is a "dangerous practice." (*Id.*)

11      The County argues that Dr. Penn's opinion is supported by "insufficient evidence" and

12 "has no basis." (Dkt. No. 152 at 23.)  Plaintiffs respond that there is "an abundance of evidence

13 in the record to support Dr. Penn's opinion," including deposition testimony from Officer

14 Petersen himself. (Dkt. No. 165 at 21–22.)

15      The Court agrees with Plaintiffs that Dr. Penn has sufficient basis for his opinion.  Any

16 qualms with the extent to which Dr. Penn's factual assumptions are supported by the record may

17 be addressed on cross-examination. *Bluetooth SIG, Inc. v. FCA US LLC*, 468 F. Supp. 3d 1342,

18 1349 (W.D. Wash. June 24, 2020).  And again, Dr. Penn's experience allows him to reliably

19 opine on the standard of care with respect to cell checks. *See Elosu*, 26 F.4th at 1024.

20      The Court therefore DENIES the County's motion to exclude Dr. Penn's proposed

21 testimony.

22           *e.   Dr. Hayward's Opinions*

23

24

1      As with Dr. Penn, the County argues for exclusion of certain of Dr. Hayward's opinions

2   by challenging his qualifications and the reliability of his opinions.  (Dkt. No. 152 at 24–26.)

3                          i.   Qualifications Related to Law Enforcement, Custody and Corrections

4      First, the County argues that Dr. Hayward is unqualified to opine on "the practices and

5   conduct of law enforcement and custody/corrections staff" considering Dr. Hayward's

6   background as a psychologist rather than a law enforcement or corrections officer.  (*Id.* at 24.)

7   Plaintiffs respond that Dr. Hayward is qualified as his experience as a clinical psychologist is

8   largely in correctional settings, and because he has experience developing suicide prevention

9   training programs in correctional settings.  (Dkt. No. 165 at 22.)  The Court agrees with Plaintiffs

10  and finds Dr. Hayward qualified.  Dr. Hayward need not be a law enforcement or corrections

11  officer to have the requisite expertise regarding the conduct of such officers as it relates to

12  suicide prevention.  *See Hambrook v. Smith*, 2016 WL 4084110, at *6 (D. Haw. Aug. 1, 2016).

13                          ii.   Reliability of Opinions 1, 2, 3 and 4

14     The County next argues that four opinions of Dr. Hayward must be excluded.  Opinion 1

15  contains Dr. Hayward's conclusion that the arresting officers "displayed deliberate indifference

16  to the medical and psychiatric needs of Nicholas Rapp" and that "[t]he arresting officers failed to

17  have Mr. Rapp evaluated by a mental health professional."  (Dkt. No. 153 at 73.)  Plaintiffs have

18  already conceded that Dr. Hayward's use of the term "deliberate indifference" in Opinion 1

19  should be excluded.  (Dkt. No. 165 at 24.)  And, the Court has already rejected the County's

20  arguments concerning Dr. Hayward's qualifications.  The County's only remaining argument

21  regarding Opinion 1 is the contention that the opinion conflicts with that of Plaintiffs' law

22  enforcement expert.  (Dkt. No. 152 at 25.)  The County provides no legal authority to suggest

23  this is a proper basis for exclusion.  The Court declines to exclude Opinion 1.

24

1      Defendants also argue that a portion of Opinion 2 must be excluded as unreliable; in

2   Opinion 2, Dr. Hayward proffers that the Kitsap County Sheriff "did not develop a suicide

3   prevention plan or program with a focus on preventing suicides in the jail."  (Dkt. No. 153 at 74.)

4   The County takes issue with Dr. Hayward's supposed failure to review "the correct policy

5   manual" in rendering this opinion.  (Dkt. No. 152 at 25.)  Plaintiffs respond that Dr. Hayward did

6   not receive the correct version of the manual until after the deadline for disclosure of expert

7   testimony, and that Dr. Hayward thereafter issued a supplemental report.  (Dkt. No. 165 at 25.)

8   "The Custody Policies did not alter Dr. Hayward's opinion."  (*Id.*)

9      As already noted with respect to Mr. Sinclair's proposed testimony, discussed above, the

10  County's argument is not a proper basis for exclusion.  If the County takes issue with Dr.

11  Hayward's review of materials in the record, the County "may cross-examine [Dr. Hayward]

12  regarding the materials [he] failed to review at trial."  *Arriaga*, 2022 WL 3052318, at *3; *see*

13  *also McBroom v. Ethicon, Inc.*, 2021 WL 2709292, at *4 (D. Ariz. July 1, 2021).[7]  The Court

14  therefore does not exclude Opinion 2.

15     The County proceeds to challenge Opinion 3, which states that "[h]ousing Mr. Rapp with

16  a cellmate [] would have reduced his opportunities to attempt suicide."  (Dkt. No. 153 at 78.)

17  The County confusingly bases its argument on what Dr. Hayward did *not* state in his opinion,

18  rather than the opinion that Dr. Hayward actually proffered.  Specifically, the County observes

19  that "Dr. Hayward does *not* opine (and provides no basis for any opinion that) Mr. Rapp was

20  required to be housed with a cellmate."  (Dkt. No. 152 at 25 (emphasis added)).  From this, the

21  County concludes that "Dr. Hayward's opinions regarding a cellmate are irrelevant."  (*Id.*)  The

22

23  [7] The Court declines to address Defendants' argument that Opinion 2 is "vague" and
    "unsupported."  (Dkt. No. 167 at 12.)  Defendants did not raise this argument prior to their reply,
24  and therefore it is waived.  *Autotel v. Nevada Bell Tel. Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012).

1    County appears to argue, then, that because Dr. Hayward did not go as far as to opine that a

2    cellmate was *required* in Mr. Rapp's case, Mr. Hayward should not be allowed to opine at all on

3    a standard of care involving housing inmates with cellmates.

4         The Court finds this argument unpersuasive.  The County provides no authority for its

5    position that Dr. Hayward may not opine on a standard of care involving cellmates unless he

6    opines that the standard of care *requires* cellmates.  (*Id.*)  And in any event, Dr. Hayward's

7    opinion is reliable; it is grounded in his experience with suicide prevention in correctional

8    settings, as well as discussion of NCCHC standards and research on the relationship between

9    isolation and mental health deterioration.  (Dkt. No. 153 at 66, 78–79.)  The Court does not

10   exclude Opinion 3.

11        Finally, the County asks that the Court exclude Opinion 4, in which Dr. Hayward opines

12   that training for correctional staff "did not address many of the essential elements of an effective

13   suicide prevention plan."  (Dkt. No. 153 at 80.)  As the County asserts, this opinion is unreliable

14   because it is "based solely upon the purported conduct of the officers," rather than an

15   "assess[ment] [of] what training was provided" to officers.  (Dkt. No. 152 at 26.)  Plaintiffs

16   respond with the "context" that the County only provided Plaintiffs with training records after

17   the deadline for expert testimony, and that Dr. Hayward thereafter issued a supplemental report

18   in which his opinions regarding training were unchanged.  (Dkt. No. 165 at 26.)  The County's

19   reply doubles down on its dispute as to whether Dr. Hayward properly considered training

20   records.  (Dkt. No. 167 at 13.)

21        The Court finds that Dr. Hayward's opinion regarding training has sufficient reliability to

22   be admitted.  The specific materials reviewed by Dr. Hayward go to the weight of his testimony;

23

24

as such, the County is free to question Dr. Hayward on his decisions to rely (or not rely) on various materials in the record.  *See Arriaga*, 2022 WL 3052318, at *3.

The Court therefore DENIES the County's motion to exclude Dr. Hayward's proposed testimony.

### III       CONCLUSION

Accordingly, and having considered Plaintiffs' and Kitsap County's motions (Dkt. Nos. 93, 152), the briefing of the parties, and the remainder of the record, the Court finds and ORDERS that both parties' motions are GRANTED in part and DENIED in part.  Testimony from the parties' experts shall be excluded consistent with the rulings identified throughout this motion.

DATED this 11th day of September 2023.


David G. Estudillo
United States District Judge