1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN RAPP et al.,

               Plaintiffs,

    v.

NAPHCARE INC et al.,

               Defendants.

CASE NO. 3:21-cv-05800-DGE

ORDER GRANTING IN PART
AND DENYING IN PART
MOTIONS FOR SUMMARY
JUDGMENT (DKT NOS. 294, 296,
297, 300, 304)

## TABLE OF CONTENTS

**INTRODUCTION**                                                                3

**PROCEDURAL HISTORY**                                               3

**RELEVANT FACTS**                                                   4

A.    **Background Information**                                     4

B.    **Nicholas Rapp's Arrest and Booking on December 31, 2019**      5

C.    **Nicholas Rapp's Medical Screening and Treatment on January 1, 2020**    7

D.    **Events Leading Up to Nicholas Rapp's Death on January 2, 2020**    11

**E.    Crisis Response at Nicholas Rapp's Cell**                                    **13**

**SUMMARY JUDGMENT STANDARD**                                                       **14**

**ANALYSIS**                                                                         **15**

**A.    Medical Negligence**                                                         **15**
    1.    *Elements of Medical Negligence*                       15
    2.    *Analysis of Medical Negligence as to NaphCare Defendants and Nagra*    17

**B.    Common Law Negligence**                                                      **29**
    1.    *NaphCare*                                              29
    2.    *Kitsap County*                                         31

**C.    Gross Negligence**                                                           **32**
    1.    *NaphCare*                                              32
    2.    *Kitsap County*                                         33

**D.    § 1983 Claims Against Individual Defendants**                                **34**
    1.    *County Officials, But Not Private Persons, May Claim Qualified Immunity*    34
    2.    *Objective Unreasonableness Standard*                   35
    3.    *Analysis for NaphCare Defendants*                      37
    4.    *Analysis for Kitsap County Individual Defendants*      47

**E.    § 1983 Claims Against NaphCare and Kitsap County – *Monell* Liability**      **58**
    1.    *Legal Standard for Monell Liability*                   58
    2.    *Analysis of Monell Claims Against NaphCare*            61
    3.    *Analysis of Monell Claim Against Kitsap County*        67

**F.    Negligent Hiring**                                                           **77**

**G.    Punitive Damages**                                                           **80**

**CONCLUSION**                                                                       **81**

1

**INTRODUCTION**

2     This case concerns the death by suicide of Nicholas Rapp in the Kitsap County,

3     Washington jail.  Before the Court are several motions for summary judgment.  Defendant

4     NaphCare, Inc., the jail's medical provider, moves for summary judgment on behalf of itself and

5     its employees.  (Dkt. Nos. 294, 296).  Former NaphCare employee Ripsy Nagra, separately

6     represented, moves for summary judgment—largely relying on the NaphCare motions.  (*See* Dkt.

7     No. 304.)  Kitsap County likewise moves for summary judgment for itself and its employees.

8     (Dkt. Nos. 297, 300.)  In this order, the Court rules on the foregoing motions, and will rule on

9     Plaintiffs' motion for partial summary judgment (Dkt. No. 307) at a later date.

10     The Court rules as follows.  As to NaphCare, the Court GRANTS summary judgment on

11     the medical negligence claims against Dr. Sandack and LPN Ladusta; the common law

12     negligence and gross negligence claims; the deliberate indifference claims against Dr. Sandack,

13     RN McCleary, and LPN Haven; the *Monell* claim, and the negligent hiring claim.  The Court

14     DENIES summary judgment as to the medical negligence claims against RN McCleary, RN

15     Molina, and LPN Nagra, and the deliberate indifference claims against RN Molina and LPN

16     Nagra.  With respect to Kitsap County, the Court DENIES summary judgment as to the

17     deliberate indifference claim against Officers Rhode and Hren and as to the negligence and gross

18     negligence claims against the County, and GRANTS summary judgment as to all other claims.

19

**PROCEDURAL HISTORY**

20     This Court previously dismissed claims against several out-of-state NaphCare defendants

21     for lack of personal jurisdiction, but otherwise denied a motion to dismiss the claims against

22     NaphCare and Kitsap County, finding they were adequately pled.  (Dkt. No. 111.)  The Court

23     granted NaphCare's motion for judgment on the pleadings as to Plaintiffs' *Monell* claim, but

24

1   allowed Plaintiffs leave to amend to cure certain deficiencies.  (Dkt. No. 238.)  Plaintiffs then

2   filed a Third Amended Complaint.  (Dkt. Nos. 241, 244.)  However, the Court granted motions

3   from NaphCare and Kitsap County to strike, finding that Plaintiffs had exceeded the scope of the

4   leave to amend by adding additional policies to support their *Monell* claim.  (Dkt. No. 266.)

5   Plaintiffs then filed the final, operative Fourth Amended Complaint ("4AC").  (Dkt. No. 273.)

6   The Court then denied a renewed motion to dismiss, finding that the *Monell* claim against

7   NaphCare was adequately pled as to two policies: LPNs exceeding the scope of their practice,

8   and failing to conduct timely COWS/CIWA withdrawal assessments, both discussed infra.  (Dkt.

9   No. 285.)  These motions for summary judgment thus arise from the operative 4AC.  As

10  discussed throughout this order, the Court also previously ruled on the admissibility of the

11  Parties' expert testimonies, granting in part and denying in part motions to exclude.  (Dkt. No.

12  212.)  The Parties requested oral argument, but the Court finds that argument is not necessary to

13  resolving the instant motions.

**RELEVANT FACTS**

14

15      A.    Background Information

16      This action arises out of the suicide of Nicholas Winton Rapp ("Nick") while he was a

17  pretrial detainee at Kitsap County Jail ("KCJ").[1]  (Dkt. No. 273 at 2.)  Nick had a long history of

18  mental illness, including diagnoses for depression and bipolar disorder starting at age 17, and

19  suicide attempts in 2003, 2008, 2009, and 2013, including once by "wrapping an extension cord

20  around his neck" and once by suffocation.  (*Id.* at 8–9.)  Nick likewise struggled with substance

21  abuse and was "an on-again/off-again functioning opioid addict and alcoholic" who had

22

23  ---
    [1] Respectfully, the Court refers to Nicholas Rapp as "Nick," which is how Plaintiffs refer to him
    in their pleadings (*see generally*, Dkt. No. 273) and will reduce any confusion with his father,
24  John Rapp.

1   periodically undergone Medication-Assisted Treatment ("MAT").  (*Id.* at 9–10.)  Nick had a

2   daughter with his former partner, Megan Wabnitz, who was also a nurse at the Jail and an

3   employee of NaphCare.  (*Id.* at 3, 10.)  Plaintiffs are John Rapp, Nick's father, Judith Rapp,

4   Nick's mother, and N.R., Nick's minor child, through Wabnitz.  (*Id.* at 3.)

5      Defendants are Kitsap County, a municipal corporation responsible for administering the

6   KCJ, and NaphCare, the healthcare provider at KCJ.  (*Id.* at 3–8.)  There are individual

7   defendants from both Kitsap County and NaphCare.  For Kitsap, that includes three supervisory

8   defendants: Mark Rufener, Kitsap County Chief of Corrections at the time of Nick's death, Gary

9   Simpson, Kitsap Sheriff at the time, and John Gese, the then-Undersheriff.  (*See id.* at 4.)  Four

10  Kitsap officers are also defendants: Brandon Rhode and Andrew Hren, the deputies who arrested

11  Rapp, Elvia Decker, the officer who conducted Nick's intake at the Jail, and John Petersen, the

12  officer who performed the last cell check before Nick's death.  (*See id.* at 5, 10–12, 23.)  For

13  NaphCare, the individual defendants are: Dr. Alana Sandack, RN Odessa McCleary, RN Erica

14  Molina, LPN Haven Ladusta and LPN Ripsy Nagra.  (*Id.* at 8.)

15     B.  <u>Nicholas Rapp's Arrest and Booking on December 31, 2019</u>

16     On the night of December 31, 2019, Nick was intoxicated and called Wabnitz and told

17  her he was suicidal.  (*Id.* at 10.)  Wabnitz drove to pick Nick up and brought him back to her

18  house.  (*Id.*)  The two got into an argument in which Nick became physically and verbally

19  aggressive and Wabnitz called 911.  (*Id.* at 10, Dkt. No. 294 at 8.)  Nick was arrested by Kitsap

20  County Sheriff's Deputies Brandon Rhode and Andrew Hren.  (Dkt. Nos. 273 at 10; 295 at 87.)

21  According to the complaint, Wabnitz informed Deputies Rhode and Hren that Nick was suicidal,

22  including that he recently attempted hanging.  (Dkt. No. 273 at 10.)  However, on the Arrest and

23  Booking Information Sheet Deputy Rohde completed, he selected "N" (as in 'no') to questions

24

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT (DKT
NOS. 294, 296, 297, 300, 304) - 5

about whether the arrestee "demonstrated any behaviors that might suggest suicidal tendencies?"; "demonstrated any behaviors that might suggest mental illness?"; or "engaged in any assaultive or violent behavior?"  (*Id.* at 11.)[2]  Likewise, Rhode selected "N" for "Does the arrestee have any observable mental health problems?"; "Does the arrestee show any signs of suicidal behavior or attempts?"; "Is the arrestee intoxicated? Level_____"; and "Does the transporting officer have any other information, which we need to know concerning this arrestee?"  (*Id;* Dkt. No. 295 at 88.)  Rhode indicated Nick should be accepted into the jail.  (*Id.*)  Neither Rhode nor Hren's written reports mention suicide or suicidal ideation.  (Dkt. Nos. 294 at 9; 295 at 185–188.)  Hren's report indicated Nick was "extremely intoxicated" and he "nodded off" several times and "said he was really drunk."  (Dkt. No. 295 at 188.)  Ms. Wabnitz wrote a narrative of the events, which did not mention suicide.  (*Id.* at 189–190.)

Nick was booked into KCJ by Corrections Officer Elvia Decker (*see* Dkt. No. 295 at 84, 90), who similarly asked Nick a series of questions related to mental health on a screening form. (Dkt. No. 294 at 10.)  She indicated his answer was no for:

1. "Have you ever attempted suicide? If Yes, When, How?";

2. "Have you ever been hospitalized for a suicide attempt or other psychiatric reasons. If Yes, When? Where?";

3. "Do you ever hurt yourself when angry or under stress? If Yes, What do you use to hurt yourself?";

4. "Are you now or have you ever been treated for a mental health or emotional problem. If Yes, When? Where, And who was your provider?

---

[2] Rhode answered no by drawing a line through the letter 'N' down a column in a table, choosing between columns for 'Y' or 'N' (*See* Dkt. No. 273 at 11.)

1

2

3

   5. "Are you currently on any psychiatric mediation? If so, What?

    …

   10. "Are you thinking of hurting or killing yourself? If Yes, explain."

4

5

6

7

8

(*Id.;* Dkt. No. 295 at 114.)  For the final question, "Will you contact staff if you feel suicidal?" Officer Decker recorded an answer of no and noted "SAID HE WOULDN'T."  (*Id.*)  In total, there were zero yes answers.  (*Id.*)  She later stated that Nick was "not very pleasant" and "smelled [of] alcohol" and that "it was a – a booking process that I just went through just to get him out and housed – 'cause we were busy that night."  (Dkt. No. 273 at 12.)

9

   C. <u>Nicholas Rapp's Medical Screening and Treatment on January 1, 2020</u>

10

11

12

13

14

15

16

17

18

19

20

21

   After Nick's booking, at 12:08 a.m. on January 1, 2020, he underwent a Receiving Screening by Registered Nurse (RN) Odessa McCleary.  (*Id.* at 13.)  She checked "NA" for questions pertaining to the arresting officers' knowledge of relevant medical information including "Current/Recent Suicidal Ideation."  (Dkt. No. 295 at 51.)  She later explained that she did not see Officer Decker's screening report, because as a matter of practice the nurses would not look at the officers' reports, at least when they did not indicate an unusual or concerning response.  (Dkt. Nos. 273 at 13; 294 at 10.)  In her screening, RN McCleary did not check any boxes indicating affirmative answers pertaining to suicide, including leaving one blank that asked about "Past suicide attempts, strong plans, or treatment for attempts."  (Dkt. Nos. 273 at 13; 294 at 11; 295 at 53.)  She wrote a note indicating that "Pt. denies any mental health diagnosis or any current thoughts of self-harm or suicidal thoughts."  (Dkt. Nos. 294 at 11; 295 at 55.)  He also "denie[d] any alcohol, illegal drug or prescribed medications use."  (Dkt. No. 273 at

22

23

24

13.)³  She further completed a Mental Health Screening, and did not select boxes for current "thoughts of self harm or suicide" or past suicide attempts.  (Dkt. No. 295 at 71–72.)  When prompted "[h]ow does the inmate feel about the current situation?" she noted his response and demeanor: "'I feel awesome.' Stated fasiciously [sic]."  (*Id.* at 72.)  However, after being asked for a urine sample, Nick told RN McCleary that his previous answer to the Receiving Screening was untrue, that he was detoxing from alcohol, methamphetamine, and MDMA, and that he relapsed from a MAT program.  (Dkt. No. 273 at 13.)  His urine sample tested positive for heroin, methamphetamine, and MDMA.  (Dkt. No. 295 at 17, 77.)

RN McCleary entered orders for Nick to undergo Clinical Institute Withdrawal Assessment for Alcohol ("CIWA") and Clinical Opiate Withdrawal Score ("COWS") assessments.  (Dkt. No. 273 at 14.)  CIWA is graded on an aggregate score of 1 to 67, and COWS on a scale of 1 to 53.  (*Id.*)  The parties dispute, however, what scores should be considered "mild" or "moderate" as compared to "severe."  (*Compare* Dkt. No. 273 at 14 *with* 294 at 11–12.)  Per the complaint, a CIWA score of 8 to 15 is "moderate" while a COWS score of 5 to 12 is "mild."  (Dkt. No. 273 at 14.)  Nick's care plan called for him to be placed in a "Low bunk for safety," to receive Librium as needed per CIWA score recommendations, to get Buprenorphine if his COWS score exceeded 9, to receive Keppra for 7 days for seizure prophylaxis, and fluids.  (Dkt. No. 295 at 17.)   RN McCleary's housing assignment placed Nick in general population but indicated he was on "Detox Watch" and had "Special Care Need(s)." (Dkt. No. 295 at 76.)

---

³ RN McCleary described Nick as "being cooperative and calm" but elsewhere indicated he was "angry" and "agitated." (Dkt. No. 295 at 55, 68, 73.)

1    RN McCleary's first assessment, around 12:25 a.m. on January 1, 2020, rated Nick at 2

2  on COWS and 0 on CIWA, and indicated "No" for thoughts of suicide or self-harm.  (Dkt. Nos.

3  273 at 14; 295 at 20–21, 25–26.)  She also completed a Comprehensive Detox Screen that

4  indicated Nick drank alcohol more than five days a week (with more than five drinks each time)

5  and that he was a daily heroin user.  (Dkt. Nos. 273 at 15; 295 at 22–23.)  After this first

6  screening, RN McCleary administered 50mg of Librium (a benzodiazepine) and moved him to

7  the "Central A Pod" of general population with instructions for "special care" and "detox

8  watch."  (Dkt. No. 273 at 15.)  Of note, Officer Decker would later testify that RN McCleary told

9  her that "I almost, um, put him in a suicide thing 'cause . . . he was answering the questions like

10  no, no, no, kinda, you know, not listening."  (*See id.*)

11    From there, Nick underwent the COWS/CIWA assessments several more times, and the

12  timing, recording, and manner of the assessments are critical to this case, as Plaintiffs argue they

13  were insufficiently frequent or performed inadequately—or not at all.  Nick's second assessment,

14  captured on surveillance video between 2:02 and 2:04 a.m. on January 1, 2020, was conducted

15  by LPN Bruce Karl (who is no longer a party to this case), and was Nick's highest score, rating

16  at 8 on CIWA and 6 on COWS.  (Dkt. Nos. 294 at 13, 273 at 16; 295 at 27–29.)  The box to

17  indicate suicidal ideation was marked "No" on both, and LPN Karl administered 100 mg of

18  Librium.  (Dkt. No. 295 at 27–29.)  Over the course of the night, there were periodic safety

19  checks.[4]

20    Around 7 a.m., Wabnitz came to work, and later that morning she sent an email to her

21  supervisor Erica Molina, the Health Services Administrator, about Nick's incarceration—in

22

23  _____

24  [4] These occurred at: 1:17, 2:46, 3:17, 4:14, 4:43, 5:00 (medical staff entered Nick's cell for 28 seconds), 5:12, 5:33, 6:26, 6:48, and 7:58. (Dkt. No. 273 at 16–17.)

1    which she disclosed that Nick was the father of her daughter, but the email did not mention

2    suicidality. (*See* Dkt. Nos. 273 at 17; 294 at 14.)  The parties greatly dispute what Wabnitz said

3    about Nick's suicidality, and to whom.  Per the complaint, Wabnitz told HSA Molina and her co-

4    worker LPN Ripsy Nagra that Nick recently attempted suicide by hanging and was suicidal.

5    (Dkt. No. 273 at 17.)  She further told LPN Nagra that Nick should be in a "crisis cell."  (*Id.*)

6         Defendant Dr. Alanna Sandack was the medical director at the Jail.  (*Id.* at 18.)  Dr.

7    Sandack did not personally examine Nick.  (*Id.*).  She did place several standing orders for

8    medications, including Levetriacetam, Ondansetron, Dicylomine, Loperamide, and vitamins and

9    supplements.   (Dkt. Nos. 273 at 18; 295 at 8.)  She ordered that Nick undergo neurological

10   assessments ("neuro check") twice daily; Plaintiffs allege these were never performed, although

11   LPN Nagra did record performing neuro checks on January 1 at 8:00 a.m. and January 2 at 9:36

12   a.m. (Dkt. Nos. 273 at 18; 295 at 10–11.)

13        NaphCare's records indicate that LPN Nagra performed CIWA/COWS on Nick around

14   10:45-10:49 a.m. on January 1, 2020, and that he scored 4 on both.  (Dkt. Nos. 273 at 19; 295 at

15   31–34.)  Plaintiffs dispute that this assessment actually occurred because Nick was captured on

16   surveillance footage using the telephone at this same time.  (Dkt. No. 273 at 19.)  Defendants

17   indicate the assessment did occur around 8:47-8:50 a.m. as captured on footage at that time (Dkt.

18   No. 294 at 13); they attribute the time discrepancy to bad Wi-Fi that delayed nurses from filing

19   reports until after rounds.  (*Id.* at 13, n.2.)  At 11:55 a.m. and 12:25 p.m. there were safety

20   checks.  (Dkt. No. 273 at 20.)  At 2:44 p.m. Nick's parents, John and Judith Rapp, went to the

21   Jail to tell staff that Nick was suicidal but could not get inside and were unable to speak with a

22   staff person through the outside intercom.  (*Id.*)

23

24

1    The next CIWA/COWS assessments were at 2:52-2:53 p.m. on January 1, 2020 by LPN

2    Nagra and 10:47-10:49 p.m. by LPN Haven LaDusta; each time Nick scored 1 on CIWA and 4

3    on COWS and each time the box was checked "No" for thoughts of self-harm or suicide.  (Dkt.

4    Nos. 294 at 13; 295 at 35–42.)  There is no video evidence of these assessments.  Previously, the

5    Court sanctioned Kitsap County for its failure to preserve video evidence, ultimately ordering

6    that the jury will be provided with an adverse instruction.  (*See* Dkt. No. 236.)

7        D.    Events Leading Up to Nicholas Rapp's Death on January 2, 2020

8        Overnight and into the morning of January 2, 2020, there were more periodic safety

9    checks and interactions with jail staff.[5]  At 2:22 a.m., LPN LaDusta apparently attempted to

10    conduct a COWS/CIWA assessment from outside Nick's cell.  (Dkt. No. 273 at 20.)  She

11    selected "0" for the numerical scores but entered the following note: "pt refused, pt observed

12    resting in bed sleeping soundly, easily aroused when name called, no signs of acute distress

13    noted."  (Dkt. Nos. 294 at 24; 295 at 43–46.)  As discussed below, Plaintiffs allege LPN LaDusta

14    "falsified" this screening because "0" indicates a score on the scale and she could not have

15    scored Nick if he was sleeping; Plaintiffs further allege it was her obligation under NaphCare

16    policy and the standard of care to wake Nick.  (*See* Dkt. Nos. 273 at 20; 328 at 28–29.)

17    Defendants reject the falsification charge, noting that the drop-down menu may not have given

18    LPN LaDusta any other choices.  (Dkt. No. 294 at 24.)

19

20

21    _____

[5] Safety checks occurred at 12:05, 12:36, 1:06, 1:58, then a purported COWS/CIWA assessment
22    at 2:22, followed by more safety checks at 3:00, 3:31, 4:00, 4:31, and 5:01.  Nick got breakfast at
      5:29, and safety checks resumed, at 6:19, 6:44, 7:07, 7:30, and 7:45. He was out of his cell from
23    8:00-8:12, and another safety check followed at 8:30.  He had a three-minute interaction with a
      nurse at 9:32 where it appears he took some medication, followed by another safety check at
24    9:48.  He interacted with a jailer around 11:43 a.m. (Dkt. No. 273 at 20–22.)

1       At 10:35 a.m. Nick called his parents.  (Dkt. No. 273 at 22.)  He told them "I'm done"

2   and "I just won't make it in here."  (*Id.*)  Nick and John Rapp had the following exchange

3   regarding his medication and housing:

4       John Rapp: "Are you in medical detox?"

5       Nick: "Medical detox? There's nothing. You just lay in bed. That's it."

6       John Rapp: "So they haven't given you any medication?"

7       Nick: "They gave me Librium the first day. That's it. Now I'm on nothing."

8   (*Id.*)

9       Nick underwent one or two more COWS/CIWA assessments that morning.  One

10  assessment was recorded in NaphCare's records as occurring at 10:39 a.m., but video evidence

11  shows Nick was on the phone at this time.  (*Id.*)  Surveillance footage instead places the time of

12  the assessment between 9:32–9:35 a.m.  (Dkt. No. 294 at 13.)  The assessment was conducted by

13  LPN Nagra and Nick scored a "3" on both COWS and CIWA.  LPN Nagra noted Nick was

14  reporting tremors and sweats and that he requested the medication Subutex.  (Dkt. No. 273 at 22;

15  295 at 47–50.)  The question regarding "thoughts of self-harm or suicide" was checked "No."

16  (*Id.*)  It is unclear what if any medication he received.  LPN Nagra entered another assessment at

17  12:49 p.m. with a COWS score of 4 and a CIWA score of 1, with "No" checked for self-harm or

18  suicide. There is not a video record of this assessment.  (Dkt. No. 273 at 23.)

19      Nick's final interactions with staff occurred in the afternoon of January 2, 2020.  He

20  engaged with an unknown jailer through his cell door for a few seconds at 12:21 p.m., and

21  Officer Jerry Randall conducted a safety check at 12:55, and walked by again at 1:00.  (Dkt. No.

22  273 at 23.)  At 1:07 p.m. Officer Randall opened Nick's cell door, and Nick removed the

23  mattress cover from his mattress and hung it on the door.  (*Id.*)  He walked out, used the phone,

24

1    and returned to his cell at 1:13 p.m. and closed the door.  (*Id.*)  After 1:14 p.m. there was no sign

2    of movement in his cell.  At 1:25 p.m. Officer Peterson walked past all the cells in Nick's unit,

3    and either did not see Nick or did not notice that he was in distress.  (*See id.* at 23–24.)

4         E.    Crisis Response at Nicholas Rapp's Cell

5         At 1:42 p.m., Officer Merile Montgomery conducted a safety check and found Nick

6    sitting on the floor with his back against the door and feet facing the toilet.  (*Id.* at 25; Dkt. No.

7    295 at 131.)  Upon closer look she saw that Nick had the mattress cover around his neck, was not

8    breathing, and was pale white in color.  (Dkt. No. 295 at 131.)  She called for backup and opened

9    the door to Nick's cell, and she moved Nick out of his cell with help from Officers Petersen and

10   Lacombe.  (Dkt. No. 295 at 80, 131.)  Wabnitz arrived on the scene to assist, saw who the inmate

11   was and yelled out "I can't do this, he is my ex!" and Officer Montgomery told her to leave

12   while others assisted.  (*Id.* at 131–132.)  When the door was opened, it released the sheet that

13   Nick had placed, and he slumped over.  (*Id.* at 124.)  The medical response team included Dr.

14   Sandack, RN Andrea Rutledge, RN Erica Molina, LPN Nagra, and others.  (*Id.* at 17, 119, 122.)

15   Dr. Sandack assisted with the attempts to resuscitate Nick by providing a jaw thrust and bagging.

16   (*Id.* at 17, 128.)  Staff performed CPR and used a defibrillator; eventually they found a pulse.

17   (*Id.* at 128.)

18        At some point that day (January 2, 2020) after Nick was discovered, Wabnitz had a

19   conversation with RN Molina, where Wabnitz said she told the arresting officers that Nick had

20   recently attempted suicide by hanging.  (*Id.* at 117, 145–146.)  Based on that, Lieutenant

21   Penelope Sapp reviewed Nick's booking form to see if there was indication he was suicidal, and

22   there was not; likewise Chief Rufener had the arrest report printed and that did not indicate

23   suicidality, either.  (*Id.* at 145–146.)

24

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT (DKT
NOS. 294, 296, 297, 300, 304) - 13

1   Nick was transported to Tacoma General Hospital, where he was eventually declared

2   brain dead and removed from life support on January 6, 2020.  (Dkt. No. 273 at 25.)  The cause

3   of death was ruled "asphyxia due to ligature hanging" and "hypoxic ischemic brain injury."  (*Id.*)

4   **SUMMARY JUDGMENT STANDARD**

5   Summary judgment is proper only if the pleadings, the discovery and disclosure materials

6   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

7   movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is

8   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

9   showing on an essential element of a claim in the case on which the nonmoving party has the

10  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

11  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

12  for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

13  (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

14  metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

15  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

16  requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

17  *Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

18  *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

19  The determination of the existence of a material fact is often a close question.  The court

20  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

21  e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

22  *Service Inc.*, 809 F.2d at 630  The court must resolve any factual issues of controversy in favor

23  of the nonmoving party only when the facts specifically attested by that party contradict facts

24

1    specifically attested by the moving party.  The nonmoving party may not merely state that it will

2    discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

3    to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

4    Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

5    be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

6                                                    **ANALYSIS**

7            A.    <u>Medical Negligence</u>

8            The Court will consider each of the claims against Defendants in the order they are raised

9    in the motions to dismiss.  Thus, the Court starts its analysis with medical negligence.  (*See* Dkt.

10   No. 294 at 16.)  Plaintiffs assert a claim for medical negligence against NaphCare employees

11   Odessa McCleary, Erica Molina, Alanna Sandack, Haven Ladusta, and Ripsy Nagra.  (*See* Dkt.

12   No. 273 at 8, 58.)

13           1.    *Elements of Medical Negligence*

14           Under Washington law, claims for medical negligence must be brought exclusively under

15   Washington Revised Code § 7.70.030.  *Wright v. Jeckle*, 16 P.3d 1268, 1269–1270 (Wash. Ct.

16   App. 2001), *as amended on reconsideration in part* (Mar. 6, 2001) ("Chapter 7.70 RCW governs

17   any action for damages based on an injury resulting from health care—exclusively.").  Under

18   that statute, the plaintiff must establish "one or more" of the following propositions by a

19   preponderance of the evidence:

20           (1) That injury resulted from the failure of a health care provider to follow the accepted
                 standard of care;

21
22           (2) That a health care provider promised the patient or his or her representative that the
                 injury suffered would not occur;

23           (3) That injury resulted from health care to which the patient or his or her representative
                 did not consent.

24

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT (DKT
NOS. 294, 296, 297, 300, 304) - 15

1

2    WASH. REV. CODE ANN. § 7.70.030 (West 2011).

3        Here, the Court understands Plaintiffs' claims to arise under Washington Revised Code

4    7.70.030(1), as they repeatedly assert that Defendants failed to "exercise that degree of care,

5    skill, and learning expected of a reasonably prudent health care provider" in their treatment of

6    Nick Rapp. (*See* Dkt. No. 273 at 58–59.) "The elements of medical negligence brought under

7    RCW 7.70.030(1) are duty, breach, causation, and harm." *Paetsch v. Spokane Dermatology*

8    *Clinic, P.S.*, 348 P.3d 389, 393 (Wash. 2015) (citing *Pedroza v. Bryant,* 677 P.2d 166 (Wash.

9    1984)).

10        The statute further provides that the "necessary elements of proof that injury resulted

11    from the failure of the health care provider to follow the accepted standard of care" are:

12        (a) The health care provider failed to exercise that degree of care, skill, and learning
        expected of a reasonably prudent health care provider at that time in the profession or

13            class to which he or she belongs, in the state of Washington, acting in the same or
        similar circumstances;

14        (b) Such failure was a proximate cause of the injury complained of.

15

16    WASH. REV. CODE ANN. § 7.70.040 (West 2021). Washington courts "have repeatedly held that

17    'expert testimony will generally be necessary to establish the standard of care.'" *Frausto v.*

18    *Yakima HMA, LLC*, 393 P.3d 776, 779 (Wash. 2017) (quoting *Young v. Key Pharm., Inc.,* 112

19    770 P.2d 182, 189 (Wash. 1989)). Likewise, expert testimony is generally required to show

20    causation. *Id.* "The expert must show that the failure to comply with the applicable standard of

21    care proximately caused the harm incurred." *Sartin v. Est. of McPike*, 475 P.3d 522, 533 (Wash.

22    Ct. App. 2020). Notwithstanding the need for expert testimony, "familiar summary judgment

23    principles" apply, and summary judgment should be denied if a genuine issue exists as to a

24    material fact, either with respect to standard of care or causation. *See Christian v. Tohmeh*, 366

1    P.3d 16, 28 (Wash. Ct. App. 2015); *see also Messenger v. Whitemarsh*, 462 P.3d 861, 869

2    (Wash. Ct. App. 2020); *see also Morton v. McFall*, 115 P.3d 1023, 1028 (Wash. Ct. App. 2005).

3        With respect to causation for a medical negligence claim on summary judgment, "if a

4    reasonable person could infer, from the facts, circumstances, and medical testimony, that a

5    causal connection exists, the evidence is sufficient to survive summary judgment." *Attwood v.*

6    *Albertson's Food Centers, Inc.*, 966 P.2d 351, 353 (Wash. Ct. App. 1998). "Generally, the issue

7    of proximate causation is a question for the jury . . . . 'it is only when the facts are undisputed

8    and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion

9    that it may be a question of law for the court.'" *Id.* (quoting *Bernethy v. Walt Failor's, Inc.,* 653

10   P.2d 280, 283 (Wash. 1982)). However, "evidence establishing proximate cause must rise above

11   speculation, conjecture, or mere possibility. Thus, medical testimony must demonstrate that the

12   alleged negligence 'more likely than not' caused the later harmful condition leading to injury;

13   that the defendant's actions 'might have,' 'could have,' or 'possibly did' cause the subsequent

14   condition is insufficient." *Id.* (internal citation omitted).

15            2.    *Analysis of Medical Negligence as to NaphCare Defendants and Nagra*

16                a.    <u>Dr. Alana Sandack</u>

17        Plaintiffs allege that Dr. Sandack violated the standard of care by failing to personally

18   examine Nick. (*See* Dkt. No. 273 at 18, 58.) Plaintiffs' expert, Dr. Nicole Chicoine, M.D.,

19   opines that the standard of care required Dr. Sandack to examine Nick. (*See* Dkt. No. 329-13 at

20   30, 33, 35; 158-6 at 6.) Dr. Chicoine further opines that the prescriptions Dr. Sandack placed in

21   a standing order were insufficient or inappropriate for treatment of withdrawal. (Dkt. Nos. 329-

22   13 6, 158-6 at 4–5.) She faults Dr. Sandack for not placing a standing order for Librium (though

23   Rapp was administered Librium, as she acknowledges) nor other benzodiazepines such as Ativan

24   or Valium, nor buprenorphine, naloxone, or methadone. (Dkt. No. 158-6 at 6.) Likewise, Dr.

1  Sandack violated the standard of care by not personally reviewing prescriptions or orders entered

2  by nurses in her name until "days after" those medications were given.  (Dkt. No. 329-13 at 55;

3  158-6 at 6.)  As to causation, Dr. Chicoine grouped the defendants together and opined that "the

4  medical care provided—or, more precisely, the lack of medical care provided—by Erica Molina,

5  Bruce Karl, Alana Sandack, LaDusta Haven, and Ripsy Nagra fell below the standard of care and

6  contributed to Nicholas Rapp's pain, suffering, and death." (Dkt. No. 158-6 at 14.)[6]  She added

7  that "Decedent's suffering, caused by [Kitsap County Jail] and NaphCare personnel's failure to

8  comport with the standard of care, more likely than not contributed to his suicide." (*Id.* at 10–

9  11.)  When pressed specifically as to whether "Dr. Sandack's violations caused Mr. Rapp's

10  suicide," Dr. Chicoine stated that "the violation of [the] standard of care caused him to unduly

11  suffer physically and mentally." (Dkt. No. 329-13 at 56.)  Dr. Chicoine attempted to link that

12  suffering to the suicide by stating that "the more anyone physically suffers, whether it be from

13  alcohol withdrawal or something else, when you have an underlying depressive disorder, it

14  worsens someone's mood and depression, and therefore, the worsening of someone's depression

15  can increase the risk of suicide."  (*Id.* at 48.)

16          Defendants deny that the standard of care required Dr. Sandack to personally examine

17  Nick.  Defendants' expert, Dr. Steven E. Dresang, M.D. states that "in many clinical settings, it

18  is very common for nurses to treat patients with routine medical issues.  Not every medical issue

19  requires a physician to examine the patient." (Dkt. No. 295 at 216.)  Specifically, "[i]n this case,

20

21  ───────────────────────────

[6] This Court previously denied a motion to exclude Dr. Chicoine's testimony, including as to
22  causation. (Dkt. No. 212 at 14, 28.)  However, the Court excluded the testimony of another one
of Plaintiff's experts, Dr. Ryan Herrington, on causation "to the extent it is based on Dr.
23  Sandack's prescribing practices" because "Washington law expressly permits nurses to do what
Dr. Herrington criticizes as deviating from the standard of care." (*Id.* at 22, 29.)  The Court
24  therefore does not consider Dr. Herrington's testimony on that issue.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT (DKT
NOS. 294, 296, 297, 300, 304) - 18

1   the medical record indicates that Mr. Rapp was experiencing normal withdrawal symptoms, the

2   nurses did not raise any specific issue with Mr. Rapp to Dr. Sandack, and Mr. Rapp did not

3   request an examination by Dr. Sandack.  Under these circumstances, Dr. Sandack had no duty to

4   personally examine Mr. Rapp." (*Id.*)  Therefore, Dr. Dresang concludes that "Dr. Sandack acted

5   entirely within the standard of care with the decedent." (*Id.*)

6          Defendants further argue that as a matter of law, there was no need for Dr. Sandack to

7   examine Nick because Washington Revised Code § 18.79.040(1)(e) gives RNs the power to

8   administer withdrawal medications and Washington Revised Code § 18.79.270 allows LPNs to

9   follow a nursing plan set by an RN; since that is what occurred here, there was no duty for Dr.

10  Sandack to do more. (*See* Dkt. No. 294 at 18.)  Even if Dr. Sandack did breach the standard of

11  care, that would be insufficient to establish causation, Defendants argue. (*Id.* at 19.)  They point

12  out that Dr. Chicoine opined only that Dr. Sandack's alleged shortcomings contributed to Nick's

13  physical and mental suffering, not that they caused his death. (*Id.* at 19–20.)

14         The Court finds that even assuming there is a disputed question of fact as to the standard

15  of care, Plaintiffs fail to establish a causal connection between Dr. Sandack's purported breaches

16  and the injury to Nick, his death.  Dr. Chicoine testified only that the mental and physical

17  suffering she attributes to Dr. Sandack's actions specifically *could have* increased a risk of

18  suicidality for Nick, not that those actions *actually did* cause his suicide. (*See* Dkt. No. 329-13 at

19  48, "the worsening of someone's depression *can increase the risk* of suicide" (emphasis added)).

20  That is insufficient to establish proximate causation.  *See Attwood*, 966 P.2d at 353 ("medical

21  testimony must demonstrate that the alleged negligence "more likely than not" caused the later

22  harmful condition leading to injury; that the defendant's actions "might have," "could have," or

23  "possibly did" cause the subsequent condition is insufficient.")  Moreover, Dr. Chicoine opined

24

1    on the actions of NaphCare defendants in the aggregate, and it is not possible from her report to

2    establish a causal connection between the actions of any particular NaphCare defendant and

3    Nick's injury.  (*See* Dkt. No. 158-6 at 10–11, 14.)

4           On this record, a reasonable jury would not be able to find that a personal examination of

5    Nick would have causally prevented his suicide.  Likewise, even if a reasonable jury could find

6    that the standard of care called for different withdrawal medications than those that Nick

7    received, a reasonable jury would not be able to conclude that it is "more likely than not" that

8    different medications would have prevented Nick's death.  The chain of causation is simply too

9    attenuated to put the question to a jury.

10          For those reasons, Defendants' motion for summary judgment on the medical negligence

11   claim against Dr. Sandack is GRANTED.

12                  b.    <u>RN Odessa McCleary</u>

13          Plaintiffs allege that RN McCleary breached the standard of care in several respects.  She

14   did not conduct a breathalyzer test or obtain an alcohol level from Nick at his intake assessment,

15   nor did she transfer him to a hospital for a "fit for jail" examination.  (Dkt. Nos. 273 at 12, 328 at

16   13.)  She did not conduct a neurological assessment ordered by Dr. Sandack.  (Dkt. No. 273 at

17   31.)  She did not "contact a higher-level provider to initiate the withdrawal protocol" contrary to

18   NaphCare's own policy.  (Dkt. No. 328 at 14.)  And in placing Nick in general population, she

19   "did not house him in a place that was safe or effective for monitoring withdrawal symptoms."

20   (*Id.*)

21

22

23

24

1     Plaintiffs' nursing care expert, RN Denise M. Panosky opined on several alleged

2   shortcomings on the part of RN McCleary.[7]  RN Panosky states that according to the NCCHC

3   Standards for Health Services in Jails, the standard of care for "persons who are unconscious,

4   semiconscious, bleeding, mentally unstable, severely intoxicated, in alcohol or drug withdrawal,

5   or otherwise urgently in need of medical attention" is to "[r]eferr[] immediately for care and

6   medical clearance into the facility."  (Dkt. No. 158-14 at 10.)  RN Panosky opines that RN

7   McCleary had actual knowledge that Nick was intoxicated, either from the arresting officers, or

8   later from Rapp's own admissions.  (*See id.* at 9–10.)  On January 1, 2020 at 12:21 a.m. she

9   placed Rapp in General Population with lower bunk and Detox Watch specifications.  (*Id.* at 10.)

10  At 12:26 she entered a note stating "[p]atient reports a history of recent and/or significant alcohol

11  and opiate use" and at 12:28 she noted that a urine screen tested positive for "heroin, met[h] and

12  MDMA, amph [sic]."  (*Id.*)  But even with this "second chance" (to intervene), RN McCleary did

13  not send Mr. Rapp to a hospital emergency department.  (*Id.*)  RN Panosky cites NaphCare's

14  policy J-F-04, Medically Supervised Withdrawal and Treatment, which states that withdrawal

15  "will be done under the supervision of an advanced clinical provider" and "if severe withdrawal

16  symptoms are observed, the advanced clinical provider is consulted promptly."  (*Id.*)  RN

17  McCleary did not call the jail physician, Dr. Sandack.  (*Id.*)  After Nick's COWS/CIWA

18  assessments showed mild withdrawal symptoms, McCleary did not call the physician or send

19  Rapp to the hospital.  (*Id.* at 10–11.)  In sum, RN Panosky opines that RN McCleary breached

20

21  ───────────────────────
    [7] This Court previously excluded RN Panosky's testimony as to whether RN McCleary failed to
22  complete certain medical assessments because fields were left blank, because "the forms
    themselves instruct that a negative answer is indicated by not selecting a check box." (Dkt. No.
23  212 at 26.)  Similar to Dr. Herrington, the Court excluded testimony from RN Panosky on
    causation related to prescribing practices.  (*Id.* at 29.)  The Court therefore does not consider RN
24  Panosky's testimony as to those excluded topics.

1    the nursing standard of care of a "reasonable prudent nurse acting in the same or similar

2    circumstances." (*Id.* at 11.)

3         Defendants again dispute any breach of the standard of care. They dispute that the

4    standard of care required a breathalyzer or blood test and argue that hospitalization would only

5    be appropriate for someone who is "dangerously or severely intoxicated," which Nick was not.

6    (*See* Dkt. No. 294 at 22.) RN McCleary did not need to consult a physician because Nick's

7    presentation was "routine" and she was implementing standing orders. (*Id.*) As to Officer

8    Decker's statement that a "triage" nurse (apparently a reference to McCleary) told her that she

9    "almost, um, put [Rapp] in a suicide thing" because he was not taking the intake assessment

10   seriously, Defendants dismiss that as an after-the-fact statement insufficient to create a triable

11   question of fact. (*Id.* at 21, n.5.) As to causation, Defendants argue that Plaintiffs fail to provide

12   evidence of proximate causation because: a) McCleary's intake assessment occurred 38 hours

13   before Nick's death, and his intoxication would have subsided by then, b) RN Panosky

14   disclaimed offering an opinion on causation, c) there is no evidence a physician would have done

15   anything different than RN McCleary, and d) Plaintiffs "have failed to show the requisite causal

16   connection between Nick's housing assignment and suicide." (*Id.* at 23.)

17        First, the Court finds that there is a genuine issue of material fact as to whether the

18   standard of care required Nick to be sent to a hospital for a "fit for jail" examination or to be

19   placed in a housing assignment with closer monitoring than general population could provide.

20   Plaintiffs have provided expert testimony opining that these additional steps were part of the

21   standard of care and would have been required of a reasonably prudent nurse in McCleary's

22   position.

23

24

1    As to causation, Plaintiffs cannot establish a genuine dispute of material fact on the

2    theory that RN McCleary was required to contact a higher-level provider.  Even assuming she

3    breached a duty by failing to do so, it is entirely speculative that Dr. Sandack would have done

4    anything different than RN McCleary and that the difference in care would have prevented Mr.

5    Rapp's death.  Plaintiffs state that "a reasonable juror could certainly conclude that had a

6    consultation with a qualified clinician occurred, a withdrawal treatment plan that sufficiently

7    alleviated his symptoms and reduced his suffering would have occurred, his suicide risk would

8    have been mitigated, and a referral to a mental health provider for a comprehensive assessment

9    would have appropriately identified his serious medical needs."  (Dkt. No. 328 at 16.)  As with

10   Dr. Sandack, that chain of hypotheticals is too speculative, with too many independent decision

11   points, to establish proximate causation.

12       However, a reasonable jury could find that had Nick been sent to a hospital or admitted to

13   a medical unit rather than placed in the general jail population he would not have had the

14   opportunity to take his life by hanging himself using a bedsheet wedged into his cell door.

15   Plaintiffs' expert Dr. Kris Sperry opined that if Nick were housed in a cell "that was more

16   frequently monitored in order to detect suspicious activities" it would have reduced his

17   opportunity for suicide.  (Dkt. No. 329-14 at 7.)  There is less evidence in the record to suggest

18   McCleary should have known of Nick's suicide risk, though it will be up to a jury to determine

19   what weight and credibility to assign to Officer Decker's testimony that McCleary told her she

20   momentarily considered placing Rapp on suicide watch—if the testimony is admissible.  It is

21   clear, as Plaintiffs' expert Dr. Ryan Hayward opines, that "[h]ousing Mr. Rapp in a suicide

22   resistant cell with suicide resistant bedding and clothing would have substantially reduced his

23   opportunities to suicide."  (Dkt. No. 158-7 at 17; *see id.* at 24)

24

1    For those reasons, the Court will DENY summary judgment for medical negligence as to

2    RN McCleary.  However, Plaintiffs will be limited in their arguments at trial to RN McCleary's

3    decision to admit Mr. Rapp to jail and place him in general population, not their other theories.

4                                          c.     LPN Haven Ladusta

5    The allegations against LPN Ladusta (whom the parties also refer to as LPN Haven) stem

6    from her failure to wake Nick during a late-night COWS/CIWA assessment.  RN Panosky opines

7    that LPN Ladusta breached the standard of care by not waking Mr. Rapp.  (*See* Dkt. No. 329-10

8    at 25–31.)  Dr. Chicoine shares that assessment, adding that she believes Nick would have been

9    at "peak withdrawal" at the time this assessment would have taken place (around 2:20 a.m. on

10   January 2, 2020).  (*See* Dkt. No. 329-13 at 12–14, 21–22.)  NaphCare policy generally directs

11   nurses to conduct the assessments while awake, or to note whatever observations are possible for

12   a patient who refuses assessment.  (*See* Dkt. No. 332 at 2.)

13   Defendants strongly contest that LPN Ladusta "falsified" her report, as Plaintiffs claim,

14   and argue that she met the standard of care.  (Dkt. No. 294 at 24–25.)  She made a note that "pt

15   refused, pt observed resting in bed sleeping soundly, easily aroused when name called, no signs

16   of acute distress noted."  (*Id.*)  She picked "0" or "No" as Nick's scores for the COWS/CIWA

17   questions because the drop-down menu on the electronic form would not have allowed any other

18   choice to indicate non-participation.  (*Id.*)  They argue that the way in which LPN Ladusta filled

19   out the form is not causally related to Nick's death.  (*Id.* at 25.)  On reply, Defendants argue,

20   apparently for the first time, that LPN Ladusta did in fact wake Nick; they provide a video that

21

22

23

24

1    shows an officer entering Nick's dark cell for about 15 seconds while a nurse stands at a rolling

2    cart outside the door.  (*See* Dkt. Nos. 341 at 27, 342-3.) [8]

3          Plaintiffs have again established a genuine issue of material fact as to the standard of

4    care, but not as to causation.  There is a question of fact as to whether LPN Ladusta breached the

5    standard of care by not waking Nick, and any evidence that she did wake him would be for a jury

6    to consider.  However, no reasonable jury could find that her failure to wake Nick caused his

7    death.  LPN Ladusta's putative exam around 2:20 a.m. was not the last one that occurred before

8    Nick's death.  At least one more occurred, as there is video evidence appearing to show an exam

9    that occurred around 9:30 a.m. on January 2, 2020.  (Dkt. No. 342-3.)  Nick scored 3 and 3 on

10   COWS/CIWA during that exam and again denied being suicidal.  (Dkt. Nos. 294 at 13; 89-1 at

11   328.)  Plaintiffs state that "a reasonable juror could determine that had Nick been assessed by

12   LPN Haven as the standard of care dictated, his withdrawal assessment scores would more likely

13   than not have triggered him receiving medication or treatment that would have reduced his

14   suffering and harm." (Dkt. No. 328 at 18.)  But that depends on a chain of contingent events,

15   each of which is unknowable: that his late-night assessment would have indicated COWS/CIWA

16   scores high enough to administer certain medications, that these medications would have

17   improved his mental state, and that as a result he would ultimately not have taken his life.  And

18   since LPN Ladusta's exam was not the last before his death, there was another opportunity for

19   medical intervention, making the causal impact of missing the 2:20 a.m. exam even harder to

20   establish.  While it was apparently not best practice, a reasonable jury could not find that LPN

21   Ladusta's failure to wake Nick was a proximate cause of his death.

22

23   [8] Docket 342-3 is filed via thumbdrive with the Clerk of Court.  The thumbdrive contains five
     videos labeled under "Exhibit C," the first of which is timestamped on January 2, 2020 at 2:09
24   a.m., and the last of which is timestamped on the same day at 9:31 a.m.

1    For that reason, Defendants' motion for summary judgment with respect to medical

2    negligence against LPN Ladusta is GRANTED.

3    d.    RN Erica Molina

4    RN Erica Molina was the Health Services Administrator at the Jail, responsible for

5    overseeing the work of the other nurses.  (Dkt. No. 328 at 19.)  Plaintiffs' expert RN Panosky

6    opines that RN Molina breached the standard of care by failing to adequately supervise the

7    nurses below her, such as by: making sure the nurses contacted a physician where appropriate,

8    preventing them from acting outside the scope of their licenses, administering medication as

9    ordered, and conducting assessments on time.  (*See* Dkt. No. 329-10 at 33–35.)  RN Panosky

10    opines that the alleged failures of RNs McCleary and Molina and LPNs Ladusta and Nagra

11    collectively "contributed to Mr. Rapp's death."  (Dkt. No. 158-14 at 12–13.)  Plaintiffs further

12    allege that Wabnitz informed RN Molina that Mr. Rapp was suicidal and that she failed to act on

13    this information.  (Dkt. No. 273 at 17–18, 25.)  They claim that RN Molina documented this

14    conversation with Wabnitz in an incident report on January 2, 2020.  (*Id.* at 25.)  Wabnitz

15    restated in her deposition testimony that she did communicate Mr. Rapp's suicide risk to RN

16    Molina.  (Dkt. No. 315-2 at 14–15.)  Though not specific to RN Molina, Dr. Hayward opines that

17    the failure to properly communicate Nick's suicide risk and implement a prevention plan

18    "substantially contributed" to his death.  (*See* Dkt. No. 158-7 at 24–25.)  Defendants argue that

19    Wabnitz's claim that she informed RN Molina is an unreliable, post-litigation statement.  (Dkt.

20    No. 294 at 25.)

21    The analysis here is similar to that for RN McCleary.  A reasonable jury could find that

22    the standard of care required RN Molina to act on information that Nick was suicidal and to

23    move him to suicide watch or otherwise implement a suicide prevention plan, and that the failure

24

1   to do so causally contributed to his death.  Any question as to whether Wabnitz in fact notified

2   RN Molina of Nick's suicide risk is a credibility determination for the jury to make.  However,

3   Plaintiffs have failed to articulate a viable causation theory as to RN Molina's alleged failures to

4   adequately supervise the nurses below her with respect to conducting assessments, administering

5   medications, and the like.  It is speculative that had RN Molina directed the other nurses to

6   complete these tasks more frequently or in a different manner that it would have prevented

7   Nick's death.

8        As such, Defendants' motion for summary judgment on Plaintiffs' claim of medical

9   negligence against RN Molina is DENIED.  However, Plaintiffs will be limited in their

10   arguments to RN Molina's alleged failure to act on information regarding Nick's suicide risk.

11                    e.    LPN Ripsy Nagra

12        Like RN Molina, Plaintiffs claim that Wabnitz told her colleague LPN Nagra that Nick

13   was suicidal, and specifically urged Nagra to move him to a suicide unit.  (*See* Dkt. No. 273 at

14   17.)  Wabnitz reiterated those claims in her deposition testimony.  (*See* Dkt. No. 315-2 at 9, 12.)

15   Plaintiffs launch a fusillade of other allegations at LPN Nagra.  They allege that she "falsified"

16   her COWS/CIWA assessments of Nick because video evidence shows Nick was doing other

17   things at the times corresponding to her reports.  (*See* Dkt. No. 273 at 19.)   Nagra (like the

18   NaphCare defendants) attributes discrepancies between the timestamps on her reports and the

19   actual times of assessment to bad Wi-Fi in the Jail.  (Dkt. No. 304 at 3.)  However, both

20   Defendants and Plaintiffs (via their expert, Dr. Herrington) seem to agree that at least some of

21   LPN Nagra's interactions with Nick can be verified with video evidence, albeit at different times

22   than indicated on Nagra's reports.  (*Compare* Dkt. No. 158-11 at 8 *with* Dkt. No. 294 at 13.)

23   Additionally, RN Panosky reviewed LPN Nagra's reports and identified some instances in which

24   Nagra did not conduct "neuro checks" or administer medications in the manner directed by the

standing orders; though RN Panosky acknowledges that LPN Nagra recorded two neuro

checks—including one on the morning of Nick's death, January 2, 2020, at 9:36 a.m.  (*See* Dkt.

No. 158-14 at 8.)  Dr. Chicoine opined that LPN Nagra's COWS/CIWA assessment results did

not make clinical sense given the qualitative observations she recorded.  (*See* Dkt. No. 329-13 at

24–25.)  Wabnitz testified that LPN Nagra's reputation for work was so poor that she was a

"scary nurse" that other staff "did not want to work with."  (Dkt. No. 329-16 at 5–6.)

As with RN Molina, there is a genuine dispute of material fact as to whether LPN Nagra

was warned of Nick's suicide risk and breached the standard of care by failing to act on that

information.  A reasonable jury could find that had LPN Nagra acted on this information and

taken steps to move Nick to a crisis cell (or at least raised the issue with a supervisor) it would

have prevented Nick's death.  However, Plaintiffs have not established a viable theory of

causation as to the other alleged deficiencies in LPN Nagra's care.  It is unclear, for instance,

how the apparent gap between the times that Nagra conducted the assessments and the times she

entered the reports causally contributed to Nick's death.  Further, Plaintiffs' experts do not

explain what data "neuro checks" would have collected and how if at all that data could have

informed Nick's mental healthcare.  In any event, since Plaintiffs' expert does not contest that at

least some neuro checks occurred, it is even harder to extrapolate how additional checks would

have made a causal difference.  Similarly, RN Panosky opines that failing to administer all of the

medications, neuro checks, and cool fluids in Dr. Sandack's orders fell below the standard of

care, and that the collective actions of NaphCare nurses "contributed to Mr. Rapp's death." (Dkt.

No. 158-14 at 11–12.)  But the record is devoid of information from which a reasonable jury

could conclude that any particular omitted medication, treatment, or assessment attributed to

LPN Nagra caused Nick's death.  In sum, there is not enough evidence for a reasonable jury to

1  find that had LPN Nagra given more frequent assessments or additional medications that it

2  would have prevented Nick's death.

3      As such, LPN Nagra's motion for summary judgment as to the medical negligence claim

4  is DENIED, but Plaintiffs will be limited to argument regarding her alleged failure to act on

5  information regarding Nick's suicide risk.

6      B.    Common Law Negligence

7      In addition to their claim of medical negligence, Plaintiffs plead a claim of negligence

8  against NaphCare and Kitsap County.  (Dkt. No. 273 at 54.)  The Court GRANTS summary

9  judgment as to the negligence claim against NaphCare because it is subsumed by the medical

10  negligence claims discussed *supra*, but DENIES the motion as to Kitsap County.

11      1.    *NaphCare*

12      Plaintiffs argue that vicarious liability attaches to NaphCare for the medical negligence of

13  its employees, but do not seem to allege any negligent acts of NaphCare itself.  (*See* Dkt. Nos.

14  296 at 25–26; 328 at 45–46.)  This claim does not survive because common law negligence in

15  the healthcare setting is displaced by Washington Revised Code, Chapter 7.70.  On very similar

16  facts, in a case involving the same defendant, this Court previously reached this same holding.

17  *See Smith v. NaphCare Inc.*, No. 3:22-CV-05069-DGE, 2023 WL 2477892, at *13 (W.D. Wash.

18  Mar. 13, 2023) (allowing claims for medical negligence against NaphCare to move forward on a

19  motion to dismiss posture but dismissing common law negligence claims based on the same

20  healthcare-related conduct).  The Court's view of this issue has not changed.  As noted above,

21  "RCW 7.70 modifies procedural and substantive aspects of *all* civil actions for damages for

22  injury occurring as a result of health care, regardless of how the action is characterized. . . .

23  [W]henever an injury occurs as a result of health care, the action for damages for that injury is

24

1  governed exclusively by RCW 7.70." *Branom v. State*, 974 P.2d 335, 338 (Wash. Ct. App.

2  1999); *see also Harris v. Extendicare Homes, Inc.*, 829 F. Supp. 2d 1023, 1028 (W.D. Wash.

3  2011) (distinguishing claims of injuries arising from deficiencies in a health care plan, which

4  must be brought under Washington Revised Code 7.70, and claims for other types of injuries

5  suffered at a nursing home, which may be brought under the common law).  That is because the

6  malpractice act is a statute in derogation of the common law.  *See Sherman v. Kissinger*, 195

7  P.3d 539, 544 (Wash. Ct. App. 2008).

8      Thus, as a matter of law, Plaintiffs cannot maintain an action for negligence against

9  NaphCare arising out of its provision of healthcare to Rapp *independent* of its medical

10  negligence claim.  In their complaint, Plaintiffs allege that Kitsap County and NaphCare

11  breached their duty to protect the "health, welfare, and safety" of Mr. Rapp.  (Dkt. No. 273 at

12  55.)  That same phrase appears in *Gregoire v. City of Oak Harbor*, 244 P.3d 924, 927 (Wash.

13  2010), which recognized that a *jailer* has a nondelegable duty of care to prevent suicide of the

14  inmates in its charge.  But NaphCare is not a jailer.  In yet another NaphCare case, this Court

15  explained that NaphCare's duties to inmates are limited to the provision of healthcare—the

16  service which NaphCare is contracted to provide.  *Picciano v. Clark Cnty.*, No. 3:20-CV-06106-

17  DGE, 2024 WL 3859755, at *11 (W.D. Wash. Aug. 19, 2024), *reconsideration denied*, No. 3:20-

18  CV-06106-DGE, 2024 WL 4451611 (W.D. Wash. Oct. 8, 2024).  In other words, Plaintiffs'

19  claims against NaphCare must derive from NaphCare's provision of healthcare, and healthcare

20  negligence claims must be brought under Chapter 7.70, not the common law.[9]

21

22  [9] On a motion to dismiss posture, this Court previously held that the allegation that LPNs
    Ladusta and Nagra "falsified" assessments was plausibly non-medical.  (*See* Dkt. No. 111 at 15.)

23  After discovery and on a more fulsome record, it is clear that this allegation is part of Plaintiffs'
    medical negligence claim.  The Court also relied on alleged conduct of LPN Bruce Karl (*see id.*),

24  but he is no longer party to the case.  (*Id.*; Dkt. No. 136.)

1          Finally, the Court notes that some of Plaintiffs' allegations against NaphCare sound in

2   negligent supervision, especially as it relates to RN Molina's supervision of the nursing staff.

3   But Plaintiffs do not plead a claim of negligent supervision.  (*See generally*, Dkt. No. 273.)

4   Likewise, the Washington Supreme Court recently held that a claim for corporate negligence can

5   be maintained against a hospital alongside a Chapter 7.70 claim, "separate from its vicarious

6   liability under the nondelegable duty doctrine."  *Est. of Essex by & through Essex v. Grant Cnty.*

7   *Pub. Hosp. Dist. No. 1*, 546 P.3d 407, 414 (Wash. 2024).  But Plaintiffs' 4AC removes a

8   corporate negligence claim (*see* Dkt. No. 273-1 at 63), and NaphCare is not a hospital.  For these

9   reasons, the Court GRANTS summary judgement to Defendant NaphCare on Plaintiffs'

10  negligence claim.

11                    2.    *Kitsap County*

12         The negligence claim against Kitsap County does not suffer the same infirmities.  The

13  elements of negligence are "(1) the existence of a duty, (2) breach of that duty, (3) resulting

14  injury, and (4) proximate cause."  *Ranger Ins. Co. v. Pierce Cnty.*, 192 P.3d 886, 889 (Wash.

15  2008).  Kitsap County had a duty to Rapp, an inmate in its care, as established by *Gregoire*, 244

16  P.3d at 927.  As discussed more fully *infra*, a reasonable jury could find that the County

17  breached that duty if Officers Rhode or Hren were warned by Wabnitz of Nick's suicidality and

18  failed to act on that information, such as by transporting him to the hospital, documenting it in

19  their reports, or informing the nurses at KCJ about it.  A reasonable jury could find that these

20  acts or omissions proximately caused Nick's death, because had information been conveyed at

21  the time of his booking that he was recently suicidal he may have been taken to a hospital for

22  evaluation or at least placed on closer monitoring such as a crisis cell.  (*See e.g.*, Dkt. No. 315-24

23  at 31, Lt. Sapp confirming Jail policy is to take suicidal individuals to the hospital before

24

1    intake.)[10]   There may also be triable fact questions as to whether Officer Petersen's final cell

2    check was negligent or whether Officer Decker was negligent in not doing more after Nick told

3    her that he would not inform jail staff if he was suicidal.

4         C.    Gross Negligence

5              1.    *NaphCare*

6         Plaintiffs' gross negligence claim against NaphCare is likewise deficient.   The faults

7    identified above apply here as well; Plaintiffs cannot maintain a common law claim against

8    NaphCare for injuries resulting from healthcare (be it negligence or gross negligence)

9    independent of their statutory claim.  *Branom*, 974 P.2d at 338 ("RCW 7.70 modifies procedural

10    and substantive aspects of *all* civil actions for damages for injury occurring as a result of health

11    care, regardless of how the action is characterized") (emphasis in original); *Harris*, 829 F. Supp.

12    2d at 1028 (analyzing negligence and gross negligence claims together).   For this reason,

13    Defendants are entitled to summary judgement on the gross negligence claim.

14         Additionally, briefing on the summary judgment motion has revealed that the gross

15    negligence claim is not adequately pled.   In their response to Defendants' motion, Plaintiffs state

16    that they have no gross negligence claim against any of the individual NaphCare employees.

17    (Dkt. No. 328 at 24.)   Instead, they only claim gross negligence against NaphCare itself and

18    Kitsap County.  (*Id.*)  But when pressed for evidence of NaphCare's gross negligence, Plaintiffs

19    refer back to their evidence/allegations against the individuals.  (*Id.* at 46.)   The Court is

20

21    _____
      [10] Plaintiffs also identify that in September 2019 Rapp was a patient at a County facility, Kitsap
22    Mental Health Services (which happens to be KCJ's mental health provider), and Rapp reported
      suicidal feelings and past attempts to his treatment providers there, but when he was booked into
23    KCJ the Jail did not obtain these records.  (Dkt. Nos. 273 at 10; 315-1 at 4.)  Plaintiffs, however,
      offer no factual or legal argument to support the conclusion that Jail staff should have looked for,
24    obtained, and reviewed records from Kitsap Mental Health Services absent knowledge of these
      records and absent Nick authorizing Kitsap Mental Health to release such records to the KCJ.

1    skeptical of this circuitous reasoning.  As Defendants note, if Plaintiffs do not allege gross

2    negligence against any individual NaphCare employee, then NaphCare cannot be vicariously

3    liable for gross negligence.  (*See* Dkt. No. 341 at 28.)

4            Nonetheless, for completeness, the Court will consider whether Plaintiffs have proffered

5    evidence of gross negligence.  They have not.  "[A] person acts with *gross* negligence when he

6    or she exercises '*substantially or appreciably*' less than that degree of care which the reasonably

7    prudent person would exercise in the same or similar circumstances."  *Harper v. State*, 429 P.3d

8    1071, 1077 (Wash. 2018).  To avoid summary judgment, the Plaintiffs must "present[]

9    substantial evidence that the defendant failed to exercise slight care under the circumstances

10   presented, considering both the relevant failure and, if applicable, any relevant actions that the

11   defendant did take."  *Id.*  Thus, NaphCare is entitled to summary judgement on the gross

12   negligence claim because the evidence conclusively demonstrates that NaphCare employees

13   exercised at least "slight care" with respect to their treatment of Nick.  Dr. Sandack and RN

14   McCleary placed Nick on detox watch and ordered medication to mitigate that detox, McCleary,

15   Molina, Haven, and Nagra then carried out periodic COWS/CIWA assessments.  Plaintiffs may

16   argue that the medications were inappropriate under the circumstance, or that the assessments

17   were done too infrequently, but those alleged shortcomings do not establish an absence of even

18   "slight care" on NaphCare's part.  For those reasons, the Court GRANTS summary judgement

19   on the gross negligence claim.

20                   2.    *Kitsap County*

21           The Court will allow the gross negligence claim against Kitsap County to proceed to trial.

22   If a jury believes Wabnitz's testimony that Rhode or Hren knew of Nick's suicide risk, but they

23   failed to document that information anywhere or relay it to anyone responsible for Nick's care, a

24

1   reasonable jury could find the absence of even "slight care."  Accordingly, summary judgment is

2   DENIED as to gross negligence against the County.

3          D.      § 1983 Claims Against Individual Defendants

4                  1.      *County Officials, But Not Private Persons, May Claim Qualified Immunity*

5          Plaintiffs assert claims against each of the defendants under 42 U.S.C. § 1983 for

6   violations of Nick's constitutional rights.  (*See* Dkt. No. 273 at 59.)  NaphCare and its employees

7   are amenable to suit under § 1983 despite being private actors because they were carrying out a

8   public function, providing healthcare services at KCJ.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d

9   1128, 1139–1140 (9th Cir. 2012).  But there is an important distinction in the legal standards

10  applied to NaphCare and the County, respectively.  Private persons are not entitled to a qualified

11  immunity defense, even when performing a government function.  *Richardson v. McKnight*, 521

12  U.S. 399, 408–409 (1997) (private prison guards not entitled to qualified immunity); *accord*

13  *Clement v. City of Glendale*, 518 F.3d 1090, 1096–1097 (9th Cir. 2008) (private towing company

14  not entitled to immunity).  Thus, as to the NaphCare defendants and LPN Nagra, the Court will

15  only consider whether a reasonable jury could find that those defendants deprived Nick of a

16  constitutional right.  *See Richardson*, 521 U.S. at 413 (on remand, court to consider liability

17  under § 1983 and other defenses, but not immunity); *see also Wallace v. NaphCare Healthcare*,

18  2020 WL 7872043 at *12 (W.D. Wash. Nov. 9, 2020) (discussing qualified immunity only as to

19  county defendants, not NaphCare).

20         By contrast, the individual County Defendants are entitled to a qualified immunity

21  defense.[11]  The Court must resolve the question of qualified immunity at this stage of the

22

23  [11] Kitsap County itself is not entitled to a qualified immunity defense.  *Hernandez v. City of San
    Jose*, 897 F.3d 1125, 1139 (9th Cir. 2018).

24

1   litigation because it "an immunity from suit rather than a mere defense to liability . . . it is

2   effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S.

3   223, 231 (2009).  In this inquiry, the Court must ask "whether (1) the state actor's conduct

4   violated a constitutional right and (2) the right was clearly established at the time of the alleged

5   misconduct." *Gordon v. Cty. of Orange*, 6 F.4th 961, 967–968 (9th Cir. 2021) ("*Gordon II*").  In

6   this framework, "[e]ither question may be addressed first, and if the answer to either is 'no,' then

7   the state actor cannot be held liable for damages." *Id.* at 968 (citing *Pearson*, 555 U.S. at 236).

8   Whether a right is "clearly established" is a question of law for a court to decide.  *Id.*  To

9   determine if the right is "clearly established" the court must first define the right, "in a way that

10  is neither 'too general' nor 'too particularized.'" *Id.* at 969.  The goal of this inquiry is to

11  determine "whether it would have been clear to a reasonable officer that the alleged conduct

12  'was unlawful in the situation he confronted.'" *Id.*  (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 152

13  (2017)).  Rights may be established by controlling precedent from the Supreme Court or Ninth

14  Circuit, or a "'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cnty. of Orange*,

15  871 F.3d 901, 911 (9th Cir. 2017).

16              2.    *Objective Unreasonableness Standard*

17          The Supreme Court and Ninth Circuit have held that "[i]ndividuals in state custody have

18  a constitutional right to adequate medical treatment." *Sandoval v. Cty. of San Diego*, 985 F.3d

19  657, 667 (9th Cir. 2021); *Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976).  However, "[m]edical

20  malpractice does not become a constitutional violation merely because the victim is a prisoner.

21  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful

22  to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.  Because

23  Nick was a pre-trial detainee, his substantive constitutional rights derive from the Fourteenth

24

1   Amendment Due Process clause, not the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535

2   (1979); *Sandoval*, 985 F.3d at 667. A pretrial detainee alleging inadequate medical care must

3   show:

4          (1) The defendant made an intentional decision with respect to the conditions under
               which the plaintiff was confined [including a decision with respect to medical
5              treatment];

6          (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

7          (3) The defendant did not take reasonable available measures to abate that risk, even
               though a reasonable official in the circumstances would have appreciated the high
8              degree of risk involved—making the consequences of the defendant's conduct
               obvious; and
9
           (4) By not taking such measures, the defendant caused the plaintiff's injuries.
10
     *Id.* at 669 (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) ("*Gordon*

11   *I*")). In the Ninth Circuit, the third element is assessed by an objective rather than subjective

12   standard. *Id.*[12] That is, "the plaintiff must show that the defendant's actions were 'objectively

13   unreasonable,' which requires a showing of 'more than negligence but less than subjective

14   intent—something akin to **reckless disregard**.'" *Id.* (emphasis added). This is commonly

15   referred to as "deliberate indifference," the term used in *Estelle*—though that phrase is

16   something of a misnomer where the court is not tasked with probing subjective intent.

17   Alternatively, the standard may be referred to as one of "objective unreasonableness" or

18   "objective deliberate indifference." *Sandoval*, 985 F.3d at 671–672. Regardless, the Court will

19   apply the objective standard to Plaintiffs' constitutional claims. As to causation, "the Court

20   looks to traditional tort law to determine causation, including whether intervening causes have

21   broken the chain of proximate causation." *Moriarty v. Cnty. of San Diego*, No. 17CV1154-LAB

22

23   _____
     [12] Defendants argue that the Ninth Circuit's objective deliberate indifference standard is
24   erroneous (Dkt. No. 294 at 27, n.6), and that argument is preserved for appeal.

1  (AGS), 2019 WL 4643602, at *6 (S.D. Cal. Sept. 24, 2019) (citing *Van Ort v. Estate of*

2  *Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996)).

3       3.    *Analysis for NaphCare Defendants*

4       For each defendant, the Court analyzes deliberate indifference on a factor-by-factor basis,

5  following the four-factor test established in *Gordon I* and *Sandoval*.

6       a.    Dr. Alana Sandack

7       Defendants are entitled to summary judgment with respect to the deliberate indifference

8  claim against Dr. Sandack because a) her failure to personally examine Nick, while possibly

9  negligent, does not rise to the level of deliberate indifference, and b) any acts or omissions are

10  not causally linked to Nick's injuries.

11       Plaintiffs can satisfy the first *Gordon I* factor, an intentional decision related to conditions

12  of confinement, with respect to Dr. Sandack.  The Court assumes that whatever treatment

13  decisions Dr. Sandack made with respect to Nick's care, or the manner in which she cared for

14  inmates at KCJ generally, were her own, intentional choices.  For instance, Dr. Sandack testified

15  that she did not have any clinical interaction with Nick prior to his death, and that she did not

16  personally examine him in response to his positive drug test.  (Dkt. No. 329-12 at 15, 19.)  She

17  was onsite one day a week.  (*Id.* at 14.)  She stated that she could see all the drugs ordered in her

18  name on a dashboard in NaphCare's medical records system and that she would review those

19  orders "when I was onsite, whether it was the next day that I was onsite or sometime shortly

20  thereafter."  (Dkt. No. 158-22 at 7.)

21       It is less clear if Plaintiffs can establish the second factor, placing Nick at a "substantial

22  risk of suffering serious harm."  Arguably, Dr. Sandack's failure to personally examine Mr.

23  Rapp, even if negligent, did not expose him to a substantial risk of serious harm because he

24  remained in the care of medical providers who could have contacted her or called emergency

1    services if his condition noticeably deteriorated.  Similarly, Plaintiffs' evidence on the third

2    element, objective unreasonableness amounting to "reckless disregard," is lacking.  Again, Dr.

3    Sandack's decision to not personally examine Nick and the timing of her review of his chart may

4    have breached the standard of care, but that does not amount to reckless disregard.  "Medical

5    malpractice does not become a constitutional violation merely because the victim is a prisoner."

6    *Estelle*, 429 U.S. at 106.  It is hard to conclude that Dr. Sandack failed to take "reasonable

7    available measures to abate" any risk that would inhere from failing to examine Nick, such that

8    the "high risk" would be "obvious" to a reasonable physician in her position, when, as noted,

9    Nick was under the care of other healthcare providers who could have alerted her if his condition

10   rapidly deteriorated.

11       Ultimately, even if a reasonable jury could find for Plaintiffs on the second and third

12   factors, the lack of causation is fatal to Plaintiffs' claim.  As discussed *supra* with respect to

13   medical negligence, there is no basis for a reasonable jury to conclude that Dr. Sandack's failure

14   to personally examine Nick or her delay in reviewing his chart caused his death.  "Because of the

15   causation requirements of a § 1983 claim, a prisoner can make no claim for constitutionally

16   deficient medical care based on delay unless the delay caused harm."  *Manago v. McMahon*, No.

17   521CV01370MCSKES, 2023 WL 9420826, at *10 (C.D. Cal. Dec. 27, 2023), *report and*

18   *recommendation adopted*, No. 521CV01370MCSKES, 2024 WL 666139 (C.D. Cal. Feb. 16,

19   2024).  It is purely speculative that Nick receiving more direct care from Dr. Sandack, as

20   opposed to any of the nurses working below her, would have changed his care in any appreciable

21   respect, let alone prevented his death.

22       The cases Plaintiff cites to support its argument are distinguishable.  In *Gonzalez v. Cecil*

23   *Cnty., Maryland*, 221 F. Supp. 2d 611, 617 (D. Md. 2002), the court allowed a deliberate

24

indifference claim to survive a motion to dismiss against a doctor who allegedly "failed to establish appropriate protocols for evaluation and treatment of physically ill prisoners." Likewise, the "Nurse Defendants acted under the control and direction of [the physician] in the manner in which they rendered care to [the plaintiff]." *Id.* On those facts, the court concluded that "these allegations are sufficient to raise an inference of deliberate indifference on the part of [the physician] as well, either because he was directly involved in rendering care to [the plaintiff], or because he was responsible for the policy that caused [the plaintiff]'s death." *Id.* Here, on a summary judgment posture, the legal standard calls for more than plausibility. Further, Dr. Sandack is not alleged to have developed policies for KCJ, rather, she was charged with implementing NaphCare policies—and her involvement in Nick's care and directing the nursing team was less direct than what was alleged in *Gonzalez*.

In *Liscio v. Warren*, 901 F.2d 274 (2d Cir. 1990), *overruled on other grounds by Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir. 2009), the court reversed summary judgment against a doctor who failed to appropriately examine a patient. The physician initially did examine the patient, ordered a withdrawal regimen, and referred the patient for psychiatric evaluation, but the psychiatrist refused to evaluate the patient because the problem was medical, and referred him back to the physician, who did not examine him again until three days later. *Id.* at 275. The physician presumed that the patient was suffering heroin withdrawal when in fact he was suffering from alcohol withdrawal, and during the three-day interval he experienced "delirium" and his condition deteriorated to the point that it became a "medical emergency." *Id.* at 276. Though similar in some respects, the facts here are distinguishable. Mr. Rapp's withdrawal symptoms never escalated to the point of "delirium" and Dr. Sandack was not informed by

1  another healthcare provider that it was necessary for her to evaluate Nick.  Other cases cited by

2  Plaintiffs do not provide greater support.

3       For these reasons, the Court GRANTS summary judgment as to the deliberate

4  indifference claim against Dr. Sandack.

5                          b.    RN Odessa McCleary

6       Defendants are entitled to summary judgment with respect to the deliberate indifference

7  claim against RN McCleary, because her housing placement for Nick, while possibly negligent,

8  does not rise to the level of objective unreasonableness or reckless disregard.

9       The first *Gordon I* element, intentional decision with respect to conditions of

10 confinement, is easily satisfied: RN McCleary made the choice to place Nick in general

11 population.  The second element, placing Nick at substantial risk of serious harm, is not so easily

12 satisfied.  Nick was placed on a detox watch protocol.  While Plaintiffs argue that the detox

13 protocol was insufficient in its design or application, there is no allegation that he was abandoned

14 to experience withdrawal without any type of monitoring or assistance.  The third factor,

15 objective unreasonableness amounting to reckless disregard, is the most clearly lacking.  Based

16 on the information available to RN McCleary at the time, no reasonable jury could conclude that

17 a high degree of risk from placing Nick in general population with detox watch was "obvious" to

18 her, and that she acted with "reckless disregard" in so doing.  During her intake screening, Nick

19 denied being suicidal or at risk for self-harm.  (*See* Dkt. No. 295 at 51–55.)  In response to the

20 information that he was detoxing from drugs and alcohol, she did place him on a detox watch,

21 with a lower bunk restriction.  (*Id.* at 76.)  In the context of medical negligence, Plaintiffs will be

22 able to argue that these steps were insufficient and fell below the standard of care, but they do

23 not evince an unconstitutionally reckless disregard to Nick's wellbeing.  Further, to the extent

24 that placing him in general population created a serious risk of harm, implementing the detox

1  watch—with the potential of readjusting his placement or care plan as conditions warranted—

2  can be seen as mitigating measures.  Likewise, the comment Officer Decker alleges that RN

3  McCleary made that she considered suicide watch for Nick because of his uncooperative

4  disposition would not be enough to establish reckless disregard, even if admissible.[13]

5      For those reasons, the Court GRANTS summary judgment as to the deliberate

6  indifference claim against RN McCleary.

7                    c.    LPN Haven Ladusta

8      For the same reasons as discussed *supra* with respect to medical negligence, Defendants

9  are entitled to summary judgment on the deliberate indifference claim against LPN Haven

10  Ladusta, for lack of causation.  Here, Plaintiffs could establish all but the final element of the

11  claim.  LPN Ladusta made an intentional decision not to wake Nick.  Based on NaphCare's own

12  policy directing nurses to wake inmates for screenings due to the dangers of withdrawal, a

13  reasonable jury could find that not waking Nick placed him at a substantial risk of serious harm,

14  that LPN Ladusta knew of that risk, and that she acted in an objectively unreasonable manner.

15  However, a reasonable jury could not find that her failure to wake him causally contributed to his

16  death.  *See supra*.  For that reason, the Court GRANTS summary judgment on the deliberate

17  indifference claim against LPN Ladusta.

18                    d.    RN Erica Molina and LPN Ripsy Nagra

19      The Court begins its analysis of the deliberate indifference claims against RN Erica

20  Molina and LPN Ripsy Nagra with a review of Ninth Circuit caselaw on a legal question: can a

21

22  [13] Wabnitz testified in her deposition that during a nurses' meeting she stated it was odd that
   Nick was not in a crisis cell, and that RN McCleary was running this meeting and was close to

23  her in physical proximity.  (Dkt. No. 315-2 at 9–10.)  But there is no allegation that Wabnitz
   directly told RN McCleary what she knew of Nick's condition, unlike the allegations against RN

24  Molina and LPN Nagra.  (*See id.* at 15, discussing conversations with Molina and Nagra.)

1    defendant be found to be deliberately indifferent to an inmate's serious medical needs if the

2    defendant was (allegedly) warned of the inmate's suicide risk and failed to act, but the inmate

3    denied or did not disclose suicidality?  The Court finds that the answer is 'yes.'

4         The Ninth Circuit has established that "[a] heightened suicide risk or an attempted suicide

5    is a serious medical need."  *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *cert.*

6    *granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *and*

7    *opinion reinstated*, 658 F.3d 897 (9th Cir. 2011).[14]  In *Conn*, officers personally witnessed a

8    detainee, Clustka, wrap a seatbelt around her neck and threaten to kill herself in a police wagon

9    but did not document that attempt nor disclose that information to jail personnel.  *Id.* at 1092.

10   She was released from jail but then re-arrested the next day by different officers.  *Id.* at 1093.

11   Clustka was medically screened on arrival and placed in general population—apparently the

12   medical screening did not reveal an imminent suicide risk—but because she had been placed on

13   suicide watch in a previous stint in the jail a month earlier, she was placed in the metal health

14   unit in a red jumpsuit.  *Id.*  Nonetheless, she had access to a bedsheet, and used it to hang herself.

15   *Id.*  The court reversed summary judgment in favor of the officers and denied qualified

16   immunity, finding that notwithstanding the intake evaluation, her prior history coupled with the

17   suicide attempt in the wagon constituted objective evidence of a serious medical need and

18   created a fact question for the jury.  *Id.* at 1095–1096, 1105.

19        In *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010), *overruled on other*

20   *grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) the court reversed

21

22   ───────────────

23   [14] *Conn* applied the now-defunct subjective intent standard for deliberate indifference for pretrial
     detainees, and is abrogated as to that standard, but *Conn's* holding that risk of suicide is a serious
     medical need is still good law in the circuit.  *See Christie v. Dep't of Corr.*, No. 3:22-CV-05692-
24   TMC, 2024 WL 3939287, at *13 (W.D. Wash. Aug. 26, 2024).

1  summary judgment in favor of a mental health worker who removed a suicidal inmate from

2  fifteen-minute observation and allowed him to access jail clothes and bedding; she had actual

3  knowledge the inmate was acutely suicidal from the notes of her colleagues. *Id.* at 1238, 1244–

4  1245.[15]  There was a genuine question for the jury as to whether she was deliberately indifferent

5  to the inmate's risk of suicide, and she was not entitled to qualified immunity. *Id.* at 1245.

6       Both *Conn* and *Clouthier* involve significantly starker facts giving rise to an objective

7  risk of suicide than the facts of this case: in *Conn* officers personally witnessed the inmate

8  attempt suicide, and in *Clouthier* the inmate had already been placed on suicide watch before an

9  ill-informed decision to remove him from that care.  Nonetheless, at a higher level of generality,

10 "the import of *Conn* is that the failure to communicate knowledge of an arrestee's serious risk of

11 suicide can establish deliberate indifference." *Christie*, 2024 WL 3939287, at *13.  Likewise,

12 *Clouthier* can be read to stand for the proposition that an official who knows of an inmate's

13 suicide risk needs to act in accordance with that information.  The inmate's past history of

14 suicide is relevant, as in *Conn*, but the inmate need not make any particular self-disclosure to

15 establish the heightened risk.

16      A recent case in this district applying these principles on facts closer to those at issue here

17 illustrates the point.  *Christie* concerned an inmate who had been in jail six times in 2019, and in

18 the first five instances disclosed that he was experiencing suicidal thoughts or had attempted

19 suicide, and as a result had been placed on suicide watch or other prevention measures. *Id.* at *1.

20

21

22

23

24

---

[15] Like *Conn*, *Clouthier* is overruled to the extent it applies the subjective standard for deliberate indifference to pretrial detainees, but its holding that an inmate has a substantive right to "be free from 'deliberate indifference to [his] mental health needs that resulted in [his] suicide'" is still controlling.  *Christie*, 2024 WL 3939287, at *7.

But the sixth and final time he did not disclose being suicidal and was placed in general

population, where he committed suicide.  *Id.*  On Christie's intake screening he

> denied ever having 'tried to hurt or kill [him]self,' 'receiv[ing] therapy or medication for
> a mental health concern and/or suicide attempt,' or receiving a mental health diagnosis.
> He also denied feeling he needed mental health services at that time. He did, however,
> disclose that he used methamphetamine daily and last used it four days before.

*Id.* at *4 (internal citations omitted).  The court found that Christie had a "clearly established

right to be free from deliberate indifference to his mental health needs, including his risk of

suicide."  *Id.* at *7 (citing *Clouthier* and *Conn*).  That said, he did not have a clearly-established

right to any particular suicide prevention protocol.  *Id.* at *8 (citing *Taylor v. Barkes*, 575 U.S.

822 (2015)).  The court granted summary judgment on deliberate indifference as to several

defendants who did not know of Christie's past medical history, including nurses who had access

to his prior arrest files and could have reviewed them, but did not—finding that the failure to do

so could constitute negligence but not deliberate indifference.  *Id.* at *12.  However, the court

denied summary judgment and denied qualified immunity as to one defendant: Christie's

community corrections officer, because he knew of Christie's suicide risk from his own

statements and that of his mother, but said nothing of it when he booked Christie into the jail.  *Id.*

at *13.

        The analysis in this case is very similar.  Plaintiffs allege that RN Molina knew of Nick's

suicide risk because Wabnitz told her, and that she failed to take any action on that information.

(Dkt. No. 273 at 17–18, 25.)  Specifically, Wabnitz testifies that after sending Molina the email

about Nick being in the jail, she pulled Molina into the jail's pharmacy and told her Nick had

threatened to kill himself and was suicidal.  (Dkt. No. 315-2 at 14–15.)  Likewise, Wabnitz

claims she told LPN Nagra about the suicide risk and urged her to move Nick to a crisis cell.

(*See* Dkt. Nos. 273 at 17; 315-2 at 9, 12.)  Defendants deny this account of events strenuously,

but it presents disputed questions of material fact that a jury will need to decide. Applying the

*Gordon I* factors, a reasonable jury could find that RN Molina and LPN Nagra 1) made

intentional decisions with respect to the conditions of Nick's confinement, i.e. they did not take

any steps to move or modify his placement in response to the suicide risk information, 2) failing

to take action on the tip placed Nick at a substantial risk of serious harm, 3) it was objectively

unreasonable not to take action to protect an inmate with a known suicide risk, such that it would

have been obvious to a reasonable nurse, and 4) the failure to move Nick to suicide watch or take

similar precautions was a proximate cause of his death.

Finally, the Court addresses the out-of-circuit precedents that Defendants invoke, a trio of

Seventh Circuit cases. In *Estate of Wallmow v. Oneida County*, 99 F.4th 385, 389 (7th Cir.

2024) ("*Wallmow*") Mr. Wallmow denied on intake that he was suicidal, but his probation officer

warned jail officials that he had been acting in a deeply disturbed manner:

> He began to alternately laugh and cry, say 'demonic' things, and hit himself. He worried
> aloud that his parents planned to 'psionically' harm him. He said [the probation officer]
> was 'talking to a dead man.' And he suggested that at a psychiatric treatment facility,
> medical personnel might force him to drink his intestines from a cup.

As a result, a supervisor in the jail made a note on a muster log to "[k]eep an eye" on Wallmow,

and he was "the subject of observation at least 37 times per day through a combination of cell

checks, walkthroughs, and head counts. During this time he behaved normally." *Id.* However,

that level of scrutiny was insufficient, and Wallmow committed suicide. *Id.* at 390. The court

affirmed a grant of summary judgment on deliberate indifference in favor of two officers, finding

that neither had acted in an objectively unreasonable manner. *Id.* at 392.

*Wallmow* built on two prior cases, *Pulera v. Sarzant*, 966 F.3d 540 (7th Cir. 2020) and

*Jump v. Village of Shorewood*, 42 F.4th 782 (7th Cir. 2022). The court summarized those cases

as follows:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

In both those cases, as in this one, the detainee was intoxicated at the time of booking and confirmed at booking that he was not contemplating suicide. In *Pulera*, as here, the deceased had spoken with medical professionals without giving any sign of suicidality. And in both cases, the deceased showed some warning signs: Pulera told others that he might die without anti-anxiety medication, and another in the cell block reported Pulera "dragging his thumb across his neck as if he was going to harm himself," while in *Jump* the deceased was seen "slamming his body against the cell bars." We affirmed the summary judgment for the defendants in both those cases.

*Wallmow*, 99 F.4th at 391–392. (internal citations omitted). From those cases, the court derived a rule that "[a]n 'express statement that [the deceased] was not considering suicide' from the deceased himself weighs heavily against objective unreasonableness." *Id.* at 391 (quoting *Pulera*, 966 F.3d at 551). Further, "when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions." *Jump*, 42 F.4th at 793.

There are relevant factual dissimilarities that distinguish these cases from Nick's case. In *Wallmow*, the jail did take preventative measures in response to a tip from Wallmow's probation officer; those measures proved to be insufficient, but cut against the allegation that officials were indifferent to his wellbeing. In *Pulera*, as noted, jail officials ignored a warning from a fellow inmate about Pulera's condition, but did search a facility database to see if he had a "mental health special instruction" from prior admissions (he did not) and nurses did call a physician when he complained that he needed his anti-anxiety medications to survive. *Pulera*, 966 F.3d at 545–547. In *Jump*, there was no specific warning. 42 F.4th at 787. Here, by contrast, Molina and Nagra are alleged to have not taken any actions in response to a specific warning from a colleague, Wabnitz, about Nick's suicide history and present suicide risk.

Beyond these distinctions, the Court declines to follow the *Wallmow* line of cases because there does not, at this time, appear to be an analogous rule in the Ninth Circuit. The *Wallmow* rule is in tension with how the Circuit viewed these issues in *Conn*—where it denied summary judgment despite an intake screening not revealing any suicide risk. Likewise,

1    *Christie*, interpreting the Ninth Circuit caselaw, denied summary judgment despite an express

2    denial of suicidality.  Even when an inmate denies being suicidal, there may be objective

3    indicators that should alert a reasonable officer or healthcare provider as to a serious risk of

4    suicide.

5        Accordingly, summary judgment on the deliberate indifference claim is DENIED as to

6    Defendants Molina and Nagra.

7            4.    *Analysis for Kitsap County Individual Defendants*

8                a.    Policymaking Defendants: Mark Rufener, Gary Simpson, and John
                       Gese

9        Supervisors cannot be held liable under § 1983 on a theory of *respondeat superior*.

10   *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  Rather, "[a] defendant may be held liable as a

11   supervisor under § 1983 'if there exists either (1) his or her personal involvement in the

12   constitutional deprivation, or (2) a sufficient causal connection between the supervisor's

13   wrongful conduct and the constitutional violation.'"  *Starr v. Baca*, 652 F.3d 1202, 1207 (9th

14   Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  The supervisor can

15   create the causal connection by "setting in motion a series of acts by others or by knowingly

16   refusing to terminate a series of acts by others, which the supervisor knew or reasonably should

17   have known would cause others to inflict a constitutional injury."  *Id.* at 1207-1208.  (cleaned

18   up).  "A supervisor can be liable in his individual capacity for his own culpable action or inaction

19   in the training, supervision, or control of his subordinates; for his acquiescence in the

20   constitutional deprivation; or for conduct that showed a reckless or callous indifference to the

21   rights of others."  *Id.* at 1208 (quoting *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir.

22   1998)).

23

24

1    Defendants are entitled to summary judgment on the claims against Rufener, Simpson,

2    and Gese because Plaintiffs have put forward no evidence that those defendants personally

3    participated in a constitutional deprivation nor caused others to do so.  The Complaint does not

4    allege any specific unconstitutional acts on the part of those individuals, but rather alleges that

5    they failed to properly train employees and failed to enforce existing policies.  (*See* Dkt. No. 273

6    at 53, 59.)  Plaintiffs' response to the Motion for Summary Judgment however merely recites

7    that these individuals held supervisory roles without identifying any specific way in which they

8    caused others to violate constitutional rights.  (*See* Dkt. No. 314 at 43–44.)  Plaintiffs argue that

9    several County policies violate constitutional rights, including a lack of direct-view safety

10   checks, ineffective risk assessments, communications failures, and breathalyzer policies.  (*Id.* at

11   36–39.)  But they do not identify any culpable action or inaction attributable directly to these

12   defendants.  Generally, the record shows that KCJ requires new-hire and annual trainings on

13   topics including suicide risk identification and the use of crisis cells, and that the KCJ officers

14   involved in Nick's custody, Decker and Petersen, completed those trainings.  (*See* Dkt. Nos. 298

15   at 3–5, 135-146; 299 at 1–4.)  There is no basis for a reasonable jury to find that Defendants

16   Rufener, Simpson, or Gese were deliberately indifferent to Nick's serious medical needs,

17   including risk of suicide.  Therefore, summary judgment is GRANTED as to these supervisory

18   defendants.

19                    b.    Deputies Andrew Hren and Brandon Rhode

20   Kitsap County Sheriff Deputies Andrew Hren and Brandon Rhode responded to

21   Wabnitz's house after she called 911, and they arrested Nick.  (Dkt. No. 300 at 2.)  Rhode

22   transported Nick to KCJ.  (*Id.* at 4.)  Both Rhode and Hren completed arrest reports; neither

23   states that Nick was suicidal or that Wabnitz made any comments about suicide, but Hren's

24   report states that Nick was "extremely intoxicated." (Dkt. No. 302 at 5–12.)  As discussed

*supra*, Rhode's intake form checked 'N' (for 'no') to questions about suicide risk, assaultive behavior, and intoxication. (*Id.* at 76–77.) Rhode testified that it was his practice to only to mark 'yes' to intoxication on this sheet if the arrestee "was highly intoxicated where he needed to be hospitalized." (*Id.* at 31.)

### (1)    There is a Genuine Dispute of Material Fact as to What Rhode and Hren Knew of Rapp's Suicide Risk

There are several pieces of evidence in the record that describe Wabnitz telling the arresting officers about Nick's suicide risk. When Wabnitz was interviewed about the incident by Port Orchard Police on January 8, 2020, she stated "I remember telling them that I had picked him up 'cause he was crying and he had said he wanted to hang himself," referring to the arresting officers. (Dkt. No. 89-1 at 77.) She clarified, "I'm sure that I didn't tell them everything in the exact order, I had so much adrenaline going." (*Id.*) A contemporaneous HSA post-incident report on January 2, 2020 (apparently written by HSA Molina) states "Megan reported to me that she had told the arresting officers that the patient was suicidal and she was concerned that he was going to hurt himself." (Dkt. No. 89-1 at 117.) This is corroborated by Kitsap Lieutenant Penelope Sapp's post-incident report on January 3; Sapp spoke to Molina, who again stated Wabnitz claimed to have told the arresting officers about Nick's suicide risk. (Dkt. No. 315-18 at 2.) After hearing that, Lt. Sapp checked the booking form to see if there was any mention of Nick being suicidal, and there was not; likewise Chief Rufener printed the arrest report, and there was no mention of suicide, either. (*Id.*) In deposition, Wabnitz testified that in her conversation with Nagra about Nick's suicide risk she referenced telling the officers about the same. (Dkt. No. 315-2 at 14; *see also id.* at 16, "And I told the officer.")

Deputies Rhode and Hren have a different version of events. Both participated in post-incident interviews on January 10. Rhode was asked if Wabnitz "mention[ed] anything about

1    suicidal tendencies" and answered "[n]ot that I can remember." (Dkt. No. 302 at 17.) Rapp

2    himself did not show suicidal tendencies either, and Rhode had no reason that night to think

3    Rapp was suicidal. (*Id.* at 17–18.) Hren answered "no" when asked if Wabnitz told him that

4    Rapp was suicidal. (*Id.* at 22.) Similarly, in deposition, Rhode testified "I don't remember" if

5    Wabnitz said anything about Nick being suicidal and "it's not in my report." (*Id.* at 28.) But had

6    Rhode known of suicidal ideation, he "wouldn't have taken [Nick] to the jail, we would go to the

7    hospital." (*Id.* at 29.) Hren testified that "Wabnitz said nothing about him being suicidal, having

8    attempted suicide, or having any suicidal thoughts. She said nothing of the sort." (*Id.* at 40.)

9         Thus, there is a genuine dispute of material fact as to whether Wabnitz told Rhode or

10    Hren about Nick's suicide risk. At trial, a reasonable jury could find testimony from Wabnitz to

11    be credible and believe that she warned Rhode or Hren about Nick's suicide risk. On reply, the

12    County acknowledges the fact dispute but argues it is legally irrelevant, especially as to Officer

13    Hren since he did not transport Nick to KCJ and "believed Deputy Rhode would provide any

14    relevant information to the jail upon his arrival there with Mr. Rapp." (Dkt. Nos. 300 at 16; 321

15    at 2.) That argument is unavailing; Hren did write an arrest report, and the "relevant

16    information" Rhode would have to convey would include anything passed on to him by Hren.

17    Likewise, the County argues that Plaintiffs have failed to prove the materiality of Wabnitz's

18    alleged statements (*see* Dkt. No. 321 at 3), but the statements are clearly material. For instance,

19    Officer Decker testified that, in her understanding, any statement from Wabnitz that Nick was

20    suicidal would be conveyed to her by the arresting officer and would have caused her not to

21    admit Rapp until after he was "mentally cleared" or she would have admitted him "straight into a

22    crisis cell, 15 minute checks, or in a suicide prevention cell." (Dkt. No. 315-8 at 27–28.)

23

24

(2)    <u>Rhode and Hren Are Not Entitled to Qualified Immunity</u>

For the same reasons discussed *supra* with respect to nurses Molina and Nagra, a reasonable jury could find that Rhode or Hren were deliberately indifferent to Nick's serious medical needs if they were warned that he was suicidal and failed to document, convey, or otherwise act on that information.  For Rhode and Hren the Court must also consider if the right was "clearly established" at the time of their actions.  But for largely the same reasons discussed *supra*, the answer is also yes.  Since at least 1988 the Ninth Circuit has recognized liability for "deliberate indifference to a pretrial detainee's mental health needs that resulted in the detainee's suicide."  *Clouthier*, 591 F.3d at 1245.  Thus in 2020 Nick had a "clearly established right to be free from deliberate indifference to his mental health needs, including his risk of suicide."  *Christie*, 2024 WL 3939287, at *7.

The County would define the right more narrowly, and in fact, out of existence.  It describes Wabnitz's alleged statement as an "uncorroborated second-hand statement from a third-party," and argues Nick has no right for officers to act based on such a statement that contradicts their own observations.  (*See* Dkt. No. 300 at 17–18.)  This statement is overly dismissive of Wabnitz's role.  She was not a random passerby, but rather was a) Nick's long-term partner who had *firsthand* knowledge of his mental health at the time of arrest, and b) the victim of the crime to which the officers were responding.  Further, the County's attempt to define the right so narrowly contravenes the Ninth Circuit's admonition that "casting an alleged right too particularly 'would be to allow [the instant defendants], and future defendants, to define away all potential claims.'"  *Gordon II,* 6 F.4th at 969.

The County argues that Rhode and Hren are entitled to qualified immunity under *Horton by Horton v. City of Santa Maria*, 915 F.3d 592 (9th Cir. 2019) ("*Horton*").  In *Horton*, an arrestee denied to arresting officers that he had any "medical problems," despite having been

admitted to the emergency room just weeks earlier after injuring and threatening to kill himself. *Id.* at 596–597. While Horton was in a holding cell, his mother spoke with an officer, Brice, and told him that her son was "depressed and suicidal, that she was really worried about him" and asked Brice to "please, watch him, please look after him, please." *Id.* at 597–598. After Brice hung up the phone, he prepared paperwork to transport Horton to the county jail, and returned to get Horton "approximately 27 minutes after leaving him." *Id.* But in that time, Horton had already hung himself. *Id.* at 598. On those facts, the Ninth Circuit held that Brice was entitled to qualified immunity because "a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful under the law at the time of the incident." *Id.* at 601. The court distinguished *Conn*, wherein the inmate attempted suicide in the officers' presence, and *Clouthier*, in which the mental health professional had actual knowledge of the inmate's past suicide attempts and present suicidality from her colleagues' notes. *Id.* at 600–601. By contrast, Brice did not have notice of Horton's suicide risk until the call with his mother; the officer spoke with Horton's girlfriend at the time of arrest, and she did *not* mention he was suicidal. *Id.* at 601. Under those circumstances, even if Brice was deliberately indifferent to the risk that Horton could "attempt suicide in the time before he was checked," there was no clearly established law that a reasonable officer should have perceived a substantial risk that Horton would "imminently attempt suicide." *Id.* at 601–602. Importantly, the court did not consider whether Brice had in fact violated any constitutional right, because an intervening change in law since the time of the events would have made that analysis irrelevant for future cases. *Id.* at 602.

The County argues that under *Horton*, officers are entitled to qualified immunity whenever they "knew only of *uncorroborated second-hand statements* of an inmate's suicidality." (*See* Dkt. No. 300 at 17) (emphasis in original). In the Court's view, *Horton* is not

1  so broad.  The case concerned a unique circumstance where a warning about suicide risk came

2  less than thirty minutes before a suicide attempt, and the court found that there was no clearly

3  established law requiring officers to "attend to Horton *immediately*."  *Horton*, 915 F.3d at 601

4  (emphasis added).  In *Horton*, there was no contention that the arresting officers had been

5  warned about suicide risk earlier—such as at the time of arrest—which is what is alleged here.

6  And *Horton* made no holding as to whether liability could attach on the same facts in the future.

7          The County also cites *NeSmith v. Olsen*, 808 F. App'x 442, 445 (9th Cir. 2020), where the

8  Ninth Circuit denied qualified immunity to officers who were alleged to have seen a noose

9  hanging in an inmate's cell and did not act on that risk.  The court explained that *Horton*

10  distinguished *Conn* and *Clouthier* on the grounds that "Horton had made no clear threat of

11  suicide or suicide attempt."  *Id.*  But that does not clearly help the County.  For one, it confirms

12  that *Conn* and *Clouthier* still establish an obligation to act on information regarding suicide risk

13  post-*Horton*.  *See also Sandoval*, 985 F.3d at 678–679 (applying *Horton* and denying qualified

14  immunity to a nurse who failed to provide care or pass on information to colleagues about an

15  inmate's serious withdrawal symptoms).  Further, taking the Wabnitz testimony as true, "here as

16  in *NeSmith*, the risk of suicide was known, and the timeline would have allowed [Rhode] or

17  [Hren] to report or respond to that risk."  *Lopez v. Nevada ex rel. Nevada Dep't of Corr.*, No.

18  2:21-CV-01161-ART-NJK, 2023 WL 6379446, at *9 (D. Nev. Sept. 29, 2023), *appeal dismissed*

19  *sub nom. Lopez v. Flanigan*, No. 23-3225, 2024 WL 4732747 (9th Cir. May 20, 2024).

20          The Court's view that *Horton* does not mandate qualified immunity here is bolstered by

21  how other courts in the circuit have applied it.  In *Lopez*, 2023 WL 6379446, the mother of a

22  fugitive, Morgan, spoke with a law enforcement officer, Shields, and requested that if her

23  daughter were captured that she be placed on suicide watch.  Morgan had a history of mental

24

1    illness and suicide attempts and had previously been on suicide watch.  *Id.* at *1.  Shields did

2    convey the information to a corrections officer at the jail, Flanigan, but it was disputed what if

3    anything Flanigan did with that information.  *Id.* at *2.  Ultimately no suicide protocol was

4    implemented when Morgan was apprehended, resulting in her death.  *Id.*  The *Lopez* court

5    rejected the argument that *Horton* required qualified immunity.  It explained:

6          *Horton* involved very different facts than *Conn* and *Clouthier* because the risk of suicide
           was not clear and the timeline was much shorter. In *Conn* and *Clouthier* it was clear that
7          the detainees were suicidal (or on suicide watch in *Clouthier*) within days of their
           suicides. *Horton*, 915 F.3d at 601. In *Horton* the risk of suicide was not clear because
8          there was evidence casting doubt on the likelihood of suicide, including Horton's
           cooperative behavior, his girlfriend's statements, and the fact that medical professionals
9          had concluded he was not suicidal two weeks earlier. *Horton*, 915 F.3d at 601. Also,
           Horton had been left alone less than thirty minutes before attempting to commit suicide,
10         so the window of knowledge and opportunity to respond was much shorter than in *Conn*
           and *Clouthier. See Conn*, 591 F.3d at 1091 (detainee committed suicide some 48 hours
11         after suicidal threats); *Clouthier*, 591 F.3d at 1237-40 (detainee jailed for several days
           before suicide prevention measures were removed). Based on these factual differences,
12         the court held in *Horton* that qualified immunity applied because a reasonable officer
           would not have known that failing to attend to Horton *immediately* would be unlawful
13         under the law at the time of the incident. *Horton*, 915 F.3d at 601.

14   *Id.* at *9.  *Lopez* held that *Conn* governed, not *Horton*, because two days had elapsed between

15   Morgan's arrest and suicide and because her suicide risk was clear.  *Id.*

16          Comparing this case to *Lopez*, the suicide risk to Nick was somewhat less definitive—

17   accepting the Wabnitz testimony as true, the officers would have known that Rapp recently

18   threatened to hang himself and was suicidal, but he did not have prior incarcerations with suicide

19   watch protocols.  However, if a jury accepts the Wabnitz testimony, they could find that Rhode

20   or Hren were aware of an objective risk of suicide that a reasonable officer would have acted on.

21   Further, the elapsed time between the suicide-tip and the completed attempt is identical between

22   this case and *Lopez*: two days.  Ultimately, *Lopez* held that "[o]n the current disputed record, 'a

23   grant of summary judgment ... with regard to qualified immunity would be inappropriate'"

24

1    because a reasonable jury could find that there was an objective risk Flanigan was aware of and

2    failed to act on, causing injury. *Id.* The same applies here.

3         The County also relies on *Yee v. Sacramento Cnty. Main Jail*, No. 2:14-CV-02955-KJM-

4    DB, 2023 WL 2374104 (E.D. Cal. Mar. 6, 2023). In 1998 Mr. Yee was arrested for domestic

5    violence and "was distraught, yelling again and again that he wanted to die, perhaps as many as

6    fifty times." *Id.* at *2. The arresting officers did not pass that information to jail staff (though

7    they later noted it in a report). *Id.* Two months later, Mr. Yee hanged himself in jail. *Id. Yee*

8    held that as of 1998 there was a clearly established right to be free from deliberate indifference to

9    suicide risk. *Id.* at *3. But *Yee* held that the law was not clear about an obligation for the

10   arresting officers to tell jail officials about the suicide risk, citing *Horton*. *Id.* The Court noted

11   that unlike other cases where courts denied qualified immunity, the officers at issue "were not

12   jail officials," and so Mr. Yee was not "in their *own* custody." *Id.* The officers were employees

13   of the Sacramento Police Department, not the Sacramento County Jail. *Id.* at *1. Here, Rhode

14   and Hren were Kitsap County Sheriff Deputies, making them part of the municipal department

15   responsible for administering the Jail—and the question is not whether the officers had a clearly

16   established obligation to convey the information to some other entity. To the contrary, the

17   deputies testified they understood their obligation (per policy or practice) was to convey the

18   information to their colleagues at KCJ if they knew an arrestee was suicidal. (*See* Dkt. Nos. 302

19   at 32, 315-6 at 9.) On that basis, *Yee* is distinguishable.

20        The County cites at least two additional cases where there was a suicide tip but summary

21   judgment was granted on deliberate indifference. In *Estate of Barrick v. Cnty. of San Joaquin*,

22   No. 2:18-CV-02216-MCE-DB, 2021 WL 5331456, at *2–3 (E.D. Cal. Nov. 16, 2021), a mother

23   called multiple times to warn a jail that her son was suicidal, though he repeatedly denied being

24

suicidal.  The court found that because the decedent had a psychiatric evaluation *after* her calls, and that evaluation still determined he was not a suicide risk, there was not a triable question about what additional follow-up could have been done.  *Id.* at *6.  By contrast, there was no psychiatric exam done on Nick.  In *Thomas v. Deschutes Cnty.*, No. 6:19-CV-01781-AA, 2022 WL 2704176, at *3 (D. Or. July 12, 2022), an inmate denied ever attempting suicide, but his mother told jail staff he had in fact attempted suicide.  After that, a clinical social worker evaluated him and he acknowledged the past attempts but stated he had no current suicidal ideation.  *Id.*  On that record, the court concluded no reasonable jury could find deliberate indifference.  *Id.* at *8.  Again, there was no similar follow-up on the tip here.

Accordingly, summary judgment is DENIED with respect to deputies Rhode and Hren.

c.    Officer Elvia Decker

As discussed *supra*, Officer Decker booked Rapp into KCJ.  Nick answered "no" to questions she asked him about suicide risk, but when she asked, "Will you contact staff if you feel suicidal?" she noted his response: "SAID HE WOULDN'T."  (Dkt. No. 295 at 114.)  There is no allegation that Officer Decker received a tip about Nick being suicidal; she testified that had the arresting officer conveyed a suicide risk to her, she would either have sent Nick for evaluation offsite or admitted him to a crisis or suicide cell.  (Dkt. No. 315-8 at 27–28.)  Decker stated that she "could smell alcohol on him" (referring to Rapp) but that he was not slurring his words and walked without stumbling, and so his level of intoxication did not trigger the need for a breathalyzer test.  (*Id.* at 8; Dkt. No. 132 at 3.)

Decker discussed her perceptions of Nick as she evaluated him in a declaration.  She stated that Nick's "demeanor, tone, and behavior told me that he was annoyed at being booked into the jail. He was rude and was acting like he was inconvenienced by the whole process."  (Dkt. No. 132 at 5, *see also* Dkt. No. 302 at 71.)  She "stopped to remind Mr. Rapp that the jail

takes the screening seriously." (Dkt. No. 132 at 5.) When he stated he would not inform staff he was suicidal, it did not trigger alarm for her because it was "consistent with his overall attitude of being annoyed and inconvenienced." (*Id.*) In her experience, "[i]t is not uncommon for inmates to act that way during the booking process. Mr. Rapp's behavior was not unusual." (*Id.*) Because non-suicidal inmates may answer "no" when asked if they would disclose suicidal feelings to staff, "[a] 'no' response does not by itself trigger a requirement to put an inmate in a crisis cell." (*Id.*) On the whole, "Mr. Rapp's behavior and responses to my questions did not raise any red flags to me that he was a suicide risk." (*Id.*)

Plaintiffs argue that Decker's actions were objectively unreasonable. Their corrections expert, Stephen Sinclair, opines that "to any reasonable corrections officer exercising his or her professional judgment," Nick's response that he would not contact staff if suicidal "would be an indicator there may be a greater suicide risk than the previous responses indicated." (Dkt. No. 89-1 at 815.) Another Plaintiff expert, Dr. Joseph Penn, opines that due to the "obvious heightened suicide risk as indicated by his demeanor, lack of cooperation, and unreliable answers to intake questions" Officer Decker and RN McCleary's collective failure to place Nick on suicide watch or send him for mental health evaluation "fell below the standard of care and was grossly incompetent." (Dkt. No. 153 at 55.)

The Court cannot agree that Nick's response that he would not discuss suicidal feelings with staff—stated immediately after he denied being suicidal—is so indicative of imminent suicide risk that a reasonable officer would perceive a "substantial risk of suffering serious harm." *Gordon I*, 888 F.3d at 1125. It is undisputed that the arresting officer did not communicate anything to Decker suggesting Nick was a suicide risk. There was simply not

1    enough information available to Decker at the time for a reasonable jury to conclude she acted

2    with deliberate indifference to his serious medical needs.

3        For those reasons, summary judgment is GRANTED as to Officer Decker.

4                    d.    Officer John Petersen

5        Officer Petersen conducted the final cell check before Nick's death. (*See* Dkt. No. 300 at

6    10.)  Plaintiffs argue that Petersen's cell check was insufficient, but Plaintiffs concede that

7    Petersen is entitled to qualified immunity because the right to "direct view safety checks" was

8    not recognized in the Ninth Circuit until 2021, after Nick's death.  (Dkt. No. 314 at 25–27 & n.

9    90.); *Gordon II*, 6 F.4th at 973.

10        Accordingly, there is no live dispute about whether there is a triable claim of deliberate

11    indifference against Officer Petersen, and summary judgment is GRANTED on that claim.

12            E.    § 1983 Claims Against NaphCare and Kitsap County – *Monell* Liability

13                1.    *Legal Standard for Monell Liability*

14        Plaintiffs' constitutional claims against NaphCare and Kitsap County as corporate entities

15    are assessed under a different standard.  In *Monell v. Department of Social Services*, 436 U.S.

16    658, 694 (1978), the Supreme Court held that municipal corporations can be liable under § 1983,

17    but not on a *respondeat superior* theory.  NaphCare, standing in for Kitsap County, is amenable

18    to so-called *Monell* liability.  *Tsao*, 698 F.3d at 1139.  To make out a *Monell* claim, Plaintiffs

19    must show that "(1) [NaphCare or Kitsap] acted under color of state law, and (2) if a

20    constitutional violation occurred, the violation was caused by an official policy or custom of

21    [NaphCare or Kitsap]."  *Id.*  That NaphCare acted under color of state law is not in dispute, but

22    NaphCare does dispute that any constitutional violation occurred.  (*See* Dkt. No. 296 at 6–7.)

23        There are direct and indirect paths to liability within the *Monell* framework.  Under the

24    "direct" path, a plaintiff "claims that a particular municipal action *itself* violates federal law, or

directs an employee to do so." *Tsao*, 698 F.3d at 1144 (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).  The plaintiff must still show that the "municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404.  But that showing can be made by demonstrating that the municipality (or here, private actor) intentionally adopted the facially invalid policy:

> [P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Id.* at 405.  The "direct" path includes not only formal policies and orders, but also "practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

The Supreme Court has also recognized *Monell* liability on a theory of omission or failure to train. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Connick*, 563 U.S. at 61–62. But to avoid the risk that this form of indirect liability morphs into *respondeat superior* liability, the Supreme Court requires plaintiffs to show deliberate indifference—that the failure to train "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (quoting *Canton*, 489 U.S. at 388) (second alteration in original).  A plaintiff may make this showing by demonstrating that "policymakers are on actual or constructive notice that a particular omission in their training program causes [their] employees to violate citizens' constitutional rights," because "the [entity] may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.*

1  Similarly, "[p]olicymakers' 'continued adherence to an approach that they know or should know

2  has failed to prevent tortious conduct by employees may establish the conscious disregard for the

3  consequences of their action—the 'deliberate indifference'—necessary to trigger municipal

4  liability.'" *Id.* at 62 (quoting *Brown*, 520 U.S. at 407).

5       The Ninth Circuit has distilled *Monell* liability into four elements: the "plaintiff must

6  prove: (1) [the plaintiff] had a constitutional right of which he was deprived; (2) the municipality

7  had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4)

8  'the policy is the moving force behind the constitutional violation.'" *Gordon II,* 6 F.4th at 973.

9  The Circuit recognizes *Monell* claims based on: an express policy, a "longstanding practice or

10  custom," or when "an official with final policy-making authority" is the person who committed

11  the violation or that official "ratified a subordinate's unconstitutional decision or action and the

12  basis for it." *Id.* at 973–974 (internal citations omitted).  Further, in the Ninth Circuit,

13  "deliberate indifference" under *Monell* is assessed using an objective standard under which the

14  plaintiff must show that the entity "had actual or constructive knowledge that the failure to

15  implement protocols necessary" to prevent a constitutional violation was "substantially certain"

16  to result in such a deprivation.  *Sandoval, 985 F.3d at 682–683; Castro v. Cty. of Los Angeles,*

17  *833 F.3d 1060, 1076 (9th Cir. 2016).*

18       Accordingly, the Court will assess whether Plaintiffs have placed sufficient evidence in

19  the record to demonstrate that: NaphCare or Kitsap County had the policies or practices that

20  Plaintiffs claim, that NaphCare or Kitsap acted with "deliberate indifference" under the Ninth

21  Circuit's objective standard, and that the challenged policies resulted in harm to Nick.

22

23

24

1

2.    *Analysis of Monell Claims Against NaphCare*

2

a.    <u>Policy 1: NaphCare has an established practice of allowing LPNs to exceed their scope of practice.</u>

3

4    Plaintiffs allege that NaphCare has a policy or custom of allowing LPNs to act outside

5    the scope of their practice. (*See* Dkt. No. 273 at 38.) Plaintiffs do not explicitly place their

6    *Monell* claim in a "direct" or "indirect" bucket, but theirs appears to be the latter, as they assert

7    that NaphCare had "constructive notice" that its policies would result in deprivation of

8    constitutionally adequate medical care. (*See* Dkt. No. 328 at 37.) Defendants argue that they are

9    entitled to summary judgment on this claim because NaphCare has no such policy or practice;

10    indeed, the activities Plaintiffs complain of are expressly permitted by Washington law. (*See*

11    Dkt. No. 296 at 12–13.) The scope of license for an LPN is defined by Washington Revised

12    Code § 18.79.270:

> A licensed practical nurse under his or her license may perform nursing care . . . and in the course thereof may, under the direction of a licensed physician and surgeon . . . or at the direction and under the supervision of a registered nurse, administer drugs, medications, treatments, tests, injections, and inoculations . . . whether or not a degree of independent judgment and skill is required, when selected to do so by one of the licensed practitioners designated in this section, or by a registered nurse who need not be physically present; if the order given is reduced to writing within a reasonable time and made a part of the patient's record. Such direction must be for acts within the scope of licensed practical nurse practice.

The Parties both rely on an Advisory Opinion from the Washington Department of Health

Nursing Care Quality Assurance Commission ("2019 Opinion")[16] that gives practical guidance

on the scope of LPN licensure. In relevant part, the 2019 Opinion states:

> The LPN may perform specific assessments or screening activities, such as mental health status, **suicidal risk**, cognitive screening, **substance use screening**, oral health screening, growth and developmental screening, or nutritional assessments. The **LPN may not**

---

[16] WASH. DEPT. OF HEALTH, Nursing Care Quality Assurance Commission Advisory Opinion No. NCAO 13.02 (Sept. 13, 2019), https://nursing.wa.gov/sites/default/files/2022-07/NCAO13.pdf.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT (DKT NOS. 294, 296, 297, 300, 304) - 61

1

2
> **analyze, synthesize, or evaluate the data** or develop the nursing care plan. As a team member, the LPN should contribute to the development of the nursing care plan. The RN retains the overall responsibility for verifying data collected, interpreting and analyzing data, and formulating nursing diagnoses.

3

4
*Id.* at 4–5 (emphasis added).[17]   Conducting a suicide risk or substance use screening is expressly

5
permitted by the 2019 Opinion; the question is whether NaphCare nurses crossed the line into

6
analyzing or synthesizing that data.  NaphCare argues that Plaintiffs have put forward no

7
evidence indicating LPNs exceeded their scope.  To the contrary, RN Panosky testified that

8
"LPNs . . . know how to do [COWS and CIWA] assessments or should know how to do their

9
assessments."  (Dkt. Nos. 296 at 14–15; 295 at 523–524.)  According to Defendants, the LPNs

10
did not "evaluate the data," they merely inputted it into NaphCare's "TechCare" medical records

11
system, which automatically scheduled follow ups and generated alerts, and the data was

12
reviewed by RNs and Dr. Sandack.  (Dkt. No. 341 at 15–16.)

13
    Defendants further argue that Plaintiffs have failed to show a pre-existing pattern of

14
violations that would demonstrate that they had actual or constructive knowledge of the need to

15
make a policy change because a constitutional violation was otherwise "substantially certain."

16
Plaintiffs cite four cases in their complaint that they say put Defendants on notice.  (*See* Dkt. No.

17
273 at 38–39.)  The first, *Est. of Marti v. Rice*, No. 19-980, 2023 WL 145592 (S.D. Ohio Jan. 10,

18
2023), this Court already distinguished:

19
> *Est. of Marti* is factually dissimilar from the instant case as it involves different LPNs in a different state (Ohio) at a different jail (Hamilton County Justice Center) who were responsible for treating an inmate with a different medical ailment (a head injury). *See* 2023 WL 145592 at *1–2. The court also did not find that NaphCare had a policy of letting LPNs act outside their scope. Rather, it determined on summary judgment that

20

21

22

23

24

---

[17] A 2021 Opinion further provides that "[i]t is within the scope of the appropriately trained and competent … licensed practical nurse (LPN) to follow standing orders within the nurse's scope." WASH DEPT. OF HEALTH, Nursing Care Quality Assurance Commission Advisory Opinion No. NCAO 28.00 (Nov. 12, 2021), https://doh.wa.gov/sites/default/files/2022-02/NCAO28.pdf.

"[a] reasonable jury could conclude that NaphCare had a custom or unwritten policy of allowing LPNs to operate outside the scope of their practice." *Id.* at 16. (Dkt. No. 238 at 9, n. 2.)  The Court also notes that the facts of *Estate of Marti* point to LPNs exercising independent judgment in a greater manner than what is alleged here: the administrator of that facility testified that LPNs "have discretion as to whether or not to implement protocols or call a provider, even when there are obvious indicators of an injury related to a protocol," an LPN testified that she was "advised to use her 'judgment as to whether to initiate protocols,'" and an expert opined that "NaphCare allowed LPNs at the jail to use discretion to evaluate patients without use of nursing protocols or guidance from advanced level providers, thus permitting LPNs to make patient care decisions outside their scope of practice."  2023 WL 145592 at *15–16.  Here the nature of the allegation is that LPNs did not faithfully adhere to standing orders entered by a physician, not that they were given discretion to choose whether to follow such orders in the first place.  (*See* Dkt. No. 328 at 35.)

Plaintiffs' other cases do not fare better.  *Abdiasiis v. Lewis was also* a denial of summary judgment that does not establish liability. No. 20-3315, 2022 WL 2802412, at *11 (S.D. Ohio July 18, 2022).  That case concerned NaphCare's alleged failure to train LPNs on protocols and practices (*see id.* at *10), and while Plaintiffs' complaint nominally alleges that "NaphCare's failure to train and supervise LPNs on their scope of practice" harmed Nick (Dkt. No. 273 at 39), the Court does not understand Plaintiffs' claim to be that NaphCare never trained LPNs on its policies or practices; rather Plaintiffs appear to allege those policies were insufficient or LPNs failed to adhere to them.  (*See e.g.*, Dkt. No. 238 at 35, arguing that LPNs "*necessarily* exercised their own independent judgment to make decisions about Nick's treatment plan" because they did not implement assessments at the intervals ordered or failed to administer medications or fluids.)  Neither *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 740 (6th Cir. 2015) nor *Preston v.*

1    *Cnty. of Macomb*, No. 18- 12158, 2019 WL 3315280 (E.D. Mich. July 24, 2019) involved

2    NaphCare, and both were failure to train cases.

3        Plaintiffs further argue that "constructive notice can be inferred from post-incident

4    evaluations, audits, or reviews" as well as "expert testimony" and they go on to cite their own

5    experts' testimony with respect to establishing notice.  (Dkt. No. 328 at 33, 37–38.)  This

6    requires clarification: Plaintiffs could point to a post-incident report as providing notice for

7    *future* similar events, or an expert report identifying *past* violations of which Defendants should

8    have been aware, but it would defy logic to say that Defendants were on notice in this case by

9    virtue of reports that had not yet been written at the time of the incident.  For instance, the

10   primary case Plaintiffs rely on, *Simpkins v. Boyd Cnty. Fiscal Ct.* finds that a DOJ report was

11   admissible to the extent it showed a detention center was on notice of past violations dating to

12   2016.  No. 21-5477, 2022 WL 17748619, at *12 (6th Cir. Sept. 2, 2022).  Another case Plaintiffs

13   cite states that later incidents involving the same officers "could not directly put [those officers]

14   on notice," but could only have circumstantial value in proving their state of mind.  *Fernandes v.*

15   *Bouley*, No. 20-11612, 2022 WL 2915702, at *7 (D. Mass. July 25, 2022).  Here, the sections of

16   Dr. Heyward and RN Panosky's reports that Plaintiffs highlight as providing notice do not

17   discuss specific past incidents of which Defendants would be aware.  (Dkt. No. 328 at 38.)

18   Plaintiffs do cite a 2022 letter from Dr. Mark Stern to Kitsap County in which he warned them

19   that protocols at the jail may allow LPNs to exceed the scope of their practice (Dkt. No. 315-26

20   at 8), though it does not identify any such protocol with specificity—and comes two years after

21   Nick's death.

22        Ultimately, it is the lack of causation that dooms this claim.  A jury must be able to find

23   that "the policy is the moving force behind the constitutional violation," but no reasonable jury

24

could find that the alleged scope of practice policy was the cause of Nick's injury and death. *Gordon II*, 6 F.4th at 973.  The Court simply cannot explain nor infer from the record how the level of licensure of the treating providers made any causal difference to Nick's wellbeing and ultimate suicide.  Plaintiffs state in their 4AC that "[h]ad Nick been evaluated and treated by healthcare professionals appropriately credentialed to do so, his severe withdrawal and related increased risk of suicide would more likely than not have been diagnosed and appropriately treated."  (Dkt. No. 273 at 39.)  There is no evidence in the record to support this statement.  As Defendants note, Nick's COWS/CIWA assessments were similar regardless of whether RN McCleary or LPNs Karl, Haven, or Nagra carried them out; he denied suicidal ideation regardless of who asked.  (Dkt. No. 296 at 19.)

For these reasons, summary judgment is GRANTED as to the scope of practice claim.

> b.     Policy 2: NaphCare had a policy of conducting COWS/CIWA assessments with insufficient frequency.

Plaintiffs allege that "NaphCare knew that its policy and custom of allowing more than an hour to pass between completing COWS assessments and allowing more than four hours to pass between completing CIWA assessments put inmates like Nick at serious risk of harm or death."  (Dkt. No. 273 at 46.)  In their response, Plaintiffs state the standard is two hours for CIWA and four hours for COWS, but his CIWA assessments were as long as eight to ten hours apart.  (Dkt. No. 328 at 41, 44.)  Defendants do not dispute that it is their practice to conduct CIWA assessments every four to eight hours rather than every four hours as Plaintiffs allege is necessary.  Instead, they argue that the less-frequent schedule of assessments is consistent with the standard of care for patients experiencing mild withdrawal, and they have consistently characterized Nick's symptoms as mild.  (*See* Dkt. No. 296 at 20–21.)  Dr. Chicoine disputes that Nick's symptoms were mild.  (Dkt. No. 328 at 41.)  As discussed with respect to medical

1    negligence, Plaintiffs have established a dispute of fact as to the standard of care for how

2    frequent the COWS/CIWA assessments should be performed.  This Court has already held that

3    "there are multiple appropriate medical standards of care for CIWA and COWS," depending on

4    the severity of withdrawal.  (*See* Dkt. No. 212 at 13.)  More is needed, however, to give rise to a

5    deliberate indifference claim.

6            Plaintiffs' COWS/CIWA frequency of assessments claim fails because Plaintiffs cannot

7    prove deliberate indifference.  In other words, no reasonable jury could conclude that NaphCare

8    had actual or constructive notice that conducting withdrawal assessments on Mr. Rapp as

9    infrequently as every eight hours was *substantially certain* to result in a constitutional

10   deprivation as compared to doing those assessments every four hours.  Plaintiffs do not cite any

11   case or pattern of past practice establishing that NaphCare was on notice of the risks of its

12   COWS/CIWA assessment policy; rather, they argue that the risk of harm from infrequent

13   assessments was sufficiently obvious.  (*See* Dkt. No. 328 at 42.)  Perhaps that argument would

14   work if NaphCare had a policy or practice of not conducting withdrawal assessments *at all*, but

15   the idea that the dangers of an eight-hour timeline as compared to a four-hour timeline were so

16   self-evident as to be obvious to a reasonable actor is not supported by the record.  Indeed, the

17   existence of a factual dispute with competing expert testimony about the appropriate frequency

18   of assessments belies the idea that a particular standard was obvious and constitutionally

19   required.  Plaintiffs again rely on their own expert opinions that Nick's assessments fell below

20   the standard of care (*see id.* at 41–43), but as discussed above, after-the-fact testimony does not

21   show that the substantial risk of harm was obvious to NaphCare at the time of Nick's treatment.

22           As to causation, Plaintiffs state that, "[h]ad Nick been evaluated more frequently, as

23   required by the standard of care, his underlying withdrawal symptoms and associated increased

24

1   risk of suicide would more likely than not have been appropriately treated and he would not have

2   committed suicide at the time and in the manner that he did." (Dkt. No. 273 at 46.)  As with

3   Plaintiffs' other causation theories, that statement is speculative.  Plaintiffs cite Dr. Hayward's

4   opinion that NaphCare and Kitsap County's suicide prevention plans did not provide for "timely

5   treatment," and that this and other deficiencies "resulted in the tragic suicide of Nicholas Rapp."

6   (Dkt. No. 158-7 at 26.)  But Dr. Hayward's only specific observation about COWS/CIWA is that

7   RN McCleary "appropriately initiated" those assessments after learning Mr. Rapp was in

8   withdrawal.  (*Id.* at 8.)

9       On the record in this case, there is not sufficient evidence for a reasonable jury to

10  conclude that the frequency of assessments caused Nick's death.  Therefore, summary judgment

11  is GRANTED as to the COWS/CIWA frequency deliberate indifference claim.

12          3.      *Analysis of Monell Claim Against Kitsap County*

13              a.      Scope of the Court's Review

14      Kitsap County seeks summary judgment on Plaintiffs' *Monell* claim and argues that five

15  policies mentioned in Plaintiffs' 4AC cannot support liability.  (*See* Dkt. No. 297 at 18.)  But

16  Plaintiffs do not respond to the arguments in the motion.  Instead, they provide a list of eight

17  *different* policies for *Monell* liability, with minimal argument for each.  (*See* Dkt. No. 314 at 35–

18  39.)  Plaintiff's inability to define the scope of the *Monell* claim against the County and respond

19  to the arguments in the operative motion impairs the Court's review, because it is unclear what

20  exactly the Court is being asked to rule on.

21      Plaintiffs' scattershot approach to the *Monell* claim has been a problem throughout this

22  litigation.  Previously, this Court struck Plaintiffs' Third Amended Complaint, holding that

23  Plaintiffs had exceeded the scope of the Court's leave to amend by adding new policies to

24  support *Monell* liability that were not previously pled.  (*See* Dkt. No. 266.)  The Court then held

that it would not consider five specific policies that were not adequately pled.  (Dkt. No. 285 at 6.)  The County alleges that Plaintiffs are acting in defiance of these rulings.  (*See* Dkt. No. 321 at 16–17.)  With that in mind, the Court will review each of the policies raised in support of the *Monell* claim, but it will not consider policies that are alleged for the first time on summary judgment.  *See Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968–969 (9th Cir. 2006).  Nor will it consider policies that were previously dismissed.

>           b.      Policies Raised in the County's Motion

The County argues that Plaintiffs cannot establish liability on five alleged policies: 1) ignoring information related to suicidality, 2) using cloth mattresses in single occupant cells, 3) failing to require that staff possess a rescue tool, 4) failing to train officers on conducting safety checks, and 5) having an annual training program that does not include components for signs of suicide risk and suicide precautions.  (*See* Dkt. No. 297 at 18.)

1.  The County argues it does not ignore suicide risk; previous suicides are not as analogous to Nick's suicide as Plaintiffs have alleged, and the County replaced its medical contractor and implemented prevention practices.  (*Id.* at 22–23.)  Plaintiffs do not respond on this point.  The Court finds that a reasonable jury would not be able to conclude on this record that Kitsap County has a policy of ignoring suicide information.  Even if the jury believed Wabnitz's testimony and found that Rhode or Hren failed to convey suicide information, the record does not support a finding of a County policy of ignoring such information.  To the contrary, Nick was repeatedly subject to suicide risk screenings and multiple county officials testified that if they have information that an arrestee is suicidal, that individual is transported to a hospital or placed in a crisis cell.  (*See e.g.*, Dkt. Nos. 315-6 at 9; 315-8 at 27–28.)

2.  The County argues that its use of cloth mattress covers in single occupant cells cannot form a basis for liability.  The County only provides mattress covers to those "not deemed or

1   identified to be a suicide risk." (Dkt. No. 297 at 23.)  Officers are trained to place inmates with

2   known suicide risk in a cell without a mattress cover. (*Id.* at 16.)  The County argues that as to

3   inmates who are not suicidal, mattress covers are used for "hygienic purposes" and that a policy

4   of not providing anyone with a mattress cover is not "sound or reasonable corrections policy"

5   nor constitutionally mandated. (*Id.* at 13–14.)  Plaintiffs did plead that the County was on notice

6   from past suicides that "mattress covers could easily be placed in a cell door as an improvised

7   hanging point and then used as a ligature to commit suicide" and that "[r]easonable and prudent

8   jailers and jail administrators also do not utilize cloth-type mattress covers in solitary

9   confinement units, which inmates can easily hang themselves with." (Dkt. No. 273 at 36, 52.)

10  Yet despite the emphasis Plaintiffs have put on this issue throughout the litigation, they

11  remarkably did not mention it at all in their response to the motion for summary judgment.

12       Of all the policies Plaintiffs allege, in the Court's view, the County's use of mattress

13  covers warrants close attention, because two key elements of a *Monell* claim are present.  For

14  one, there is no doubt the County is on notice that mattress covers can be used by inmates to

15  hang themselves.  A mattress cover was used in 2017 when a woman named Tessa Nall hung

16  herself at KCJ (*see id* at 36), Plaintiffs cite other cases involving hangings with mattress covers

17  in the jail (Dkt. No. 314 at 18–19), and they have entered numerous incident reports involving

18  hanging attempts with mattress covers into the record. (*See e.g.*, Dkt. Nos. 318 at 3–4; 318-1 at

19  2, 4; 318-2 at 3; 318-10 at 2–3; 318-12 at 2–3; 318-13 at 3.)  Second, there is undoubtedly

20  causation between the policy of providing mattress covers and Nick's death: Nick was able to

21  hang himself with a mattress cover because he had access to it.

22       Nonetheless, the Court agrees with Defendants that as a matter of law, Plaintiffs cannot

23  prove that it violates the Constitution for the County to provide mattress covers to *non-suicidal*

24

1    inmates. *Cf. Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019) ("It is

2    well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation,

3    and here there is no constitutional violation.")  Plaintiffs have not suggested any change to the

4    policy of identifying who is eligible to receive a mattress cover other than suggesting that no one

5    in single occupant or solitary cells should have one, but Plaintiffs have not cited any national

6    standard to support such a practice.  They have not identified any type of mattress cover less

7    susceptible to use for hanging nor an alternative practice that would maintain inmate hygiene and

8    comfort without mattress covers.  Since Plaintiffs fail even to respond to the summary judgment

9    motion on the mattress cover policy, the Court will not attempt to make the argument for them.

10   As such, the Court finds that there is not a triable jury question with respect to mattress covers.

11       3.  The County argues that Plaintiffs cannot prove that it failed to require staff to carry a

12   rescue tool, and in fact, according to Lt. Sapp's declaration, the officers who responded to Nick's

13   suicide had a rescue tool available to them.  (Dkt. Nos. 297 at 24; 298 at 5.)  Plaintiffs offer no

14   response.  Because the unrebutted evidence is that officers did have access to a rescue tool, there

15   can be no causation to Nick's injury on this theory.

16       4.  The County argues that Plaintiffs cannot prove it failed to train jail staff on conducting

17   safety checks, because the County does train staff on safety checks and Plaintiffs have not

18   identified any deficiency in that training.  (*Id.* at 24–25.)  Plaintiffs respond indirectly by raising

19   a related policy failure: that the County does not require "direct view" safety checks.  (Dkt. No.

20   314 at 36.)  Generally, a direct view safety check refers to one where the officer can see the

21   inmate in-person (not by video) to determine if that person needs medical attention.  *Gordon II*, 6

22   F.4th at 972–973.  In 2021, a year after Nick's death, the Ninth Circuit held that there is a right to

23   such direct view checks.  *Id.* at 973.  The County replies that Plaintiffs cannot show causation

24

between a safety check policy and Nick's injury because even if Officer Petersen's safety check were unconstitutional that would only be a single instance of a violation. (Dkt. No. 321 at 13.), The County states its practices are consistent with *Gordon II. Id.* at 19.) Further, the County states that Plaintiffs raise the issue of direct view checks for the first time on summary judgment. (*Id.*) The Court disagrees with the latter point; Plaintiffs discuss direct view checks in their 4AC (*see* Dkt. No. 273 at 50), and if the County believed that the 4AC exceeded the scope of the Court's leave to amend, it needed to raise that issue sooner.

On the merits, there is insufficient evidence for a reasonable jury to find that the County has a policy or practice of not requiring direct view cell checks. Kitsap County Sherriff's Office Custody Policy 507.2 requires "direct visual safety checks" every 30 minutes for inmates in pre-classification and special management units, and Policy 507.3 states "safety checks shall be done by personal observation of the corrections officer and shall be sufficient to determine whether the inmate is experiencing any stress or trauma." (Dkt. No. 89-1 at 153.) Plaintiffs acknowledge that Nick was a "special care" inmate and so Policy 507.2 would apply to him, but they argue that 30-minute checks were "rarely" performed. (Dkt. No. 273 at 30.) However, this is not consistent with the factual record, which shows that safety checks were performed throughout Nick's time in KCJ. (*See* Relevant Facts, *supra*.)

Statements from the Defendants do not reveal a practice that is contrary to direct view checks. Officer Petersen testified that, to his knowledge, Kitsap County policy requires him to "look in the cell to make sure that there's nothing going on in the cell" and "[l]ook in the cells to make sure that there's no problems or anything to alert us to any problems." (Dkt. No. 315-14 at 13, 23.) When asked if that requires him to "visually see the inmate," Officer Petersen answered that sometimes an inmate might not be present in their cell during a check, but for an inmate who

is sleeping, he would look to see "if the covers are going up and down" or if "they've got color in their face." (*Id.* at 13–15.)  Chief Rufener was asked: "is walking by a cell, appearing to glance toward the window of the cell door, and continuing past the cell door towards the stairway, does that comport with Kitsap County's policy [507.3] on safety checks?" (Dkt. No. 315-23 at 16–17.)  He answered, "[i]f that policy you showed me was in effect, possibly" and "[i]t doesn't specify what the type of check it was to be. That would be while on the lines of a practice or procedure; not a policy." (*Id.* at 16.)  This exchange about a hypothetical scenario falls short of evidence that the County's policy or practice is to conduct cell checks where the officer fails to make visual contact with the inmate.

Ultimately, the Court concludes that Plaintiffs have not created a triable fact question as to the County's policies on cell checks, and so this basis for the *Monell* claim is insufficient. Even if there is a fact question as to whether Officer Petersen conducted a direct view safety check on Nick or whether a deficiency in Petersen's check was causally related to Nick's death, his individual act or omission cannot give rise to *Monell* liability.  *Monell*, 436 U.S. at 694 ("a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021) ("generally, a single instance of unlawful conduct is insufficient to state a claim for municipal liability under section 1983.").

5.  The County argues that it is not liable for failure to train staff on signs of suicide and suicide risk, because its officers do receive annual training on these topics.  (Dkt. No. 297 at 25.) Plaintiffs challenge the risk assessment tools the County uses but do not respond on training specifically.  The record shows that Officer Peterson completed training modules on "identifying suicidal offenders," "managing suicidal offenders," "responding to suicides," and "suicide

prevention for corrections professionals," while Officer Decker completed "overview of suicide prevention for corrections" and other courses.  (Dkt. No. 298 at 4–5, 135–145.)  Plaintiffs fail to allege any specific deficiencies in these trainings.  Thus, this basis for the *Monell* claim is unsupported.

c.    Policies Raised in Plaintiffs' Response

The Court additionally considers policies raised in Plaintiffs' response, to the extent they are properly raised.

1. Plaintiffs confusingly argue that because every County Defendant testified that their actions complied with policy, "on this basis alone a reasonable juror could conclude that the County's policies and practices were deliberately indifferent to the risk of harm to Nick."  (Dkt. No. 314 at 35) (cleaned up).  Effectively, Plaintiffs argue that because Defendants followed policies and Nick suffered harm, the policies are therefore constitutionally deficient.  This tautology is not a theory of liability.

2. The Plaintiffs raise direct view safety checks, discussed *supra*.

3. Plaintiffs argue that the County uses a "dangerously misleading" risk assessment that "relies on the absurd belief that inmates are going to be honest and open about their suicidal inclinations" and "makes the dangerous assumption that inmates are either suicidal or not suicidal."  (*Id.* at 37.)  The County argues that this is raised for the first time on summary judgment.  (Dkt. No. 321 at 19.)  The County concedes that Plaintiffs' Second Amended Complaint ("SAC") did raise allegations about a nine-question assessment but says that a) that assessment is different than the one Plaintiffs now reference, and b) this claim is precluded by the Court's Order (Dkt. No. 238) granting NaphCare's Motion for Judgment on the Pleadings.  (*See id.* at 20.)

1    The Court disagrees that the County's risk assessment tool is being raised for the first

2    time on summary judgment.  Plaintiffs do assert in the 4AC that "the 9-question instrument used

3    by NaphCare and Kitsap County is not a 'suicidal risk assessment' of the type required by

4    national standards and the applicable standard of care."  (Dkt. No. 273 at 29.)  Plaintiffs argue

5    that the Columbia-Suicide Severity Rating Scale (C-SSRS) is the appropriate mechanism, in both

6    the 4AC and the response to summary judgment.  (*Compare id. with* Dkt. No. 314 at 37.)  The

7    Court disagrees that this policy is precluded by the Court's order at Docket 238, which says

8    nothing about suicide risk assessments.

9    On the merits, however, Plaintiffs would not be able to prove to a reasonable jury that the

10   type of suicide risk assessment the County used caused Nick's death.  As discussed *supra*, Nick

11   denied being suicidal numerous times, when asked by multiple individuals, and falsely denied

12   having attempted suicide in the past.  (*See e.g.*, Dkt. No. 295 at 114.)  Dr. Hayward's expert

13   report states: "A suicide risk assessment based on actual risk factors as described in the literature

14   on suicides rather than the inmate's self-report would have determined that Mr. Rapp presented

15   an elevated risk level, requiring close observation or housing with safety garments and no

16   clothing or bedding that could be used as a ligature."  (Dkt. No. 158-7 at 22) (citation omitted).

17   Dr. Herrington's opinion is conclusory and not supported by any reasoning explaining how or

18   why a different set of questions would have elicited more truthful responses from Nick that

19   would have caused him to be placed in a crisis/suicide cell.  Thus, the Court finds that there is

20   not a triable jury question as to *Monell* liability premised on the risk assessment tool.

21   4.  Plaintiffs argue that the County lacks policies to ensure effective communication

22   between corrections officers and health professionals.  (Dkt. No. 314 at 37–38.)  Specifically,

23   they highlight that RN McCleary did not talk with corrections officers about her care plan for

24

1   Nick.  (*Id.* at 38.)  McCleary testified she never saw Decker's intake evaluation, because it was

2   not NaphCare's policy for nurses to review the officers' forms unless there was "something

3   unusual."  (Dkt. Nos. 273 at 13; 302 at 58.)  Defendants allege this is not properly raised.  (Dkt.

4   No. 321 at 20.)  Regardless, this basis of liability fails because Plaintiffs cannot show that a lack

5   of communication between corrections officers and health professionals was causally related to

6   Nick's death.  To the contrary, the record shows that neither Decker nor McCleary's intake

7   assessments had affirmative responses that Nick was suicidal, and there is no evidence that a

8   policy requiring greater communication between them would have changed Nick's care in any

9   material way.

10          5.  Plaintiffs argue that the County failed to conduct mental health screenings upon

11  assignment to 22-hour lockdown cells.  (*Id.* at 38.)  The Court already dismissed this policy

12  twice as inadequately pled (*See* Dkt. Nos. 238 at 12; 285 at 7) and will not consider it again.

13          6.  Plaintiffs argue the County had a policy of corrections officers not knowing where

14  inmates were supposed to be during cell checks.  (Dkt. No. 314 at 38.)  This policy is raised for

15  the first time on summary judgment and the Court will not consider it.

16          7.  Plaintiffs argue that the County's policy of only using breathalyzers to detect blood

17  alcohol level for individuals who were unable to walk on their own violates national standards.

18  (Dkt. No. 314 at 38–39.)  The County argues that this is improperly raised because breathalyzers

19  were not mentioned in the SAC, though they acknowledge the issue was raised in the 4AC.  (Dkt

20  Nos. 321 at 21, 273 at 27–28.)  Again, if the County felt that the 4AC still exceeded the scope of

21  the Court's leave to amend, it needed to raise that issue sooner.

22          It is undisputed that the County's policy is that it will not admit inmates with a blood

23  alcohol level of more than 0.25, but that it will only perform a breathalyzer test to determine

24

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT (DKT
NOS. 294, 296, 297, 300, 304) - 75

1    blood alcohol level if the inmate cannot walk on their own.  (*See* Dkt. No. 315-8 at 8, testimony

2    of Officer Decker, confirming same.)  However, Plaintiffs do not provide evidence that the

3    national standard is to use breathalyzer tests in this circumstance.  RN Panosky's expert report

4    cites NCCHC Standards for Health Services in Jails J-E-02: "persons who are . . . severely

5    intoxicated, in alcohol or drug withdrawal, or otherwise urgently in need of medical attention

6    are: a. Referred immediately for care and medical clearance into the facility."  (Dkt. No. 158-14

7    at 10) (emphasis omitted).  This does not state that a breathalyzer must be used to determine

8    intoxication.  Likewise, Plaintiffs cite two cases that discuss similar national standards, but

9    neither mention breathalyzers.  *See M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1086 (N.D.

10    Cal. 2014); *Belcher v. Lopinto*, No. CV 18-7368, 2021 WL 1605120, at *2 (E.D. La. Mar. 1,

11    2021).

12        Accordingly, Plaintiffs have not submitted sufficient evidence to create a triable fact

13    question as to whether the County's policy with respect to use of breathalyzers constitutes

14    deliberate indifference and violates a constitutional right.

15        8.  Plaintiffs argue that the County violates the Constitution because it has adopted

16    NaphCare's policies, and those policies are deficient.  (Dkt. No. 314 at 39.)  Again, this is

17    tautological and not a basis for liability.  Similarly, Plaintiffs argue that because there have been

18    numerous past suicides and attempts at KCJ, the County's policies are obviously deficient.  (*Id.*)

19    This fails to identify any specific policy for the Court to consider.

20        d.    Conclusion: *Monell* Claim Against Kitsap County

21        Having thoroughly considered all of the alleged policies that could form a basis for

22    Plaintiffs' *Monell* claim against the County, the Court finds that none are sufficiently argued and

23    supported to create a triable fact question for a jury.  Accordingly, summary judgment is

24    GRANTED as to the *Monell* claim against the County.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT (DKT
NOS. 294, 296, 297, 300, 304) - 76

1

F.    <u>Negligent Hiring</u>

2          Finally, NaphCare Defendants move for summary judgement on the claim that NaphCare

3    was negligent in hiring LPN Nagra.  To prove negligent hiring (or negligent retention), Plaintiffs

4    must show that "1) the employer knew or, in the exercise of ordinary care, should have known of

5    its employee's unfitness at the time of hiring, and 2) the negligently hired employee proximately

6    caused the resulting injuries."  *Carlsen v. Wackenhut Corp.*, 868 P.2d 882, 886 (Wash. Ct. App.

7    1994) (internal citations omitted); *see also Betty Y v. Al-Hellou*, 988 P.2d 1031, 1033 (Wash. Ct.

8    App. 1999).  Here, the dispute centers around what NaphCare knew or should have known *at the*

9    *time of hiring*, since it is undisputed that LPN Nagra's license was suspended *after* the events

10   surrounding Nick's death, but Plaintiffs argue that other public information should have alerted

11   NaphCare that Nagra was unfit.  (Dkt. No. 328 at 46–51.)  NaphCare argues causation is also

12   lacking.  (Dkt. No. 296 at 29.)

13         It is undisputed that NaphCare conducted a background check on Nagra, though what that

14   entailed is unclear.  NaphCare's expert, Dr. Stuart Freed, states that NaphCare conducted a third-

15   party background check which "did not yield any concerning information as a bar to her

16   employment with NaphCare."  (Dkt. No. 296 at 28.)  The Court previously excluded Plaintiffs'

17   expert's opinion on negligent hiring as unreliable and noted that "Plaintiffs have also conceded

18   NaphCare would not have had access to the many 'Washington State Department of Health

19   ('DOH') investigations and complaints' regarding Ms. Nagra."  (Dkt. No. 212 at 22.)  Plaintiffs

20   do not dispute that NaphCare conducted a background check but argue that other information

21   should have put NaphCare on notice that Nagra was unfit for the position, including:

22         • Nagra indicated on her resume that she obtained her nursing degree at "Walter Jay

23           University" or "Walter Jay Medical," but that institution lost its accreditation in

24

2010 and in fact was a sham school set up as part of an immigration fraud
conspiracy.  (Dkt. No. 328 at 48.)

- Nagra indicated on her employment application that she was "working towards a
  medical degree" at "All Saint University School," and while she did receive an
  offer of admission to the MD program at that school in 2013, her enrollment
  status had been inactive since 2016.  (*Id.*)

- Nagra listed herself as "Dr. Aminder Nagra, MD" on public webpages, and online
  reviews for her services (and that of a company she created, Nightingale
  Healthcare) referred to her as "Dr. Nagra Ripsy" when in fact she is not a doctor.
  (*Id.* at 49–50.)

Plaintiffs fail to cite any authority establishing that NaphCare had a duty to investigate
these red flags outside of what a background check would have revealed.  The one case Plaintiffs
cite, *Glaves v. Mapleton Andover*, 659 F. Supp. 3d 1208, 1221 (D. Kan. 2023) analyzes a
negligent supervision claim under Kansas law and suggests a Google search might have revealed
that physician assistant's license in question was suspended by the state.  But Defendant
NaphCare could not have learned of the Washington DOH investigation into Nagra by way of a
Google search, because of the confidential nature of DOH investigations and timing of Nagra's
suspension.  Plaintiffs also make arguments that sound in negligent *retention*, including that
NaphCare retained Nagra despite her reputation for poor work product.  (Dkt. No. 328 at 48.)
But negligent retention is a different cause of action that Plaintiffs did not plead, and so the Court
will not consider these retention arguments.

The Court's own review of Washington caselaw on negligent hiring shows that
employers who conduct background checks generally are not liable, though in some cases a

1    deeper inquiry may be necessary.  In *Peck v. Siau*, 827 P.2d 1108, 1110 (Wash. Ct. App. 1992)

2    the Washington Court of Appeals held that a school district was entitled to summary judgment

3    on a negligent hiring claim regarding a teacher who sexually assaulted a student because "[i]t is

4    undisputed that the District checked his teaching certification and his background when it hired

5    him."  In *Carlsen*, the court reversed summary judgment on a negligent hiring claim, involving a

6    concert security guard who attempted to rape a concertgoer.  The guard lied on his employment

7    application about not having a criminal record, lied about having a college degree, did not

8    indicate any prior employment, and gave two different home addresses on applications

9    completed five days apart.  886 P.2d at 886.  The court distinguished *Peck*, because the employer

10    in *Carlsen* did not conduct a background check *at all* on the employee and simply relied on his

11    statements because of his supposedly low-level position.  *Id.* at 886–87.  However, the court did

12    state that the omissions and inconsistencies on the application should have "aroused concern" for

13    the employer, and that it should have "more extensively examined [the guard's] background

14    before hiring him" because of his "position of responsibility," including contacting references.

15    *Id.* at 886–888 (citing *La Lone v. Smith*, 234 P.2d 893 (Wash. 1951)).

16         The caselaw does not lead the Court to the conclusion that NaphCare had a duty to

17    investigate Nagra beyond verifying that she had—at the time of hiring—a valid nursing license

18    and no disqualifying criminal history.  Again, Plaintiffs cite no authority in Washington law

19    establishing a duty to search materials extrinsic to the employment application.  *Carlsen* is

20    distinguishable on the grounds that the employer did no background check at all.

21         Plaintiffs also fail to establish causation with respect to negligent hiring.  Plaintiffs

22    generally repeat their allegation that Nagra failed to act on a tip from Wabnitz and claim that she

23    "falsified" Nick's COWS/CIWA assessments, an apparent reference to the time-stamp issue.

24

1    (*See* Dkt. No. 328 at 47.)  They cite Wabnitz's deposition transcript, in which Wabnitz stated that

2    Nagra had a reputation for poor work and alleged that Molina became aware that Nagra falsified

3    a report based on video evidence.  (*Id.* at 48, citing Dkt. No. 315-2 at 12.)  But again, Plaintiffs

4    did not plead a negligent retention claim, so the only question is what NaphCare knew or should

5    have known at the time of hiring, and how that causally relates to the injury.  *Carlsen*, 868 P.2d

6    at 886.  Plaintiffs have put forward no evidence that NaphCare's act of hiring Nagra—the alleged

7    source of NaphCare's liability—was causally related to Nick's death.  By contrast, cases where

8    Washington courts have allowed negligent hiring claims to survive summary judgment involve at

9    least some evidence to suggest a causal connection between the negligent hiring practice and the

10   resulting injury.  *See Rushner v. ADT, Sec. Systems, Inc.*, 204 P.3d 271, 281–282 (Wash. Ct.

11   App. 2009) (finding a triable fact question on whether an employer's failure to conduct a

12   background check of a door-to-door salesman was causally related to the salesman's rape of a

13   minor during a sales call two months after hiring).

14       G.    Punitive Damages

15       Additionally, NaphCare Defendants argue that Plaintiffs cannot recover punitive damages

16   because their § 1983 claims do not survive.  (Dkt. Nos. 294 at 31; 296 at 25.)  NaphCare further

17   argues that Plaintiffs would not be entitled to punitive damages even if the *Monell* claims

18   survived (Dkt. No. 296 at 25), though the Court need not reach that argument since it has granted

19   summary judgment on the *Monell* claims, *see supra*.  Punitive damages are available for those

20   § 1983 claims that do survive: deliberate indifference with respect to RN Molina, LPN Nagra,

21   and Deputies Rhode and Hren.  *See Castro*, 833 F.3d at 1066 n.2 (incorporating the punitive

22   damages section of *Castro v. County of Los Angeles*, 797 F.3d 654, 669–670 (9th Cir. 2015),

23

24

1    holding that a jury may award punitive damages if it could reasonably find a defendant to be

2    deliberately indifferent).

3                                        **CONCLUSION**

4        For the NaphCare Defendants, summary judgment is GRANTED as to: the medical

5    negligence claims against Dr. Sandack and LPN Ladusta; the common law negligence and gross

6    negligence claims; the deliberate indifference claims against Dr. Sandack, RN McCleary, and

7    LPN Ladusta; the *Monell* claim against NaphCare; and the negligent hiring claim against

8    NaphCare.  Summary judgment is DENIED as to: the medical negligence claims against RN

9    McCleary, RN Molina, and LPN Nagra, and the deliberate indifference claims against RN

10   Molina and LPN Nagra.

11       For Kitsap County, summary judgment is DENIED as to the common law negligence and

12   gross negligence claims and the deliberate indifference claims against Deputies Rhode and Hren,

13   and GRANTED as to all other claims.

14

15       Dated this 14th day of January, 2025.

16

17                                              David G. Estudillo
                                                United States District Judge

18

19

20

21

22

23

24