UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOHN RAPP, <br><br> Plaintiff, <br><br> v. <br><br> NAPHCARE INC, <br><br> Defendant. | CASE NO. 3:21-cv-05800-DGE <br><br> ORDER DENYING RECONSIDERATION (DKT. NOS. 357, 358) AND PROVIDING CLARIFICATION |

## I    INTRODUCTION

Before the Court are two motions related to this Court's Order Granting and Denying In Part Motions for Summary Judgment (Dkt. No. 355) (the "Order"). Plaintiffs' Motion for Partial Reconsideration asks the Court to reverse several aspects of the Order. (Dkt. No. 358.) Defendant Kitsap County's motion asks the Court to "reconsider a narrow portion" of the Order—specifically that there is a triable fact question as to negligence premised on the actions of Officer John Petersen, or "[i]n the alternative, Kitsap County respectfully requests that the

Court clarify what triable issues of fact exist as to causation with regard to Officer Petersen's cell check." (Dkt. No. 357 at 1–2.)

The Court DENIES Plaintiffs' motion for reconsideration as it fails to demonstrate manifest error in the Order.  As to Kitsap County's motion, the Court DENIES reconsideration to the extent the County asks the Court to change its finding that there is a triable fact question as to negligence premised on Officer Petersen's acts or omissions.  However, the Court will, in the alternative, provide the requested clarification as to what triable fact question exists with respect to Officer Petersen.  Previously, the Court limited its discussion of Officer Petersen's conduct vis-à-vis the negligence claim since the acts of other officers, discussed in greater detail, provided independent grounds to support that claim.  But the Court understands how this created confusion.  To clarify the scope of the negligence claim in advance of trial, the Court explains that there is a fact question as to whether Officer Petersen would have been able to see a noose hanging from Nicholas Rapp's cell door at the time of his final cell check.

## II   BACKGROUND

The Court assumes familiarity with the facts of this case, discussed at length in the prior Order.  That Order granted Defendant NaphCare's motions for summary judgment as to: the medical negligence claims against Dr. Sandack and LPN Ladusta; the common law negligence and gross negligence claims; the deliberate indifference claims against Dr. Sandack, RN McCleary, and LPN Haven; the *Monell* claim, and the negligent hiring claim. (Dkt. No. 355 at 3.)  For RNs McCleary and Molina and LPN Nagra, the Court denied summary judgment as to medical negligence, and denied summary judgment as to deliberate indifference only for Molina and Nagra, but limited the scope of the surviving claims: Plaintiffs could advance to trial on the basis of McCleary's "fit for fail" examination and Molina/Nagra's alleged failure to act on

1  suicide information, but not on the basis of alleged failures of those Defendants to involve higher
2  level providers in Mr. Rapp Rapp's care.  (*See id.* at 20–24, 26–29.)

3      With respect to Kitsap County, the Court denied summary judgment as to the deliberate
4  indifference claim against Officers Rhode and Hren and as to the negligence and gross
5  negligence claims against the County.  (*Id.* at 3.)  Summary judgment was granted as to all other
6  claims—including, as relevant here, deliberate indifference as to Officer Decker, and a *Monell*
7  claim against the County.  (*Id.*)

8      Here, Plaintiffs seek reconsideration as to: the medical negligence and deliberate
9  indifference claims against Dr. Sandack and LPN LaDusta, and those aspects of the Court's
10 holdings on RNs McCleary, Molina, and LPN Nagra that limited the scope of Plaintiffs' medical
11 negligence and/or deliberate indifference claims against those Defendants.  (*See* Dkt. No. 358 at
12 1.)  Plaintiffs further seek reconsideration as to the grant of summary judgment on deliberate
13 indifference against Officer Decker, and the *Monell* claims against both NaphCare and Kitsap
14 County.  (*Id.*)

15     As discussed *supra*, Kitsap County only seeks reconsideration to the extent of Officer
16 Petersen's role in the negligence claim.  NaphCare did not move for reconsideration.

17                 **III**    **DISCUSSION**

18     **A. Legal Standard**

19     Under Local Civil Rule 7(h)(1), motions for reconsideration are disfavored, and will
20 ordinarily be denied unless there is a showing of (a) manifest error in the ruling, or (b) facts or
21 legal authority which could not have been brought to the attention of the court earlier, through
22 reasonable diligence.  LCR 7(h)(1).  Reconsideration is an "extraordinary remedy, to be used
23 sparingly in the interests of finality and conservation of judicial resources."  *Kona Enters., Inc. v.*
24

*Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). "[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Marlyn Natraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009). "Whether or not to grant reconsideration is committed to the sound discretion of the court." *Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003).

### B. Plaintiffs Have Not Met the Burden for Reconsideration

Plaintiffs' motion advances two over-arching arguments: that the Court committed manifest error with respect to its rulings on the claims against the NaphCare defendants by requiring Plaintiffs to prove causation between those Defendants' actions and Mr. Rapp's death, as opposed to his other pain and suffering, and that the Court improperly drew inferences in the non-movant's favor. (*See generally*, Dkt. No. 358.) As the Court explains *infra*, it finds these arguments unavailing. Plaintiffs also ask the Court to consider the impact of a ruling in another case, *Tapia v. NaphCare*, No. 22-1141, 2025 WL 90973 (W.D. Wash. Jan. 14, 2025), which allowed a *Monell* claim against NaphCare to proceed to trial on the theory that LPNs were acting beyond the scope of their practice—a claim that this Court rejected. (*See id.* at 9.) The Court finds that *Tapia* is factually distinguishable, as it presents a much clearer causal connection between the alleged harm and resulting injury, and for that reason *Tapia* does not change the Court's analysis in this case. Additionally, Plaintiffs argue the Court gave insufficient consideration to their expert opinions regarding Officer Decker. (*Id.* at 8.) The Court addresses each of these concerns.

ORDER DENYING RECONSIDERATION (DKT. NOS. 357, 358) AND PROVIDING CLARIFICATION - 4

### 1. The Court Appropriately Considered Nicholas Rapp's Pain and Suffering in Its Causation Analysis

The Court rejects Plaintiffs' first theory of error on three grounds: the Court's Order *did* consider Mr. Rapp's pain and suffering; Plaintiffs' Complaint did not plead a cause of action premised only on his suffering and not his death; and finally, Plaintiffs have not presented a triable jury question as to injury premised solely on Mr. Rapp's suffering from withdrawal in isolation from his death.

Plaintiffs argue the Court "committed manifest error by failing to consider pain and suffering attributable to withdrawal" with respect to the medical negligence claim against Dr. Sandack, RNs McCleary and Molina, and LPNs LaDusta and Nagra, but that is not so. (*See* Dkt. No. 358 at 2, 4–5) (emphasis omitted). The Court did "consider" Mr. Rapp's pain and suffering from withdrawal throughout the Order. For instance, the facts section of the Court's order recounts, in great detail, Mr. Rapp's scores on his COWS/CIWA assessments, the exact timing of those assessments, and the medications he was (or was not) prescribed. (*See* Dkt. No. 355 at 8–13.) In its analysis of the claim against Dr. Sandack, the Court discussed the report of Plaintiffs' expert Dr. Chicoine, who opined that the prescriptions called for in Dr. Sandack's standing order were "insufficient or inappropriate for treatment of withdrawal," and that Dr. Sandack was required by the standard of care to personally examine Mr. Rapp and review his prescriptions sooner. (*Id.* at 17–18.) Indeed, the Court noted Dr. Chicoine's conclusion that "the violation of [the] standard of care caused [Mr. Rapp] to unduly suffer physically and mentally." (*Id.* at 18.) Likewise, with respect to RN McCleary, the Court noted Plaintiffs' contention that "a withdrawal treatment plan that sufficiently alleviated [Mr. Rapp's] symptoms and reduced his suffering would have occurred" had she contacted a higher-level provider, and with respect to

LPN LaDusta, the Court noted Dr. Chicoine's opinion that her putative late-night exam would have occurred when Mr. Rapp was at "peak withdrawal." (*Id.* at 23–24.) Similarly, the Court noted RN Panosky's opinion that LPN Nagra's alleged failures to administer medications, neuro checks, or cool fluids breached the standard of care. (*Id.* at 28.) Throughout, the Court made inferences in Plaintiffs' favor, finding that there were disputed questions of fact as to the standard of care for withdrawal management. (*See e.g., id.* at 19, 23, 25.)

But to the extent Plaintiffs argue the Court erred by requiring causation between these purported breaches and Mr. Rapp's *death*, as opposed to his suffering from withdrawal in isolation, that is a feature of how Plaintiffs pled and presented the case—not manifest error that warrants reconsideration. The claims in Plaintiffs' Complaint, for instance, allege injury from Mr. Rapp's suffering *and* death; none are pled on the basis of withdrawal suffering alone. All five of the claims repeat the allegation that "Mr. Rapp suffered unimaginable pain, suffering, embarrassment, and terror before he was allowed to successfully take his own life" and "Mr. Rapp's parents and minor child have suffered the loss of familial association." (Dkt. No. 273 at 54–60.) The deliberate indifference claim alleges that Defendants failed to "take reasonable measures to guarantee the safety of the inmates, including from self-harm" and they knew of the risk of their actions "because numerous other inmates had been injured and/or killed as a result of these inadequacies in the past." (*Id.* at 59.) The damages portion of the Complaint seeks to recover for Mr. Rapp's family's loss of his services and support and pecuniary costs including his funeral expenses. (*Id.* at 54.)

It is beyond dispute that the Eighth Amendment guarantees a right to constitutionally adequate medical care in jail—not just the absence of death—but this case as presented has always been about Mr. Rapp's death. Plaintiffs essentially would like to claim damages both

ORDER DENYING RECONSIDERATION (DKT. NOS. 357, 358) AND PROVIDING CLARIFICATION - 6

from Mr. Rapp's withdrawal suffering and his death, but only prove causation as to the former, not the latter.  That argument does not withstand scrutiny.

Even were the Court to credit Plaintiffs' theory and take Mr. Rapp's withdrawal suffering in isolation, Plaintiffs' evidence only supports an inference that Mr. Rapp's suffering was increased in a highly generalized and unspecified manner, and the Court does not find this would be sufficient to survive summary judgment.  Since Mr. Rapp cannot testify as to his own medical care, the Court relies primarily on Plaintiffs' expert reports.  For instance, Dr. Chicoine's report concludes that "the medical care provided—or, more precisely, the lack of medical care provided—by [NaphCare Defendants] fell below the standard of care and contributed to Nicholas Rapp's pain, suffering, and death"—but it does not mention any particular symptom that Mr. Rapp suffered (or experienced more severely) as a result of those acts or omissions.  (Dkt. No. 158-6 at 14.)  To be clear, the report talks extensively about withdrawal symptoms *in general*, and the types of symptoms a typical patient might suffer from alcohol and/or opiate withdrawal (e.g., seizures, delirium).  (*See e.g., id.* at 9.)  Likewise, it states that withdrawal is "extremely uncomfortable and miserable and cause[s] great suffering" and concludes that "Decedent's suffering could have been prevented had KCJ and NaphCare personnel properly monitored, evaluated, and treated decedent for such." (*See id.* at 10.)  But again, other than reference to suffering itself, the report falls short of finding that the failure to administer any particular withdrawal medication or assessment caused any particular medical outcome for Mr. Rapp.  Likewise, RN Panosky finds that medications were not given as ordered and opines that "[m]issing medications *can* be detrimental for patients like Mr. Rapp"—without saying how it *was* detrimental for him—other than that "these actions/inactions contributed to Mr. Rapp's death." (Dkt. No. 158-14 at 11–13) (emphasis added).

The Court in no way means to discredit Mr. Rapp's suffering or the pain of withdrawal. But on this record, the Court believes that its analysis as to causation was legally and factually correct, and that reconsideration is not warranted.

### 2. The Court Did Not Make Impermissible Inferences in Favor of the Non-Movant

Plaintiffs allege the Court made "impermissible fact inferences" in favor of the nonmovant. (Dkt. No. 358 at 3.) First, Plaintiffs argue the Court failed to consider several portions of expert testimony in its analysis of the claims against Dr. Sandack. (*See id.*) The Court painstakingly reviewed the entire record, and the aspects Plaintiffs now highlight do not change the analysis. Plaintiffs cite a portion of Dr. Chicoine's testimony where she was asked how Dr. Sandack's failure to examine Mr. Rapp contributed to his suicide, and she did not directly answer, responding that the failure to examine him contributed to his "pain and suffering." (Dkt. No. 329-13 at 56.) For the reasons described *supra*, that is insufficient to establish causation. Plaintiffs next state that the Court "ignored" the testimony of Dr. Hayward and Dr. Sperry. (Dkt. No. 358 at 3.) Dr. Hayward does not mention Dr. Sandack even once by name in his report. (*See* Dkt. No. 158-7.) He states that "there was no indication of sufficient supervision of this nurse," which is apparently a reference to RN McCleary, and then states that "[a]s a result, Mr. Rapp's elevated suicide risk [was] never identified by the NaphCare clinicians or by the correctional officers." (*Id.* at 25.) This statement is conclusory and does not explain how closer supervision of McCleary by Sandack would have resulted in more accurate identification of Mr. Rapp's suicide risk. The testimony Plaintiffs highlight from Dr. Sperry is about placement in a cell with a greater level of monitoring (Dkt. No. 329-14 at 7), which the

ORDER DENYING RECONSIDERATION (DKT. NOS. 357, 358) AND PROVIDING CLARIFICATION - 8

Court directly cited in denying summary judgment on the medical negligence claim against RN McCleary.  (Dkt. No. 355 at 23.)

Plaintiffs repeat this theme with respect to the Court's analysis on the negligence claims against McCleary, LaDusta, and Nagra.  (Dkt. No. 358 at 5.)  Plaintiffs again argue the Court made inferences against them by not considering Dr. Hayward's testimony, and argue McCleary's failure to fill out intake forms with "relevant information related to [Mr. Rapp's] intoxication, drug use, and suicide risk" contributed to the failures Dr. Hayward opined on.  (*See id.*)  It is not clear what "relevant information" Plaintiffs are referring to that a jury could rely on to find negligence that the Court did not already consider.  As the Order described, RN McCleary initially wrote in her screening that Mr. Rapp "denie[d] any alcohol, illegal drug or prescribed medications use" but then placed Mr. Rapp on Detox Watch and ordered COWS/CIWA assessments after he tested positive for drug use.  (Dkt. No. 355 at 7–8.)  Likewise, the Court thoroughly considered the causal impact of LPN LaDusta's putative late-night exam, drawing an inference in Plaintiffs' *favor* that the exam breached the standard of care, but concluding that no reasonable jury could find causation to Mr. Rapp's injury from that breach.  (*Id.* at 25.)

With respect to deliberate indifference, Plaintiffs argue the Court made inferences against them in its analysis of Dr. Sandack.  (Dkt. No. 358 at 6.)  The Court walked through each of the four factors of the *Gordon I* analysis, and commented that "[a]rguably, Dr. Sandack's failure to personally examine Mr. Rapp, even if negligent, did not expose him to a substantial risk of serious harm because he remained in the care of medical providers who could have contacted her or called emergency services if his condition noticeably deteriorated."  (Dkt. No. 355 at 37–38.)  The Court intended this to serve as a discussion of the challenges Plaintiffs would face meeting their burden on the deliberate indifference factors at trial, not as an inference against them—

though the Court understands why Plaintiffs read it that way.  However, the Court's conclusion did not turn on this discussion of the second or third factors.  The Court stated: "[u]ltimately, *even if a reasonable jury could find for Plaintiffs* on the second and third factors, the lack of causation is fatal to Plaintiffs' claim." (*Id.* at 38) (emphasis added).  Thus, the Court did ultimately make an assumption in Plaintffs' favor on the second and third factors—and found it would be insufficient, because Plaintiffs could not carry their burden on the fourth.

### 3. *Tapia* is Factually Distinct

Plaintiffs argue this Court erred in granting summary judgment on the LPN scope of practice *Monell* claim, and ask the Court to consider the impact and reasoning of another recently decided case in this district, *Tapia v. NaphCare Inc.*, No. C22-1141-KKE, 2025 WL 90973 (W.D. Wash. Jan. 14, 2025).  The *Tapia* court denied summary judgment on a similar claim regarding NaphCare having a policy of LPNs acting outside the scope of their practice.  *See id.* at *6–*7.  Even a cursory review of *Tapia* however reveals there are significant factual differences between that case and this one which would explain the disparate outcomes.  *Tapia* concerned an inmate who was experiencing withdrawal and also developed a condition in his leg that ultimately resulted in amputation.  *Id.* at *1–*3.

The facts discussed in *Tapia* describe symptoms significantly more severe than those reflected in the record in this case.  A Pierce County Mental Health Provider (MHP) charted, on September 18, 2018 that Tapia "appears to be confused and was unable to verbally respond to my questions" and was "decompensated." *Id.* at *2.  The next day an MHP again charted that Tapia was nonverbal and "decompensated" and made a referral to medical.  *Id.*  An LPN looked at him and found that he "does not appear to be in distress" and "states he did not have any medical concern at this time" but did not report that finding to an RN; Tapia does not recall this

encounter occurring. *Id.* But the MHP kept visiting and kept finding Tapia to be nonresponsive, to the point that he "would not even shake his head yes or no." *Id.* Eventually, by September 29, an RN did examine Tapia after a request from a corrections officer, and wrote that Tapia was nonverbal and that his cell smelled of urine—and yet found "[n]o acute distress" and gave him an Ensure chocolate drink because he may not have been eating. *Id.* at *3. On October 1, after another request to examine Tapia from a corrections officer because his "toes [were] turning black," an RN finally sent Tapia to a hospital, where he was diagnosed with Phlegmasia Cerulea Dolens ("PCD") and his lower leg was amputated. *Id.*

On this record, the *Tapia* court found that there was a fact question about the LPN's supervision, or lack thereof, since his report of a verbal response was inconsistent with "all other recorded interactions with Tapia." *Id.* at *6. The LPN also *conceded* that his license did not allow him to conduct patient assessments—but he maintained that he was acting within NaphCare's policies. *Id.* at *8. He testified that "[u]nder my license[,] I'm not allowed to do— I'm not able to do assessments and I'm not able to diagnose." *Id.* at *10. But an RN testified that "The LPNs do it – they do evaluate." *Id.* at *8. From this, the court concluded a jury could find that LPNs conduct assessments beyond the scope of their practice due to NaphCare policy. *Id.* at *10.

Critically for present purposes, the *Tapia* court also found clear evidence of causation between these failures and Tapia's injury. Tapia's medical expert opined that Tapia's PCD had been present for 2–4 weeks before he was sent to the hospital, and that "[t]his delay in diagnosis was a significant contributing factor which led to Mr. Tapia's left lower leg amputation." *Id.* at *10. More likely than not, had the condition been diagnosed and treated sooner, Tapia would not have lost a limb. *Id.* And when the MHP referred Tapia for medical evaluation, the person who

responded was an LPN, who by his own admission was unqualified to make a diagnosis. *Id.* On these facts, a reasonable jury could find "the practice of LPNs making independent assessments outside of their scope of practice directly led to Tapia's delayed care (and subsequently, his amputation)." *Id.* at *11.[1]

There are myriad ways in which this case is different. First, Mr. Rapp never displayed severe symptoms such as being nonverbal, and there was no referral for him to be medically examined by mental health or corrections officials. Second, the kind of assessments LPNs conducted in this case, COWS/CIWA assessments, are not similar to the medical assessment an LPN conducted in *Tapia*. The former is a "substance use screening" expressly contemplated in state guidelines for acceptable practice for LPNs (*see* Dkt. No. 355 at 61), the latter called for evaluation and diagnosis of the sort LPNs cannot perform alone. And there is nothing comparable in this case to the apparent admissions made by the LPN and RN in *Tapia* that they were asked to do work outside the scope of their licensure.

Finally, there was an unambiguous causal link in *Tapia* between the practices complained of and the injury suffered, which the Court found is lacking here. Tapia suffered from a leg condition that was not properly or timely diagnosed, and an expert testified that he would most likely not have lost the leg but-for those failures. *Id.* at *10. A medical doctor would have been better able to make that diagnosis than an LPN, whose license does not allow for making diagnoses to begin with. *See id.* By contrast here, as the Court stated in its Order, "[t]he Court

---

[1] NaphCare's response says almost nothing of these factual differences, perhaps not wanting to draw attention to the record in *Tapia* or compromise that ongoing litigation. Instead, NaphCare attacks *Tapia* as "grievously wrong" and states that "[s]hockingly, the *Tapia* court defied Supreme Court and Ninth Circuit precedent" amounting to "egregious error." (Dkt. No. 366 at 10–11.) This Court finds these attacks on the *Tapia* court to be gratuitous and unnecessary, especially considering how readily distinguishable the cases are.

simply cannot explain nor infer from the record how the level of licensure of the treating providers made any causal difference to Nick's wellbeing and ultimate suicide." (Dkt. No. 355 at 65.) The Court found that it was purely speculative whether a differently-credentialed provider would have elicited any different responses from Mr. Rapp on screening questions or discovered any different information regarding his mental or physical state (*see id.*)—far unlike the tangible failure to diagnose a particular condition in *Tapia*.

For these reasons, the Court finds that *Tapia* does not change the analysis in this case and the Court did not make any manifest error in granting summary judgment on the *Monell* claim against NaphCare. To the contrary, *Tapia* highlights what factual elements would have been needed to allow the claim to survive summary judgment, which did not exist here.

4. The Court Did Not Err in Its Analysis of the *Monell* Claims

Besides *Tapia*, Plaintiffs raise other discreet issues with the Court's *Monell* analysis. First, Plaintiffs argue that the Court erred by classifying their *Monell* claim as "indirect" rather than "direct" and thus erroneously required Plaintiffs to show constructive notice. (Dkt. No. 358 at 9.) Any error here is of Plaintiffs' making, as neither their complaint nor response to the summary judgment motion state explicitly whether their theory of liability is "direct" or "indirect," but both talk about notice. (*See* Dkt. No. 273 at 38–39; 328 at 37–38.) Indeed Plaintiffs' response states "Plaintiffs must demonstrate that NaphCare had notice, constructively or because it was obvious, that allowing LPNs to act outside of their scope of practice was substantially certain to result in the pain, suffering, terror, or death Nick endured[.]" (Dkt. No. 328 at 37.) Nor is it clear that assessing Plaintiffs' claim under the "direct" path would have yielded a different outcome, as Plaintiffs would then have to prove that NaphCare adopted the policy "with the requisite degree of culpability and must demonstrate a direct causal link

between the [defendant's] action and the deprivation of federal rights." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

Further, Plaintiffs argue the Court erred by holding that "expert testimony related to obviousness of the risk of harm cannot create a genuine issue of fact with respect to deliberate indifference." (Dkt. No. 358 at 11, emphasis omitted.) Plaintiffs misstate the issue. There is no doubt that expert testimony can create a genuine dispute of material fact, including deliberate indifference. But the portion of the Court's Order that Plaintiffs cite (Dkt. No. 355 at 66) had to do with proving that the municipal entity was on notice of a potential constitutional violation for purposes of a *Monell* claim. The Court stands by its reasoning that it would "defy logic to say that Defendants were on notice in this case by virtue of reports that had not yet been written at the time of the incident." (*Id.* at 64.) No case Plaintiffs have cited has contradicted that principle. (*See id.*) To the extent Plaintiffs argue that their expert reports show that NaphCare's COWS/CIWA assessments were so obviously unconstitutional that it would have been self-evident to NaphCare at the time of Mr. Rapp's death, the Court already addressed that argument in its Order, finding that the practices complained of were not so obviously unconstitutional—even assuming a fact dispute as to the medical standard of care. (*See id.* at 65–66.)

5. <u>The Court Appropriately Granted Summary Judgment on the Deliberate Indifference Claim Against Officer Decker</u>

Plaintiffs argue the Court erred in granting summary judgment on the deliberate indifference claim related to Officer Decker's conduct because their expert testimony is sufficient to establish deliberate indifference. (*See* Dkt. No. 358 at 8.) The basis for liability against Officer Decker would be that she failed to take action in response to Mr. Rapp telling her that he would *not* inform jail staff if he became suicidal. (*See* Dkt. No. 355 at 56.) The Court

covered this issue in its Order (*see id.*), but takes this opportunity to elaborate on its reasoning. To prove deliberate indifference, Plaintiffs must show that "a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021). This showing is "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

Plaintiffs have two experts who could testify as to obviousness of risk. Dr. Joseph Penn has significant expertise in psychiatry, including in correctional settings. (Dkt. No. 153 at 32–43.) However, the Court previously excluded his "opinions related to NaphCare's intake procedures and suicide screening" as unreliable, finding that "Dr. Penn's critiques of the intake process do not appear to be based on reliable facts or data." (Dkt. No. 212 at 24–25.)[2] As it relates to Officer Decker, Dr. Penn opines that:

> Given Mr. Rapp's presentation (extremely intoxicated) and the obvious heightened suicide risk as indicated by his demeanor, lack of cooperation, and unreliable answers to intake questions, Elva Decker, and Odessa McCleary's failure to put Mr. Rapp on suicide watch or, at a bare minimum, initiate a referral for a timely mental health evaluation, fell below the standard of care and was grossly incompetent. That failing to put Mr. Rapp on suicide watch or, at a bare minimum, get mental health involved, would lead to serious harm or death to Mr. Rapp would have been obvious to any qualified correctional health professional exercising his or her professional judgment.

(Dkt. No. 153 at 55.)

The Court finds that this testimony falls within a similar logic to the prior exclusion order. This testimony concerns intake procedures, and it is conclusory. For instance, Dr. Penn offers no explanation as to why Mr. Rapp's demeanor, lack of cooperation, or unreliable answers while extremely intoxicated created an "obvious heightened suicide risk." Dr. Penn does not cite

---

[2] In a separate order, the Court found portions of Dr. Penn's testimony on other issues, including Officer Petersen's cell check, to be reliable. (*See* Dkt. No. 255 at 23–24.)

ORDER DENYING RECONSIDERATION (DKT. NOS. 357, 358) AND PROVIDING CLARIFICATION - 15

any evidence to support these conclusions, such as reference to a national standard or published research.  As Defendants note, "[a]n expert's conclusory assertions are not sufficient to create a genuine issue of material fact."  *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 886 (N.D. Cal. 2019); *see also Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins.*, 690 F. Supp. 3d 1104, 1114 (C.D. Cal. 2023), *aff'd sub nom. Comprehensive Med. Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 23-3308, 2025 WL 416814 (9th Cir. Feb. 6, 2025) ("conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of material fact and defeat summary judgment.").

Plaintiffs additionally have testimony from Stephen Sinclair, a corrections practices expert, who states "Mr. Rapp responded [to Decker] that he would not contact staff if suicidal, which to any reasonable corrections officer exercising his or her professional judgment would be an indicator there may be a greater suicide risk than the previous responses indicated." (Dkt. No. 89-1 at 815.)[3]  This is the entirety of Mr. Sinclair's opinion on Officer Decker, and it does not cite any authority for its conclusion.  As stated in the Order, this too is insufficient to defeat summary judgment.  Were the opinions of Dr. Sperry and Mr. Sinclair paired with other evidence in the record from which a jury could infer deliberate indifference on Officer Decker's part, the Court may have reached a different conclusion, but standing alone it is not enough.

Additionally, and although the Court did not reach the issue previously, even assuming Officer Decker acted with deliberate indifference she likely would be entitled to qualified immunity.  The Court does not undertake a full analysis of the issue here, but observes that the cases discussed in the Order—which clearly establish a right to be free from deliberate

---

[3] The Court previously denied a motion to exclude portions of Mr. Sinclair's testimony, including on Officer Petersen's cell check, but this specific excerpt related to Officer Decker was not discussed.  (*See* Dkt. No. 255 at 11–16.)

ORDER DENYING RECONSIDERATION (DKT. NOS. 357, 358) AND PROVIDING CLARIFICATION - 16

indifference to serious medical needs, including suicide risk—address officers failing to act on known risk of suicide, not a situation where an inmate stated he would refuse to disclose suicidality.  *See Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *and opinion reinstated*, 658 F.3d 897 (9th Cir. 2011) (officers witnessed an inmate wrap a seatbelt around her neck and threaten to kill herself); *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (nurse removed inmate from suicide protocols despite known risk).

For these reasons, the Court finds that reconsideration is not warranted.

### C. Clarification of the Court's Ruling on Officer Peterson

Kitsap County asks the Court to reconsider its ruling that "[t]here may also be triable fact questions as to whether Officer Petersen's final cell check was negligent."  (Dkt. Nos. 355 at 32; 357 at 1.)  In the alternative, the County "respectfully requests that the Court clarify what triable issues of fact exist as to causation and whether Officer Petersen's cell check was negligent."  (Dkt. No. 357 at 7.)  In the prior Order, the Court did not provide analysis as to this issue because it provided extensive reasoning as to why the negligence claim would survive on the basis of Officers Rhode and Hren's alleged conduct (*see* Dkt. No. 355 at 48–50, finding a disputed question of fact as to the officers' knowledge of Wabntiz's alleged statement), so additional analysis as to this subsidiary issue seemed unnecessary—but the Court understands how this approach created confusion.  The Court will DENY the reconsideration motion because it believes there is a material question of fact as to Officer Peterson, but the Court will provide the requested clarification to explain its reasoning.

Officer Petersen conducted the final cell check at Mr. Rapp's cell at 1:25 p.m. on January 2, 2020. The question is whether Petersen could have seen anything when he conducted this cell check that would have alerted him to Mr. Rapp's impending suicide attempt. The County states in its motion that "[t]he Court has already excluded the only evidence in the record that Plaintiffs alleged showed what was happening in Mr. Rapp's cell at 1:25pm." (Dkt. No. 357 at 3.) That is not quite right. As the County notes, the Court previously excluded portions of testimony on cell checks from Plaintiffs' expert Dr. Sperry, on the grounds that he possessed medical but not correctional qualifications—but the County gives insufficient attention to those portions that were not excluded. (*See* Dkt. No. 255 at 18.) The Court started its discussion of this issue by stating "Dr. Sperry may recount, based on record evidence, Officer Petersen's conduct during the 1:25 p.m. cell check." (*Id.*) But the Court held that "to the extent that Dr. Sperry's proposed testimony expresses an opinion as to the propriety or sufficiency of Officer Petersen's cell check, such testimony must be excluded, as Plaintiffs concede that Dr. Sperry does not have the requisite law enforcement or corrections experience." (*Id.* at 19.) Acknowledging this was a "fine line," the Court opined Dr. Sperry could testify Petersen "never looked in Mr. Rapp's cell" but could not testify that Petersen "did not sufficiently look into the cell" and "chose to leave Mr. Rapp for dead." (*Id.*) As to causation, the Court held that "Dr. Sperry's opinions regarding the relationship between the timing of medical intervention and Mr. Rapp's death, including his opinions regarding at what point in time intervention would have averted death, may stand." (*Id.* at 21.)

Of relevance here, Dr. Sperry opined the time period between the start of CPR on Mr. Rapp (1:46 pm) and when he would have needed to get into the hanging position with pressure on his neck was "to a reasonable degree of medical certainty, no more than about 5 to 7 minutes,

which would have been somewhere between 1339 and 1341 hours." (Dkt. No. 158-18 at 7.) Reviewing the video evidence, Dr. Sperry observed that Mr. Rapp was seen throwing the mattress cover over his door at 1:07 p.m., and it would have taken some number of minutes thereafter to tie a knot around his neck. (*See id.* at 7–8.) From this, Dr. Sperry concludes:

> If Officer Petersen had looked into Mr. Rapp's cell when he walked through the unit at 1325 hours, he would have seen the mattress cover hanging on the inside of the door. And, more likely than not, Officer Petersen would have directly observed Mr. Rapp engaged in aligning himself in the seated position, affixing the ligature around his neck, or some combination thereof.

(*Id.* at 8.) Taking these statements together, Dr. Sperry's opinion is that based on his review of the video and medical evidence, at 1:25 p.m. it would have been possible for Petersen to see the bedsheet hanging on the door (since it was placed there at 1:07), and perhaps to see Rapp placing himself in the seated position, but he would not have seen Rapp hanging/compressing his airway (since in Dr. Sperry's medical opinion, that occurred no earlier than at 1:39 p.m.) This portion of testimony is not clearly excluded by the Court's prior order, as it is based on Dr. Sperry's review of the record evidence and does not call for specialized correctional knowledge. And a reasonable jury could credit Dr. Sperry's testimony and, based on that and other evidence, draw an inference that Petersen's cell check was not sufficiently thorough. Of course, the County can expose any flaws in this testimony on cross-examination (*see* Dkt. No. 255 at 18 n.5), but for summary judgment purposes the Court finds that, together with other evidence, it is sufficient to establish a material question of fact.

The Court disagrees with the County that no reasonable jury could infer negligence from the factual record. As the County notes, the record indicates: Mr. Rapp hung the bedsheet up at 1:07 p.m. (*See* Dkt. No. 89-1 at 324, timestamp 13:07:30, video showing Rapp holding what appears to be a bedsheet and raising it to his door), he was seen returning to his cell around 1:13

p.m., with no movement visible through the cell door window after 1:14 (*id.* at timestamp 13:13:45 to 13:14:06), and per Dr. Sperry's testimony he did not begin hanging himself until 1:39 p.m. To accept Plaintiff's theory would require a jury to draw an inference, that the bedsheet was still visibly hanging or that Rapp was engaged in some pre-hanging activity at 1:25 p.m., but it is not a totally unreasonable inference from the circumstantial evidence. *See United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976) ("circumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred.") To be sure, it is also possible that none of those things are true, that as the County posits, Mr. Rapp could have stopped and re-started his activities and was doing nothing visibly suspicious at 1:25 p.m. (*see* Dkt. No. 357 at 4–6), but there is enough evidence in the record to put the question to a jury.[4]

## IV    CONCLUSION

For the foregoing reasons, the motions for reconsideration (Dkt. Nos. 357, 358) are DENIED, but the Court provides additional reasoning to support its prior Order.

With all outstanding motions resolved and the scope of this litigation significantly narrowed, the Court again strongly encourages the Parties to engage in mediation in good faith in an effort to reach a negotiated resolution.

Dated this 2nd day of April 2025.



David G. Estudillo
United States District Judge

---

[4] Nothing in this Opinion impacts the Court's holding that summary judgment must be granted as to the deliberate indifference claim against Officer Petersen. (*See* Dkt. No. 355 at 58.)